UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL WATSON, INDIVIDUALLY, AND AS FATHER AND NEXT FRIEND OF JOHN WATSON, PPA<br>　　　Plaintiff<br><br>v.<br><br>ELECTROLUX PROFESSIONAL OUTDOOR PRODUCTS, INC.<br>　　　Defendant | CIVIL ACTION NO. 04-11782 DPW |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO PRECLUDE EXPERT TESTIMONY AND FOR SUMMARY JUDGMENT

## INTRODUCTION

This is a product liability action arising from an accident allegedly sustained by the plaintiff, Michael Watson ("Watson"), while he was working as a laborer on the highway construction project known as the Central Artery Project or "Big Dig" in Boston, Massachusetts.  Watson, while standing on a ladder, was allegedly using a Partner K2300 electric power cutter manufactured by the Partner Industrial Products division of the defendant, Electrolux Professional Outdoor Products, Inc. ("Electrolux") to cut off steel rebar that protruded from the 15' to 20' high concrete wall of the tunnel where Watson was working.  After making his last cut, Watson released his finger from the trigger of the saw, and climbed down the ladder holding the saw in his left hand and the rail of the ladder in his right.  When Watson reached the bottom of the ladder, he transferred his grip on the saw and the blade contacted his left leg, causing his injury.

Notwithstanding Watson's acknowledged experience with power saws in general

and his familiarity with the subject power cutter in particular, he claims that his injury was caused by one, or the other, of two separate alleged design defects in the saw, each alleged defect corresponding to a completely different accident scenario.  Initially, Watson claimed only that the power cutter should have been equipped with an electric blade brake — a feature that no other power cutter has — that allegedly would have stopped the blade faster than its normal coast-down time.  More recently, Watson has added a second, quite different theory of design defect; namely, that the K2300 has a defective "trigger lock" that is capable of being inadvertently activated resulting in the possibility that the saw might be accidentally turned on.  Finally, Watson asserts that the saw lacks adequate warnings about the dangers of a coasting blade and the possibility of inadvertent activation.

In support of his claims, Watson relies upon the proposed testimony of a single expert, Leslie N. Wilder, a general-practice engineering consultant doing business from his home as Sabon Industries, Inc.  Wilder's purported qualifications and proposed testimony concerning his blade brake theory were disclosed pursuant to Fed. Rule Civ. P. 26(a)(2) in a report dated September 29, 2005 and in his deposition taken on March 27, 2006.  Wilder disclosed his trigger lock theory in a one-page letter dated March 24, 2006, provided to Electrolux on the last business day before his deposition, and during the course of the deposition itself.

Electrolux now moves to preclude Wilder's testimony and for summary judgment on all of Watson's claims.  As discussed in greater detail below, Watson has failed to demonstrate that Wilder is qualified to offer any opinions concerning the design of the subject power cutter.  Moreover, Wilder's proposed testimony relative to the lack of a

blade brake should be precluded because it is not supported by any reliable engineering methodology. Notably, Wilder never designed or tested his proposed blade brake in a power cutter, the product at issue in this case.

Likewise, Wilder's proposed testimony with regard to the design of the trigger lock, even if allowed notwithstanding its untimely disclosure, is similarly unreliable because his alternative trigger lock represents no more than a "concept" that Wilder never even purported to design or test.  In short, Wilder's opinions are "sheer *ipse dixit*" and would not assist the jury in evaluating the propriety of the power cutter's design. Without Wilder's testimony, Watson cannot prevail on his claims of product defect and, therefore, the Court should enter summary judgment in favor of Electrolux on all of Watson's claims.

Significantly, Watson will be unable to demonstrate either that he was injured by a "coasting" blade, such that his accident might have been caused by the absence of a blade brake, or, alternatively, that he was injured by a blade that was under power after he inadvertently turned on the saw, such that his accident might have been caused by an inadequately designed trigger lock.  Accordingly, unless Watson proves that the power cutter was defective in *both* respects, he will be unable to establish the necessary causal connection between a defect in the saw and his injury.  As Watson cannot show that Wilder's testimony with respect to *both* the blade brake and the trigger lock are admissible, summary judgment must be granted for Electrolux with respect to causation, even if Watson can succeed in demonstrating that Wilder's proposed testimony is admissible as to one of his two alleged design defects.

