UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL WATSON, INDIVIDUALLY, AND AS FATHER AND NEXT FRIEND OF JOHN WATSON, PPA<br>　　　Plaintiff<br><br>v.<br><br>ELECTROLUX PROFESSIONAL OUTDOOR PRODUCTS, INC.<br>　　　Defendant | CIVIL ACTION NO. 04-11782 DPW |

**DEFENDANT, ELECTROLUX PROFESSIONAL OUTDOOR
PRODUCTS, INC.'S, STATEMENT OF UNDISPUTED
FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to United States District Court Local Rule 56.1, the defendant,

Electrolux Professional Outdoor Products, Inc. ("Electrolux") submits, in support of its

motion to preclude expert testimony and for summary judgment, the following statement

of material facts as to which there exists no genuine dispute.

**UNDISPUTED MATERIAL FACTS**

**Background**

1.　　The accident that is the subject of this action occurred on December 5,

2001, when the plaintiff, Michael Watson ("Watson"), was injured while allegedly using

a Partner K2300 electric power cutter.  At the time of his accident, Watson was working

as a laborer for Modern Continental on the highway construction project known as the

Central Artery Project, or "Big Dig," in Boston, Massachusetts.  Amended Complaint at

¶¶ 5 and 6.

2.      The defendant, Electrolux Professional Outdoor Products, Inc. ("Electrolux") allegedly designed, manufactured and distributed, through its Partner Industrial Products division ("Partner"), the Partner K2300 power cutter involved in Watson's accident.  Amended Complaint at ¶ 6.

3.      Before his accident, Watson had owned and operated various types of power saws, which he used while working as a cabinet maker in the late 1980's.  After he became a construction worker in 1998, Watson learned to operate the type of power cutter allegedly involved in his accident.  Watson Dep., Ex. A at 22-30, 44-48, 68-72.

4.      During the three to four weeks immediately prior to Watson's accident, he regularly used the power cutter to cut "hundreds" of pieces of steel rebar on the job.  Watson Dep., Ex. A at 70-74.

5.      As of the time of the accident, Watson knew how to operate the power cutter and felt comfortable using it.   Watson Dep., Ex. A at 72-73.

6.      Watson never read the owner's manual for the power cutter before his accident.  Watson Dep., Ex. A at 77.

7.      Before his accident, Watson was aware that the blade of the power cutter did not stop as soon as he released his finger from the trigger.  Watson understood that the blade continued to turn or "coast" for some period of time before stopping.  Watson also knew that he could be hurt if the still-spinning blade contacted his body, and that he had to be careful to keep the coasting blade away from him even if it was not under power.  Watson Dep., Ex. A at 74-76.

8.      Watson is right-handed.  Watson Dep., Ex. A at 67.

**The Power Cutter**

9.      The Partner K2300 power cutter is an electrically powered, hand-held saw designed to cut masonry or steel.  An exemplar Partner K2300 power is shown on the cover of the Partner K2300 Illustrated Parts List, previously produced to plaintiff in discovery, Ex. B and in a photograph taken of Watson holding an exemplar K2300 and marked Ex. 7 at his deposition, Ex. C; Watson Dep., Ex. A at 109-110; Wilder report, Ex. D at pp. 2-3; Gustafsson affidavit, Ex. E at ¶ 9.

10.      The K2300 is generally used by professional users, mostly in the construction industry.  Wilder Dep., Ex. F at 103-104; Gustafsson affidavit, Ex. E at ¶ 7.

11.      The rear handle of the K2300 is equipped with a finger-operated switch or "trigger" that can only be actuated if a separate lock button, or "trigger lock," located forward of the trigger at the front of the rear handle, is depressed.  The trigger lock appears as item 3 and the trigger appears as item 4 in a photograph of a K2300 taken from the Partner Owner's Manual and previously produced to plaintiff in discovery, Ex. G at 1; Wilder report, Ex. D at 3.

12.      In order to turn the saw on, the operator must make two independent movements, each in a different direction.  The operator must first depress the trigger lock button.  Only when the trigger lock is depressed is the operator able to depress the trigger to turn on the saw.  Watson Dep., Ex. A at 76-77; Wilder report, Ex. D at 3.