## ARGUMENT

**I.    To prevail in this case, Watson must establish, through reliable testimony of a qualified expert witness, that the subject power cutter was defective at the time it was sold, and that the defect caused the accident and resulting injuries.**

Massachusetts law, applicable in this diversity case, requires that a product manufacturer anticipate the environments in which its product will be used, and design against the reasonably foreseeable risks attending the product's foreseeable uses in those settings.[1]  A manufacturer cannot, of course, design its product to prevent just one kind of accident, or to be reasonably safe and useful for just one user or one operation.  Rather, the product must be designed with the safety and utility of all foreseeable users and uses in mind, and a particular design option that might make the product safer or more useful in one setting might make it more dangerous or less useful in others.[2]

A plaintiff challenging a product's design must show that the design was "defective" in that as a whole, it presented an unreasonable risk of injury to users.[3]  This is partly a question of the reasonable expectations of the class of consumers for whom the product is designed, and partly one of "social acceptability," involving consideration of such competing factors as "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."[4]

The plaintiff must demonstrate that at the time the product was manufactured, a feasible alternative design was available that would have protected the plaintiff from the

---

[1]  *Back v. Wickes Corp.*, 375 Mass. 633, 640-41, 378 N.E.2d 964 (1978).
[2]  *See Bernier v. Boston Edison Co.*, 380 Mass. 372, 378-79, 403 N.E.2d 391 (1980).
[3]  *Back, id.* at 642; *Bernier*, 380 Mass. at 378.
[4]  *See Back*, 375 Mass. at 642; *Bernier*, 380 Mass. at 378.

accident that occurred, without unduly interfering with the overall safety or utility of the product, or unreasonably increasing its cost.[5]  Proof of a safer alternative design is an essential element of a plaintiff's design-defect case under Massachusetts law—it is "a *sine qua non* for the imposition of liability."[6]

Since the knowledge on which evaluation of these matters will rest is likely to be technical and specialized, and not within the ordinary experience of a jury, the plaintiff is required to present competent expert testimony as to "the precise nature of the alleged design defect and the causal relationship between the defect and the plaintiff's accident."[7] And even with such expert assistance, courts are appropriately cautious about using a brief trial and a lay jury to re-design a complex product that may reflect years of engineering work, experience in the field, and gradual evolution of internal and industry-wide design standards.  A courtroom remains always "a poor substitute for a design office."[8]

An expert witness offered in support of a claim of design defect must (1) be qualified as an expert, (2) offer testimony that is relevant to the disputed facts in the case, and is likely to assist the jury in deciding the particular issues of the case, and (3) offer testimony that "has a reliable basis in the knowledge and experience of the relevant

---

[5]  *See Colter v. Barber-Greene Co.*, 403 Mass. 50, 57, 525 N.E.2d 1305 (1988) (quoting *Uloth v. City Tank Corp.*, 376 Mass. 874, 881, 384 N.E.2d 1188 (1978)); *Fahey v. Rockwell Graphic Systems, Inc.*, 20 Mass. App. Ct. 642, 648, 658, 482 N.E.2d 519, *rev. denied*, 396 Mass. 1103 (1985); *Kotler v. American Tobacco Co.*, 926 F.2d 1217, 1225 (1st Cir. 1990), *vacated on other grounds*, 505 U.S. 1215 (1992).

[6]  *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 26 (1st Cir. 2004); *Kotler*, 926 F.2d at 1225.

[7]  *Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 104, 520 N.E.2d 1315 (1988).

[8]  *See, e.g., Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 596 (Pa. 1987) (Hutchinson, J., dissenting).

discipline."[9]  Here as elsewhere, it is the party seeking to offer the testimony who bears

the burden of establishing its admissibility, by a preponderance of proof.[10]

**II.    In this case, where Watson concedes he does not know how his accident occurred, and has advanced two alternative theories as to how the accident was caused by a design defect in the power cutter, he must offer sufficient evidence to prove both of these theories in order to establish causation.**

Watson contends that he injured himself after he cut a piece of rebar some ten feet

above the floor, climbed down from the fifth or sixth rung of the aluminum ladder he was

using, and prepared to carry the cutter by its rear handle with his left (non-dominant)

hand.[11]  Watson's claims in this case are premised on the essential assumption that the

cutter's dull-edged abrasive "cutter wheel" was turning when the accident occurred —

otherwise, it is undisputed, he could not have been hurt.  But Watson admits he does not

know whether in fact the wheel was turning, either as he was descending the ladder or

when he was injured.[12]  He also does not know whether, if it was turning, the wheel was

"coasting" to a stop, as it does for some twelve seconds after a user releases the trigger-

type power switch (a fact Watson understood from his extensive experience with the

cutter), or whether the wheel was under power because he somehow unintentionally

activated the power trigger with his left hand while preparing to carry the tool.[13]

Seeking to account for both of these possible scenarios, Watson contends that in

either case, the cause of the accident was a defect in the design of the power cutter.  If the

---

[9]  *See* Fed. R. Evid. 402, 702. *See generally, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 156, 119 S.Ct. 1167 (1999) (discussing *Daubert*'s applicability to admissibility of expert engineering testimony in product liability case); *Cipollone v. Yale Industrial Products, Inc.*, 202 F.3d 376, 380 (2000) (same).