13.      Use of the saw requires the operator to hold it with both hands.  To use the saw, the operator holds his left hand on the front handle nearest the blade and his right hand on the rear handle where the trigger and trigger lock are located.  Watson Dep., Ex. A at 109-112; photograph taken of Watson holding an exemplar K2300 and marked Ex. 7

at his deposition, Ex. C; Watson Dep., Ex. A at 109-110; Partner Safety Manual,

previously produced to plaintiff in discovery, Ex. H at 8.

## Watson's Accident

14.     On December 5, 2001, Watson was using the power cutter to cut rebar that

protruded from the concrete wall of a tunnel for the Central Artery Project.  He had been

doing this job for three to four weeks prior to his accident.  Amended Complaint at ¶ 5;

Plaintiff's Answers to Defendant's Interrogatories, Ex. I at Ans. No. 2; Watson Dep., Ex.

A at 67-68, 70-74.

15.     At the time of Watson's accident, the power saw was equipped with a 12"

abrasive blade used for cutting steel.  An abrasive blade as no "teeth."  The blade that

was on the saw at the time of Watson's accident looks like the one shown in a photograph

marked Exhibit 1 to Watson's deposition, Ex. J; Plaintiff's Answers to Defendant's

Interrogatories, Ex. I at Ans. No. 2; Wilder report, Ex. D at 2; Watson Dep., Ex. A at 80-

81; Gustafsson affidavit, Ex. E at ¶ 8.

16.     The rebar Watson was cutting was spaced about three feet apart and ran

from the floor of the tunnel to the ceiling, a distance of between 15' and 20'.  In order to

cut the rebar above him, Watson stood on a 10 to 12 foot high aluminum ladder that was

propped against the concrete wall.  After Watson cut rebar in a particular section, he

would climb down the ladder holding the saw before moving the ladder to a different

location.  Plaintiff's Answers to Defendant's Interrogatories, Ex. I at Ans. No. 3; Watson

Dep., Ex. A at 89-93.

17.     Watson was standing on the fifth or sixth rung of the ladder when he cut

rebar that was about 10' above the floor and to his left.  When he made the cut, his left

hand was on the front handle of the saw and his right hand on the rear handle. Watson released his finger from the trigger, changed the position of his left hand on the front handle, reached across his body with his right hand and felt the cut to make sure that it was flush with the wall. Watson then changed the grip of his left hand on the front handle a second time and started climbing down the ladder, one step at a time, with his right hand holding the rail of the ladder and his left hand still on the front handle of the saw. Plaintiff's Answers to Defendant's Interrogatories, Ex. I at Ans. No. 3; Watson Dep., Ex. A at 93-103; photograph of Watson holding an exemplar K2300 and marked Ex. 7 at his deposition, Ex. C; Watson Dep., Ex. A at 93-110.

18.     When Watson reached the bottom of the ladder, he momentarily placed his right hand on the front handle of the saw and then transferred his left hand from the front to the rear handle in order to walk with the saw to the next location. Immediately after doing so, the saw blade came in contact with his left leg resulting in his injury. Watson Dep., Ex. A at 94-95, 103-105, 111-116.

19.     Watson was at the "bottom" or "base" of the ladder when the blade contacted his leg. Watson Dep., Ex. A at 89, 95, 102-103, 115-116.

20.     Watson does not know whether the blade was still spinning as he was going down the ladder. Watson Dep., Ex. A at 114.

21.     Watson does not know how much time elapsed between when he released his finger from the trigger after making his last cut and when the blade contacted his leg. Watson Dep., Ex. A at 105.

22.     Watson does not know whether he reactivated the saw between the time he released his finger from the trigger after making his last cut and when his accident

occurred.  Watson Dep., Ex. A at 114.

23.    Watson contends that the power cutter is "dangerous and defective in that,
when it was manufactured, it was not equipped with an adequate braking mechanism to
stop the rotating blade, it was not equipped with a mechanism that would effectively
protect against inadvertent activation and it lacked adequate warnings to inform the
Plaintiff of the particular risks associated with the use of the saw."  Plaintiff's Answers to
Defendant's Interrogatories, Ex. I at Ans. No. 5.