[10]  *Daubert, id.* at n.10.

[11]  *See* Electrolux's Statement of Undisputed Facts ("U.F."), ¶¶ 16-18.

[12]  *See* U.F. ¶ 20, 22.

[13]  *See* U.F. ¶¶ 7, 20, 22.  Watson's expert, Leslie Wilder, has likewise concluded that the evidence does not permit any reasonable engineering determination as to whether the cutter wheel was coasting or under power.  *See* U.F. ¶ 71.

cutter wheel was coasting, Watson says, the cutter was defective in that it did not incorporate a "motor brake" (also referred to as a "blade brake") to reduce the stopping time of the cutter wheel after the power trigger is released.  If the cutter wheel was under power, on the other hand, the defect was that the locking button for the power trigger, an important safety feature that must be separately pressed before the trigger can be used, should have been "redesigned" in one of several possible ways.[14]

As Watson recognizes, the theory that he was injured by a coasting blade and by a powered blade are inconsistent explanations of how the accident occurred.  Watson's expert concedes, as he must, that a motor brake would have done nothing to prevent or mitigate the accident if the cutter was under power, and could only arguably have made a difference if at the time of the accident the power trigger had just been released, and the cutter wheel had been "coasting" for more than two seconds (the time it would putatively take a motor brake to stop the blade) but less than twelve seconds (because by that time, under the existing design, it would have stopped entirely).  Conversely, a different locking-button design could only arguably have made a difference if the cutter was under power when the accident occurred.[15]

Given Watson's conceded uncertainty about how he was injured, in order to prove causation he would need to show that the power cutter was defectively designed in _both_ of the respects he alleges, so that whichever way the accident happened, it was the result of a defect in the power cutter.  A plaintiff who cannot establish precisely how an

---

[14]  As explained below, Wilder merely proposes several "concepts or approaches" for an alternative trigger-lock design, none of which he has actually designed or tested.

[15]  _See_ U.F. ¶¶ 75-76.  Watson's expert is forced to confront still another possible accident scenario, one equally unsupported by any actual evidence as to what occurred: that Watson unintentionally re-activated the cutter at some point after his cut—presumably during the process of shifting his grip on the handles—and then released the power trigger, starting a new twelve-second coasting period, during which the accident occurred.  This speculative theory, like the others, necessarily depends on proof that the power cutter was defective in both of the respects alleged.  _See_ U.F. ¶ 71-72.

accident occurred is not necessarily barred from maintaining tort or warranty claims such as those asserted by Watson here, so long as he can show a greater likelihood that the accident was "due to causes for which the defendant was responsible than from any other cause."[16]  If the defendant could be found responsible for only one of the possible causes, not both, then the defendant is entitled to summary judgment.[17]  This is because if a jury were satisfied that one of two possible conditions caused an accident, but the jury could not determine from the evidence which of the two it was, and the defendant was responsible only for one of the two possibilities, then it simply could not rationally be said that the defendant's negligence caused the condition that resulted in the accident, and the defendant cannot be liable.[18]

### III.    Watson has failed to show that his proposed expert is qualified to offer expert testimony as to the design of a power cutter such as this one, having no background, experience or training with such tools.

A witness is qualified to provide expert testimony only if he has the "knowledge, skill, experience, training, or education" in the relevant field of expertise, such that his proffered opinions are likely to be of assistance to the jury.[19]  The witness's qualifications must "relate to the subject matter of the proposed testimony."[20]  Experience gained in litigation is entitled to little if any weight.[21]

---

[16]  *Carey v. General Motors Corp.*, 377 Mass. 736, 740, 387 N.E.2d 583 (1979). *See also, Solimene v. B. Grauel & Co., K.G.*, 399 Mass. 790, 797-798, 507 N.E. 2d 662 (1987).
[17]  *Id.* at 741 & n.1. *See e.g., Forlano v. Hughes*, 393 Mass. 502, 507-508, 471 N.E.2d 1315 (1984).
[18]  *Id.* at 743-44.  Watson's expert assumes this burden, recognizing the uncertainty about how the accident happened, and therefore indicating that "both" of the design changes he proposes would have been necessary to prevent or mitigate Watson's injury.  *See* U.F. ¶ 77.
[19]  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589-592.
[20]  *Berry v. Crown Equipment Corp.*, 108 F.Supp. 2d 743, 749 (E.D. Mich. 2000); *and see Polaino v. Bayer Corp.*, 122 F.Supp. 2d 63, 68-69 (D. Mass. 2000) (excluding chemist's opinion that film processor was defective where he had no knowledge relative to design of machinery at issue).
[21]  *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying"), *cert. denied*, 493 U.S. 1073 (1990).