24.    There were no witnesses to Watson's accident.  Plaintiff's Answers to
Defendant's Interrogatories, Ex. I at Ans. No. 16; Watson Dep., Ex. A at 118.

25.    Watson does not know what happened to the saw involved in his accident
and never saw it after the accident.  Watson Dep., Ex. A at 120.

### Plaintiffs' Proposed Expert:  Leslie N. Wilder

26.    Wilder is the sole owner and employee of Sabon Industries, Inc., a
"forensic consulting" business operated from his home.  Wilder advertises to, and
provides expert witness services for, lawyers.  Wilder Dep., Ex. F at 4-7, 11-13; Wilder
report and curriculum vitae, Ex. D.

27.    Wilder holds himself out as an "expert" in a wide variety of matters and
on a virtually unlimited number of different products, many of which he has found to be
defectively designed.  For example, Wilder has claimed "expertise" in the following
subject matter areas and on the following products:

| | | |
|---|---|---|
| Abrasive Cut-Off Saw | Food Equipment / Food | Power Tools |
| Amputation / Artificial |   Waste Dispenser | Rail Saw |
|   Limbs | Furniture Garden Lawn | Roadway Milling Machine |
| Archery | Equipment | Router |

| | | |
|---|---|---|
| Automatic Door / Automatic Sliding Electric Door | Guarding | Seat Belts |
| | Household Appliances | Sidewalks |
| Baby Changing Table | Industrial Equipment / Machinery Kitchen Appliances | Signal Alarm System |
| Balling Machine | | Skiing Equipment |
| Bicycles | Ladder / Scaffold | Slips / Trips / Falls Snow Throwers |
| Brakes | Lawn Mower / Riding Mower | |
| Building Materials/Products | | Sports Exercise Equipment |
| Car Wash | Leaf Blower | Sports Recreation Equipment |
| Chain Saw | Log Splitter | Stairs / Stairways |
| Circular Saw | Machine Guards | Stool / Chair |
| Construction Equipment | Machinery & Equipment | Stud Gun |
| Conveyor Belt | Man-lift | Swimming Pool / Filter |
| Die Cutting Machine | Meat Grinder | Table |
| Door / Gate | Medical Equipment / Nuclear Medicine Machine | Tools |
| Door Latch | | Toys |
| Dumpster | Milling Machine | Tractor Trailer Connector |
| Electro-mechanical Products | Nail Gun | Training Shoe |
| | Off-Road / All Terrain Vehicles | Treadmill |
| Emergency Alarm Switch Equipment | | Vehicles |
| | Patent Handling Equipment | Welding Helmet |
| Extrusion Machine | Plumbing Power Sewer Auger | Woodworking Shaping Machine |
| Fitness Equipment | | Wrench |

Wilder Dep., Ex. A at 12-13, 155-176; Wilder internet profile marked Ex. 2 to Wilder

Dep., Ex. K; Wilder report and curriculum vitae, Ex. D.

28.    Over the past five years, essentially all of Wilder's earned income has

been derived from his work on litigation matters, mostly on behalf of plaintiffs.  Wilder

Dep., Ex. F at 176-177.

29.    Wilder has never designed any type of power saw and, more specifically,

has never designed a power cutter.  Wilder Dep., Ex. F at 20-21, 109.

30.    Wilder has never designed a blade brake for a power cutter.  More

specifically, Wilder has never prepared any design drawings or prototype model for such

a blade brake.  Wilder Dep., Ex. F at 109.

31.    Wilder has never tested a power cutter with a blade brake.  Wilder Dep.,

Ex. F at 109.

32.    Wilder has never designed a trigger lock for a power saw.  More specifically, Wilder has never prepared a design drawing or prototype of such a trigger lock.  Wilder Dep., Ex. F at 146.