Watson's proposed expert, Leslie Wilder, is precisely the sort of "all-purpose engineer" and litigation professional whose testimony courts have viewed skeptically.[22] Wilder is a generalist mechanical engineer whose work is essentially limited to consulting for lawyers in litigation, from which he derives essentially all of his earned income.[23]  He holds himself out as an expert on a virtually unlimited range of products, as well as a wide range of different subjects such as slip-and-fall cases, accident reconstruction, "human factors" and "cumulative trauma" disorders.[24]  He has never designed any type of power saw, including a power cutter; never used a power cutter, except that he may have picked one up once; never worked in the power-tool industry; and never published any article on the subject of such tools.[25]  He has never designed a motor brake, or tested a power cutter with a brake.[26]  An electric motor brake is, obviously,  an electrical device, not a mechanical one, and even in the litigation context, the issues on which Wilder consults are, he concedes, "mostly mechanical," not electrical.[27]  And he has never designed a trigger lock, or tested a power cutter with a trigger lock.[28]

The design of a complex power tool such as the power cutter at issue in this case is not a mere matter of the interaction of simple physical mechanisms, where the wariness

---

[22]  *See Tokio Marine & Fire Ins. Co. v. Grove Manuf. Co.,* 958 F.2d 1169, 1175 (1st Cir. 1992) (upholding district court's exclusion of testimony by professional expert who had no experience or qualifications that would permit him to opine on the design of the crane at issue); *Carifio v. Benetton Sportsystem USA, Inc.*, 2005 WL 1527801,*4 (D. Mass. 2005) (Woodlock, J.) (unpublished) (acknowledging concerns, but permitting expert to testify where alleged defect involved "basic principles of physics and engineering"); *Chapman v. Bernard's, Inc.,* 167 F. Supp. 2d 406, 421 (D. Mass. 2001) (same).
[23] *See* U.F. ¶ 26, 28.
[24] *See* Wilder CV, Ex. D; U.F. ¶ 27; Wilder internet profile, Ex. K.
[25] *See* U.F. ¶ 29, 34-35.
[26] *See* U.F. ¶¶ 30-31.
[27] Wilder Dep., Ex. F at 5; Wilder report, Ex. D at 3-5.
[28]  *See* U.F. ¶¶ 32-33.

against an all-purpose engineer might be overcome.[29]  Wilder's proposed expert

testimony should be excluded in its entirety based on his lack of demonstrated

qualifications.[30]

IV.     **Plaintiff's proffered expert testimony in support of the theory that the placement of the trigger lock renders the power cutter defective is so unreliable that it should be excluded.**

As is by now well recognized, Rule 702 of the Federal Rules of Evidence

"imposes a special obligation upon a trial judge to ensure that any and all [expert]

testimony is not only relevant, but reliable."[31]  Where the "factual basis, data, principles,

methods or... application" of methods underlying an expert's proposed testimony "are

called sufficiently into question,... the trial judge must determine whether the testimony

has a reliable basis in the knowledge and experience of the relevant discipline."[32]  The

objective of *Daubert*'s gatekeeping requirement "is to make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field."[33]  The issue "is not only how objectively reliable the

evidence is, but also the legitimacy of the process by which it is generated."[34]

In the absence of any of the process or methodology normally underlying an

opinion that is truly grounded in engineering science, an expert's opinion amounts to

---

[29] *Cf. Carifio, Chapman*, supra.

[30] *See, e.g., Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472, 476-77 (1st Cir. 1997) (upholding preclusion of proposed expert in automobile design defect case where, *inter alia*, witness lacked sufficient expertise "in relevant areas such as the design or manufacture of automobiles or their components"); *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1175 (1st Cir. 1992) (same).

[31] *Kumho Tire*, 526 U.S. at 147 (quoting *Daubert*).

[32] *Kumho Tire, id.* at 149.

[33] *Id.* at 152.

[34] *U.S. v. Hines*, 55 F. Supp.2d 62, 65 (D. Mass. 1999).