33.    Wilder has never tested a trigger lock for a power saw.  Wilder Dep., Ex. F at 146.

34.    Wilder has never worked in the power saw industry and has never published an article on the subject of power saws.  Wilder Dep., Ex. F at 15; Wilder report and curriculum vitae, Ex. D.

35.    Wilder never used a power cutter similar to that allegedly involved in Watson's accident, other than the fact that he "may have picked up" a diamond-bladed saw that was at his home when he had some masonry work done there and "made a cut in some stone."  Wilder Dep., Ex. F at 21-23.

**Wilder's Blade Brake Opinion**

36.    Wilder disclosed, in his Fed. R. Civ. P. 26(a)(2) report dated September 29, 2005, his opinion that the saw was "defective" because it lacked a motor brake that would stop the saw blade faster than its normal coast-down time after the saw is turned off.  Wilder report, Ex. D.

37.    Before reaching his opinions, Wilder never met or spoke with Watson. Wilder Dep., Ex. F at 34.

38.    Before reaching his opinions, Wilder never reviewed, or asked for, Watson's answers to defendant's interrogatories.  Wilder Dep., Ex. F at 34.

39.    Wilder never had an opportunity to examine, and never did examine, the

8

power cutter that was involved in Watson's accident. Wilder Dep., Ex. F at 93, 96.

40.    A 12" blade will coast to a stop within approximately 12 seconds after the operator of a K2300 power cutter releases his finger from the trigger. Wilder Dep., Ex. F at 60-61; Wilder report, Ex. D at 3.

41.    Before reaching his opinion that the power cutter was "unreasonably dangerous" due to the absence of a blade brake, Wilder did no research to determine the frequency of coasting blade accidents with power cutters. Nor was he aware of any statistics or data with respect to the frequency of such accidents. Wilder Dep., Ex. F at 107-108.

42.    Apart from this case, no user of a Partner electric power cutter has ever complained to, or brought suit against, Partner or Electrolux alleging a danger from a coasting blade. Gustafsson Aff., Ex. E at ¶ 6.

43.    Wilder is not aware that any power cutter had a blade brake before Watson's accident or even today. In fact, no power cutters on the market employ a blade brake. Wilder Dep., Ex. F at 65-66; Gustafsson affidavit, Ex. E at ¶ 4.

44.    Wilder's opinion that the saw was "defective" because it lacked a blade brake was arrived at in connection with, and for the purposes of, this litigation. Wilder Dep., Ex. F at 106-107.

45.    Wilder has never advised any government or industry group that power saws without blade brakes are defective and dangerous. Wilder Dep., Ex. F at 107.

46.    Wilder based his blade brake opinion on the fact that certain models of *different* types of power saws - namely, portable circular saws and stationary miter saws - are offered with blade brakes. Wilder also relied on the fact that other types of machines

such as snow throwers and lawn mowers utilize braking mechanisms.  Wilder report, Ex. D at 3-5.

47.    Power cutters are different from portable circular saws and stationary miter saws, are not as frequently used to make repetitive cuts (where blade brakes can enhance productivity) and are used by professional users, mostly in the construction industry, to cut steel or masonry, as opposed to wood.  Gustafsson Aff., Ex. E at ¶ 7.

48.    Wilder based his opinion that a blade brake on the K2300 would have stopped the blade within two seconds on his evaluation of the "less than two seconds" stopping time of a miter saw equipped with a blade brake.  Wilder did some "rough calculations" and "ball parking based on some numbers" and arrived at a hypothetical two second stopping time for a power cutter blade if equipped with a blade brake.  Wilder report, Ex. D at 4; Wilder Dep., Ex. F at 110-112, 115-118.

49.    Wilder never discussed, with any other engineer, his determination of the stopping time of a blade on a power cutter equipped with a blade brake.  Wilder Dep., Ex. F at 115.

50.    Wilder never modified any power cutter by putting a blade brake on it, and Wilder never designed or tested a power cutter with a blade brake.  Wilder Dep., Ex. F at 20, 109.