"sheer *ipse dixit*."[35]   Courts are appropriately wary of "expert testimony that offers only a bare conclusion" or "nothing but a bottom line," given the danger of "argument... masquerading as expert opinion."[36]   Likewise, opinions formed solely in the context of litigation should be subjected to extra scrutiny.[37]

Whether a theory "can be (and has been) tested" is a "key" factor in assessing whether the theory is reliable as expert scientific testimony.[38]   It is "generating hypotheses and testing them to see if they can be falsified... [that] distinguishes science from other fields of human inquiry."[39]   For similar reasons, investigation and testing done *after* an expert has already reached the opinion he seeks to offer in a case is an indicator of unreliability.[40]   In a product liability case, the required engineering analysis includes consideration of the overall benefits and risks, from the user's and society's point of view, of the existing design, and a careful comparison with the benefits and risks of any proposed alternative design.   An expert who fails to devote genuine engineering consideration to all of these factors should have his testimony excluded.[41]

In this case, plaintiff's proposed expert, Wilder, says that his initial evaluation of the design of the power cutter after he was retained in this case included at least passing

---

[35] *See Cipollone*, 2000 WL 60912 at **2.

[36] *SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999); *Sultis v. General Motors Corp.*, 690 F.Supp. 100, 103-104 (D. Mass. 1988); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).

[37] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.)

[38] *Daubert,* 509 U.S. at 592 n.9.

[39] *Id.* (citations omitted).

[40] *See Perry v. U.S.*, 755 F.2d 888, 892 (11th Cir. 1985).

[41] *See Quintana-Ruiz v. Hyundai Motor Corp.*, 2002 WL 1941486 at *8 (1st Cir. June 11, 2002) (product design involves a "trade off" between risks and benefits to consumers, and a plaintiff may prevail "only if the challenged design aspect does more harm than good, overall, for the consumer"); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869-70 (7th Cir. 2001) (affirming exclusion of expert on design of forklift, based on lack of testing to support theory); *Berry*, 108 F. Supp.2d at 754-55 (same); *Demaree v. Toyota Motor Corp.*, 37 F. Supp.2d 959, 966 (W.D. Ky. 1999) (excluding opinion of expert who failed to address potential risks of proposed alternative design); *Dancy v. Hyster Co.*, 127 F.3d 649, 653 (8th Cir. 1997) (affirming exclusion of testimony where expert "assumed away" potential problems with alternative design).

consideration of the locking button for the power trigger, which, he does not dispute, is an important safety feature, designed to prevent unintentional activation of the cutter. Wilder attempted to manually actuate the locking button and power trigger on an exemplar cutter, and found it "difficult to impossible to accidentally actuate the trigger" in circumstances such as those described by Watson. Wilder thus found no reason to suppose that the trigger lock was improperly designed, and he did not mention it in his September 2005 expert report.[42]

Some time later, Wilder watched a videotaped demonstration prepared by the defendant, which depicted what Wilder assumed (incorrectly) was an operator using the same hand to activate both the locking button and the power trigger, while holding the cutter by the rear handle in one hand, as Watson says he was doing at the time of his accident.[43] In fact, for purposes of the demonstration and under controlled test conditions, the trigger lock had been deliberately disabled by the defendant's engineers, so that the user in the videotape was activating the power cutter with only the power trigger.[44] In other words, the videotape did *not* show that unintentional one-handed activation of both the locking button and the power trigger was possible, as Wilder thought it did.[45] Nonetheless, based solely on this mistaken assumption, Wilder formulated a new hypothesis: that it was "possible" Watson's accident occurred when he unintentionally activated the locking button and power trigger while holding the cutter in his left hand, at his side.[46]

---

[42] *See* Wilder Dep., Ex. F at 144-146.
[43] *See* U.F. ¶ 52.
[44] *See* U.F. ¶ 55.
[45] *See* U.F. ¶ 53, 55.
[46] *See* U.F. ¶ 53, 56.

To "test" this theory, Wilder attempted to replicate such unintentional one-handed activation himself on his exemplar cutter.[47]  He found it "almost impossible" to do with his bare hand, but possible while wearing a work glove.[48]  (There is no evidence that Watson was wearing gloves at the time of the accident, and the evidence suggests he was *not*.)[49]  Wilder supposes that with an experienced user of the cutter, one-handed activation of the locking button and power trigger might become "second nature" or "instinctive," but he offers no support for this notion other than his own conjecture.[50]