### Wilder's Trigger Lock Opinion

51.    Wilder disclosed, for the first time, his opinion that the saw was "defective" due to the lack of an "effective safety interlock" in a letter dated March 24, 2006, which was provided to Electrolux's counsel on the eve of Wilder's March 27, 2006 deposition.  Wilder March 24, 2006 letter, Ex. L.

52.    Wilder reached his trigger lock opinion after viewing a video demonstration prepared by Electrolux and produced to plaintiff's counsel on December 16, 2005.  The video shows Ove Donnerdal, Director of Research and Development for Partner, attempting to reconstruct Watson's accident.  In the video Donnerdal, wearing protective gear, climbs down a ladder holding an exemplar K2300.  After reaching the bottom, Donnerdal is seen starting the saw with one hand.  Donnerdal affidavit, Ex. M; Wilder March 24, 2006 letter, Ex. L; Wilder Dep., Ex. F at 42-45, 136, 143-144.

53.    After he viewed this videotaped sequence, Wilder considered the possibility that Watson might have inadvertently activated both the trigger lock and the trigger, thereby accidentally turning on the saw.  This, in turn, led Wilder to conclude that the trigger lock on the K2300 was "defective."  Wilder March 24, 2006 letter, Ex. L; Wilder Dep., Ex. F at 42-45, 136, 143-144.

54.    Donnerdal narrated the video in Swedish.  Wilder does not understand Swedish, did not have Donnerdal's narration of the video translated into English and does not know what Donnerdal was saying during his demonstration.  More specifically, Wilder does not know whether the trigger lock was operative and functional during the video demonstration.  Donnerdal affidavit, Ex. M, ¶ 5; Wilder Dep., Ex. F at 43-44.

55.    In fact, as Donnerdal explained in the introduction to the video, he had deliberately disabled the trigger lock of the saw to see if there was a risk that it might be accidentally started if someone had removed the interlock or if it was broken.  Donnerdal affidavit, Ex. M at ¶¶ 4-6.

56.    Before he saw the video, Wilder thought that "it would have been difficult to impossible to accidentally actuate the trigger" of the saw, given how Watson described

the accident and considering the design of the trigger lock. After viewing the video,

Wilder believed that it was indeed "possible" that Watson had inadvertently activated the

trigger lock and trigger, and that the blade was powered at the time of his accident.

Wilder Dep., Ex. F at 80-82, 143-145; Wilder March 24, 2006 letter, Ex. L.

57.    Wilder does not base his "trigger lock opinion" on any research or data

relative to the frequency of power cutter accidents resulting from inadvertent activation

of the saw. Wilder March 24, 2006 letter, Ex. L.

58.    In his March 24, 2006 letter, Wilder did not even purport to articulate an

alternative design for the trigger lock, other than to opine that it "could and should have

been designed to more effectively prevent or minimize inadvertent actuation by, for

example, being recessed, guarded, or positioned away from an operator's normal

operating grip on the handle." Wilder March 24, 2006 letter, Ex. L.

59.    By the time of his deposition on March 27, 2006, Wilder had done some

"mental designs" and had come up with several different "concepts or approaches" for

alternative trigger locks including, (1) moving the interlock out of the internal cavity of

the rear handle of the saw and placing it on top of the handle so that it could be reached

by the thumb, and putting "some barriers around the side of it. Maybe it's a slide switch,

a slide push button, so that one has to kind of awkwardly reach up front to get it and then

put your hand back into a comfortable position for holding the trigger lock" (2) leaving

the interlock button where it is and placing a barrier around it "so that one has to use the

tip of one's finger to actuate it" and (3) providing "something that required a

simultaneous press of two fingers in another area (to release the trigger lock) . . .

analogous to the two-handed operation that's needed on punch presses." Wilder Dep.,

Ex. F at 146-149.

      60.    Although Wilder "thought about" these alternative ways of designing the

trigger lock, he never actually put "pen to paper," never did a design drawing, never

developed a prototype and never otherwise designed an alternate trigger lock for any

power saw.  Wilder Dep., Ex. F at 146-149.