Wilder had never before this case held the opinion that a trigger lock on any power cutter or other such tool was defective, and his thinking about the issue now was not informed by any research or data suggesting that such unintentional one-handed two-switch activation can occur in real-world use of a power cutter, or that such events have led to any — much less a significant number of — accidents.[51]  Still, Wilder proceeded to consider some "concepts or approaches" for redesigning the trigger lock: "putting it on top of the handle," inserting a "barrier" around the button, or "something that required a simultaneous press of two fingers in another area."[52]  These "approaches" have never been reduced to even a drawing, let alone a model or prototype that could be subjected to any engineering analysis or testing.[53]  Indeed, Wilder acknowledges that in this respect his theory that the power cutter should be re-designed is purely "artificial."[54]

---

[47]  *See* Wilder Dep., Ex. F at 144-145.  Wilder never inspected the power cutter Watson was using when he injured himself—to determine, for example, whether the trigger lock on that cutter was working properly at the time of the accident—because the cutter was not preserved after the accident.  *See* U.F. ¶ 39.
[48]  Wilder Dep., Ex. F at 86-88, 144-146.
[49]  Watson Dep., Ex. A at 79.
[50]  *See* Wilder Dep., Ex. F at 145.
[51]  *See* U.F. ¶ 57.
[52]  *See* U.F. ¶ 59.
[53]  *See* U.F. ¶ 60.
[54]  *See* U.F. ¶ 61.

Having stopped at the "concept" stage, Wilder necessarily did not ever test any of his "approaches" to redesigning the trigger lock to see whether they, in fact would work in the real world, without "adverse consequences" to the product in terms of safety and/or utility.[55]  As noted, Wilder has no meaningful experience with using power cutters, and he certainly cannot recall ever using one with a different trigger-lock design from the subject cutter.  Nor did he subject his redesign "concepts" to any kind of peer review by, for example, other engineers.[56]

As noted, Watson failed to disclose Wilder's "trigger lock" theory until late March 2006, some six months after the deadline for plaintiff's expert disclosures in this case, and on the last business day before Wilder's scheduled deposition.  For this reason alone, the trigger-lock opinion should be excluded.  Furthermore, even when the theory was disclosed, Wilder's written report did not purport to articulate any alternative design beyond suggesting in passing that the device should have been "recessed, guarded, or positioned away from an operator's normal grip on the handle."[57]  And as is evident from the discussion above, the proposed testimony, even as elaborated in Wilder's deposition, is not founded on any reliable engineering methodology.  Nor is it based on any valid investigation or analysis, or even serious consideration, of the factors a jury would be required to consider: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."[58]

---

[55] *See* U.F. ¶ 62; *Back,* 375 Mass. at 642.
[56] *See* U.F. ¶ 64.
[57] Wilder letter, Ex. L.
[58] *See Back*, *id* at 642; *Bernier*, 380 Mass. at 378.

14

Instead, the proposed opinion, which Wilder developed solely for this litigation, is based on nothing more than (a) his factually mistaken interpretation of a videotape produced by the defendants, (b) his limited personal experimentation with an exemplar cutter, and (c) his unscientific and inadmissible speculation about what might become "second nature" or "instinctive" to "someone that handled this saw all the time."[59] Even if there were some engineering basis for this "overfamiliarity" thesis, and even if Wilder's concepts for relocating or reconfiguring the trigger lock on the rear handle of the cutter were sufficiently concrete even to merit engineering consideration, they do not meaningfully or scientifically address the problem Wilder purports to have identified. Accepting for the sake of argument that multiple repeated uses of the cutter, and engagements of the locking button and power trigger, should be assumed to breed familiarity and thus unconsciousness in their use, the same issue would presumably exist with any of alternative designs Wilder imagines.

Because Wilder is not qualified as an expert with respect to the subject power cutter, and because his proposed trigger-lock opinion is not the product of any legitimate engineering methodology, the proposed testimony should be excluded.[60] Since expert testimony is essential to Watson's trigger-lock theory of defect, he should be barred from pursuing it. And since success in proving this defect is, for the reasons set forth in Section II above, essential to Watson's case overall, Electrolux is entitled to summary judgment.

---

[59] Wilder also suggests in passing, in his deposition testimony, that "the weight of the saw" might "cause the interlock button to be depressed." Wilder Dep., Ex. F at 145. But this simply makes no sense on its face: when a user holds the power cutter in one hand by the rear handle, the button is below the user's hand, and the weight of the power cutter if anything moves the button away from the hand, not toward it.

[60] *See Cipollone,* 202 F.3d at 380; *and see Bogosian*, 104 F.3d at 479 (district court properly excluded proposed engineering expert's testimony based on inadequate efforts to investigate applicability of his general design theory to the facts of the case).