      61.    Wilder acknowledged that:

> I haven't been hired to redisign [sic] the saw, and in engineering designs
> you try an approach.  You experiment with it and you test it on people.
> You see whether it works or not.  Then you redesign it and you refine it,
> and what we're doing here is artificial in the sense that all I'm going to be
> able to give you is some two or three approaches to what I would take, and
> then after working with them, trying some prototypes, testing them on
> people, they would either be modified or discarded or what.

Wilder Dep., Ex. F at 147.

      62.    Wilder never tested any alternate trigger lock designed for a power saw.

Wilder Dep., Ex. F at 146, 149.

      63.    Wilder could not recall using a power cutter with an alternate trigger lock

design.  Wilder Dep., Ex. F at 149-150.

      64.    Wilder never discussed his "concepts or approaches" about an alternate

trigger lock design with any other engineers.  Wilder Dep., Ex. F at 149.

      65.    Wilder had never previously come to the opinion that a trigger lock on any

power saw was "defective."  Wilder developed this opinion only in connection with this

case.  Wilder Dep., Ex. F at 150-151.

**Wilder's Warning Opinions**

      66.    Although Wilder believes that the saw should have incorporated additional

warnings about the danger of the coasting blade and the danger of inadvertently

activating the saw, he never actually sat down to write additional warnings for the saw. Wilder Dep., Ex. F at 154-155.

67.     Wilder never tested the effect of any different warnings that might have been on the saw.  To do so "would be a process where you would write several and test them on groups of people, etcetera.  That would be quite a project" and was not something that Wilder did.  Wilder Dep., Ex. F at 155.

68.     Wilder knows of no studies or data indicating the effect that warnings about the coasting blade or about inadvertent starting of the saw might have on users of the saw.  Wilder Dep., Ex. F at 155.

69.     Wilder believes that a warning on the saw regarding the danger of a coasting blade "might or might not have been helpful.  I can't tell you that."  Wilder Dep., Ex. F at 180.

### Wilder's Accident Scenario

70.     Wilder never did any tests to determine whether Watson's injury occurred while the blade was coasting or under power.  Wilder Dep., Ex. F at 74-75.

71.     Wilder does not know, and cannot say to a reasonable degree of engineering certainty, whether the blade of the saw was coasting or under power when Watson was injured.  Wilder Dep., Ex. F at 41-42, 80-82, 178.

72.     Wilder cannot say to a reasonable degree of engineering certainty that Watson inadvertently activated the saw.  Wilder Dep., Ex. F at 80.

73.     Wilder does not know whether the trigger lock was operative and functioning as it was intended to function on the day of Watson's accident.  Wilder Dep., Ex. F at 91.

74.     Wilder concedes that if the trigger lock of the saw had been defeated on the day of Watson's accident and Watson had inadvertently activated the saw, that would not be a design problem with the saw.  Wilder Dep., Ex. F at 93-96.

75.     Wilder agrees that if Watson's accident occurred while the saw blade was still coasting after he turned it off following his last cut, and without Watson having inadvertently activated the saw, the design of the trigger lock would not have caused the accident.  Wilder Dep., Ex. F at 97-98.

76.     Wilder agrees that if Watson's accident happened after he inadvertently activated the saw and while the saw was under power, the lack of a blade brake did not cause the accident.  Wilder Dep., Ex. F at 98.

77.     Because Wilder does not know whether Watson's injury was caused by a coasting blade or a powered blade, Wilder acknowledges that he can only opine that "the presence of *both* of those safety devices, a blade brake and an interlock in my opinion would have either prevented or mitigated this injury."  Wilder Dep., Ex. F at 178-179 (emphasis added).

ELECTROLUX PROFESSIONAL OUTDOOR
PRODUCTS, INC.,
By its Attorneys,


/s/  *David A. Barry*
David A. Barry, BBO No. 031520
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737
(617) 227-3030
barry@srbc.com

/s/ *Suleyken D. Walker*
Suleyken D. Walker, BBO No. 654933
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114-4737
(617) 227-3030
walker@srbc.com


DATED: May 19, 2006




CERTIFICATE OF SERVICE


I, David A. Barry, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 19, 2006.


/s/ *David A. Barry*
David A. Barry
barry@srbc.com


377545

16