This same result is also warranted by two further considerations, as set forth below: that Wilder's proposed opinion that the power cutter should have been redesigned with a motor brake is likewise unreliable and inadmissible, and that plaintiff's "failure to warn" theory contains similar deficiencies that are fatal to his claims.

**V.    Wilder's proffered expert testimony on the "motor brake" theory is likewise insufficiently reliable to be admissible.**

Just as Wilder's proposed testimony concerning the design of the trigger-lock button is not based on adequate engineering methodology to be considered even minimally reliable and admissible, so too Wilder has offered no sufficient scientific basis for his other opinion, that the power cutter was defective for lack of a motor brake. Evaluation of this theory, as a matter both of science and Massachusetts law, must involve fair consideration of the likelihood that the range of foreseeable users of this model power cutter would unwittingly encounter a coasting cutter wheel. Without such evidence, a jury could not rationally determine that such a scenario was an unreasonable risk that rendered the power cutter defective. Wilder has conducted no research or investigation into this question, and there is no basis on which the jury could rationally consider it.[61]

Furthermore, Wilder has admittedly done no research or investigation, and can offer no data, as to the likelihood that a user could actually be injured, during the twelve-second coast-down period, by contact with the sort of dull-edged abrasive wheel that is commonly used in the tool—and that Watson was using at the time of the accident.[62] Indeed, there is no evidence in the record to suggest that such injuries have ever occurred,

---

[61]  *See* U.F. ¶ 41.
[62]  *See* U.F. ¶ 15.

other than possibly in this case, much less that they are sufficiently frequent to warrant re-designing the cutter. Indeed, what evidence there is is to the contrary: Electrolux has presented uncontradicted testimony, for example, that it knows of no claims alleging the danger of a coasting blade on its power cutters such accident involving its power cutters.[63]

Wilder reached his conclusion that a motor brake should have been added to the cutter solely for purposes of this litigation, and solely with reference to Watson's accident.[64] In effect, Wilder's conclusory "reasoning" is that because Watson was injured, because the injury *might* have resulted from a coasting wheel, and because some other kinds of power tools have various kinds of braking mechanisms (while others do not), the subject cutter could and should likewise have had one. Here again, Wilder has done no design of a motor brake for the cutter, has developed no model or prototype, has engaged in no testing of a motor brake on a power cutter, and has not submitted his concept for review or evaluation by any other engineer.[65] No other power cutter (a saw used by professionals to cut steel or masonry)[66] with a motor brake is on the market,[67] and to the extent it may be relevant that some other kinds of tools have motor brakes, Wilder has never obtained, analyzed or tested any such tool, other than running a "miter saw" (a differently designed stationary saw used for multiple repetitive cuts[68]) for purposes of determining how quickly its motor brake stopped its blade. Wilder is thus not in a position to suggest to the jury—and indeed never does—that any such other tool

---

[63] *See* Gustafsson Aff., Ex. E ¶ 6; U.F. ¶ 42.
[64] *See* U.F. ¶ 44.
[65] *See* U.F. ¶ 49-50.
[66] *See* Gustafsson Aff., Ex. E ¶ 7; U.F. ¶ 47.
[67] *See* Gustafsson Aff., Ex. E ¶ 4; U.F. ¶ 43.
[68] *See* Gustafsson Aff., Ex. E ¶ 7; U.F. ¶ 47.

actually embodies an overall safer alternative design for the subject power cutter.  Nor has Wilder done any analysis or testing that would enable him to opine, or to assist the jury in determining, whether a motor brake would interfere with the overall safety and utility of the power cutter's design.[69]

Under these circumstances, Wilder's opinion amounts to "sheer *ipse dixit*."[70]  His testimony should not be admitted, and cannot properly support plaintiff's motor-brake theory.[71]  Because expert testimony here too is essential, this theory, and Watson's claims against Electrolux overall, must fail as a matter of law.

## VI.    The deficiencies in plaintiff's case are not cured by his addition of a warning theory.

Wilder also seeks to opine that the power cutter should have had a different warning about the putative hazards of a coasting cutter wheel and of unintentional one-handed two-button activation.[72]  An expert's proposed opinion concerning proper warning "design" is subject to the same requirements of reliability as his opinions concerning other alleged design defects.[73]  As with Wilder's two design-defect theories, given that Watson cannot say (or otherwise prove) whether the accident was caused by a coasting cutter wheel or one under power, in order to establish the required causal connection between any failure to warn and his accident, he must prove that additional warnings on *both* of the suggested subjects were necessary to render the cutter reasonably safe.

---

[69]  *See* U.F. ¶ 50.
[70]  *See Cipollone*, 202 F.3d at 380.
[71]  *See Cipollone, id.*; *and see Bogosian*, 104 F.3d at 479 (engineering expert properly excluded based on inadequate efforts to investigate applicability of general design theory to facts of case).
[72]  *See* U.F. ¶ 66.
[73]  *See Milancowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 541 (D.N.J. 2001); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001).

Wilder acknowledges that he has not bothered even to write down what additional warnings he believes should have been incorporated, much less to re-design the tool's warning labels so as to incorporate them.[74]  Such failure to propose specific alternative instructions, by itself, renders an expert's opinion on warnings unreliable and inadmissible.[75]

An expert must also have a valid scientific basis for concluding that different warnings would have the desired effect of preventing accidents such as the one that occurred.[76]  In this case, Wilder knows of no studies or data indicating the effect that warnings either about the danger of a coasting cutter wheel or about the putative risk of inadvertent starting might have on users of the tool.[77]  Moreover, Watson acknowledges that he fully understood that the cutter wheel would continue to coast for several seconds after the power trigger was released, that if he contacted the wheel he could be injured, and that he therefore had to be careful to keep the cutter away from his body even when it was not under power.[78]  Under these circumstances, there is no scientific basis—as Wilder expressly acknowledges—on which the expert could conclude that a different warning on this subject would have made any difference to Watson under the circumstances he was in prior to the accident.[79]

---

[74]  *See* U.F. ¶ 66.

[75]  *See, e.g., Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 538-39 (7th Cir. 2000) (affirming grant of summary judgment to manufacturer of forklift based upon exclusion of opinion relative to allegedly defective warnings; expert's failure to draft alternative warning made opinion unreliable); *Jaurequi v. Carter Manufacturing Co., Inc.*, 173 F.3d 1076, 1084 (8th cir. 1999) (upholding district court's exclusion of opinion relative to inadequacy of warnings on combine where expert's failure to propose alternatives made his testimony unreliable and inadmissible)

[76]  *See, e.g., Bourelle*, 220 F.3d at 538-39 (upholding district court's exclusion of opinion relative to warnings because expert had failed to test alternative); *Jaurequi*, 173 F.3d at 1084 (holding that expert's failure to test efficacy of unspecified alternative warning made it inadmissible).

[77]  *See* U.F. ¶ 68.

[78]  *See* U.F. ¶ 7.

[79]  Specifically, Wilder's testimony about a possible warning on the saw against the danger of a coasting cutter wheel is that such a warning "might or might not have been helpful.  I can't tell you that [it would

By the same token, there is no rational basis on which a jury could conclude that Electrolux had a duty to warn users such as Watson about the coasting-blade phenomenon, or that the absence of a coasting-blade warning caused Watson's accident. Even where a manufacturer has a duty to warn about a risk associated with its product because it is generally foreseeable that users may not be aware of the risk, failure to do so cannot as a matter of law be the cause of an injury suffered by a user who is already fully aware of the risk, such that no further information would conceivably have made a difference.[80]

For these additional reasons, Electrolux is entitled to summary judgment on all of Watson's claims.

## CONCLUSION

Expert testimony is necessary in this case both as to "the precise nature of the alleged design defect[s] and the causal relationship between the defect[s] and the plaintiff's accident."[81]  Since the cause of Watson's injury is unknown, and because he will be unable to present admissible expert testimony to prove *both* of his alleged defects, he will be unable to show "that there was a greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause."[82]  Summary judgment should be granted in favor of Electrolux.

---

have helped]."  *See* U.F. ¶ 69.

[80] *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d at 29; *Slate v. Bethlehem Steel Corp.*, 400 Mass. 378, 384, 510 N.E.2d 249 (1987).

[81] *Goffredo,* 402 Mass. at 104.

[82] *Carey,* 377 Mass. at 740; *Forlano*, 393 Mass. at 507.

ELECTROLUX PROFESSIONAL OUTDOOR
PRODUCTS, INC.,
By its Attorneys,


/s/  David A. Barry
David A. Barry, BBO No. 031520
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737
(617) 227-3030
barry@srbc.com


/s/  Suleyken D. Walker
Suleyken D. Walker, BBO No. 654933
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737
(617) 227-3030
walker@srbc.com


DATED: May 19, 2006

## CERTIFICATE OF SERVICE


I, David A. Barry, hereby certify that this document, filed through the ECF
system, will be sent electronically to the registered participants as identified on the Notice
of Electronic Filing (NEF) on May 19, 2006.


/s/ David A. Barry
David A. Barry
barry@srbc.com


377566