EXHIBIT A

Michael Watson, 8/4/2005

1

1                          Volume:
                           Pages:  1 - 132
2                          Exhibits:  1 - 11

3          COMMONWEALTH OF MASSACHUSETTS

4    Suffolk, ss.              Superior Court
                              No. 04-2012-F
5

6    MICHAEL WATSON, INDIVIDUALLY
     AND AS FATHER AND NEXT FRIEND
7    OF JOHN WATSON,

8                     Plaintiffs

9    vs.

10   PARTNER INDUSTRIAL PRODUCTS,

11                    Defendant

12

13       Deposition of MICHAEL WATSON, a witness

14   called on behalf of the Defendant, pursuant

15   to the Massachusetts Rules of Civil

16   Procedure, before Rosamond K. Marcy, a

17   Certified Shorthand/Registered Professional

18   Reporter and Notary Public in and for the

19   Commonwealth of Massachusetts, at the Offices

20   of Sugarman, Rogers, Barshak & Cohen, P.C.,

21   101 Merrimac Street, Boston, Massachusetts

22   02114, commencing at 10:00 A.M. on Thursday,

23   August 4, 2005.

24

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

22

```
 1   A.   Yes.

 2   Q.   When were you introduced to Kenny?  Was

 3        it in the fall of '88?

 4   A.   Oh, no.  I have known him longer,

 5        probably since 1984.

 6   Q.   Did you have any carpentry experience

 7        before the fall of '88 when you went to

 8        work for Fellsway Cabinets?

 9   A.   No.

10   Q.   In the job with Fellsway Cabinets did

11        you operate any power tools?

12   A.   Yes.

13   Q.   Which ones?

14   A.   Table saws, routers, belt sanders, jig

15        saws, Sawzall, drill presses, lathes.

16   Q.   Portable circular saws, so-called skill

17        saws?

18   A.   From time to time, yes.

19   Q.   How about radial saws?

20   A.   Yes.

21   Q.   I assume you didn't use any chain saws

22        making cabinets?

23   A.   No.

24   Q.   The power tools and saws that you have
```

Michael Watson, 8/4/2005

23

```
1        just described were the ones that you

2        used in your job making cabinets for

3        Fellsway Cabinets.

4   A.   Yes.

5   Q.   You had that job for about two years?

6   A.   Yes.

7   Q.   What happened to the business?

8   A.   The economy wasn't doing too great for

9        that kind of stuff at the time.  They

10       were struggling and at that point I

11       sought other employment.

12  Q.   During the time that you were working

13       for Fellsway Cabinets you hadn't started

14       taking courses at U.Mass. yet.

15  A.   No.

16  Q.   Do I understand correctly that before

17       the fall of 1988 you hadn't operated any

18       of these power tools that you used in

19       your job at Fellsway Cabinets, is that

20       right?

21  A.   Most of them, no.  Have I operated a

22       drill before?  I would say yes on bikes

23       and things like that but on any regular

24       basis I couldn't tell you.  I was a
```

Michael Watson, 8/4/2005

24

```
 1        little boy.  Most of them, no, I haven't
 2        operated them.
 3   Q.   Who owned the equipment that you used in
 4        your job at Fellsway Cabinets?
 5   A.   Kenny.
 6   Q.   Have you yourself personally ever owned
 7        any power tools?
 8   A.   Oh, yes.
 9   Q.   Do you own any now?
10   A.   No.
11   Q.   Tell me about the power tools that you
12        have owned.
13   A.   Drills, circular saws such as a skill
14        saw, miter saws, jig saws, Sawzalls.  I
15        think that's about it for what I owned.
16   Q.   When did you own these tools that you
17        just mentioned?
18   A.   A little bit after the accident in 2002
19        I pretty much sold them all.
20   Q.   When did you first own them?
21   A.   Going back to 1988 some of them.  When I
22        worked in a cabinet shop I acquired my
23        own tools.
24   Q.   Did you have a shop?
```

Michael Watson, 8/4/2005

25

1  A.  No.

2  Q.  What did you do with the tools that you

3      used, the skill saws, miter saws, jig

4      saws, Sawzalls?

5  A.  I mostly used them around the house,

6      repairs around the house.

7  Q.  Did you build any cabinets or other

8      woodworking pieces?

9  A.  Not at home.  I have always used the

10      shop.  I never built any cabinets at

11      home.

12  Q.  What shop, the shop at Fellsway

13      Cabinets?

14  A.  Yes.

15  Q.  You used the Fellsway Cabinets shop to

16      build some cabinets for your home?

17  A.  Yes.

18  Q.  Let me go back to when you started the

19      job with Fellsway Cabinets.  During the

20      early period when you were working there

21      did you get any training in the use of

22      these various power tools?

23  A.  By training you mean showing me how to

24      use them?

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

26

1  Q.  Did you get instructions or training?

2  A.  Yes.

3  Q.  From whom?

4  A.  Various people working at the shop,

5      Kenny in particular.

6  Q.  What did Kenny teach you about using

7      these power tools?

8  A.  They were different tools.

9  Q.  Did he demonstrate the use of the

10     various tools to you?

11 A.  Yes.

12 Q.  Did he or anybody else at Fellsway

13     Cabinets give you Owners Manuals for any

14     of the tools to read?

15 A.  Not to my knowledge.

16 Q.  I imagine that the tools that you owned

17     yourself came with Owners Manuals.

18 A.  Yes.

19 Q.  Did you read any of them?

20 A.  Yes.

21 Q.  Do you remember, for example, reading

22     the Owners Manual for the skill saw that

23     you had?

24 A.  Particularly, no.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

27

1  Q.  What was your practice as far as whether

2       you would read the Owners Manuals that

3       accompanied the tools that you yourself

4       owned?

5  A.  You mean the general type of how I read

6       an Owners Manual?

7  Q.  Did you read them cover to cover?

8  A.  Yes, for the most part.  I buy a tool

9       and I don't know how to work it.  No one

10      has ever showed me and they have

11      different functions and speeds.  Yeah,

12      usually.

13  Q.  That was your practice.

14  A.  Yes, for the most part.

15  Q.  Describe in your own words who gave you

16      instruction at Fellsway Cabinets and

17      what instruction you got in the use of

18      the power tools that they had.

19           MR. TOBIN:  Objection.  You

20      can answer if you understand.

21  A.  That's a vague question.

22  Q.  Let's start with the table saw.  You

23      used table saws.

24  A.  Yes.

Michael Watson, 8/4/2005

28

```
 1   Q.   Did anybody show you how to use a table
 2        saw at Fellsway Cabinets?
 3   A.   Yes.
 4   Q.   What instructions did you get in the use
 5        of table saws?
 6   A.   Particularly how to work the wood going
 7        through and how to do it safely.   A
 8        table saw can come back at you and pull
 9        your hand into the blade so they showed
10        me the position for my hands.   I can
11        remember actually being shown how to
12        work the guide.   You have to be very
13        careful and go straight.
14   Q.   Was there more than one table saw that
15        you used at Fellsway Cabinets?
16   A.   No, only one.
17   Q.   Did it have a blade guard?
18   A.   I don't remember.
19   Q.   Do you remember the make and model of
20        the saw?
21   A.   I don't.
22   Q.   You used a radial saw on the job?
23   A.   Yes.
24   Q.   Do you remember the make and model of
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

29

1       that?

2    A.   I don't.  I could guess.

3    Q.   Was it a 10-inch or a 12-inch?

4    A.   I don't remember.

5    Q.   What instruction did you receive in the

6         use of the radial arm saw?

7    A.   I don't remember that.

8    Q.   Was that from Kenny?

9    A.   It would have been, yes.

10   Q.   Was he the person who instructed you in

11        the use of the table saw?

12   A.   Yes.

13   Q.   There was a skill saw that you used also

14        on the job?

15   A.   From time to time, yes.

16   Q.   Did you get some instruction in the use

17        of the skill saw?

18   A.   Yes.

19   Q.   Who gave you that instruction?

20   A.   Kenny.

21   Q.   What did he tell you about how to use

22        skill saws?

23   A.   I know he told me to make sure what I am

24        doing was on a solid surface because

Michael Watson, 8/4/2005

30

1    it's a temperamental saw.  It was a

2    dangerous tool.  Making sure you get a

3    straight cut, really.

4  Q.  What did he tell you about using the

5    skill saw on a solid surface?  Why did

6    he tell you to do that?

7  A.  Because it had a tendency to bind and

8    kick back.

9  Q.  Did you ever before December 5, 2001

10    have an accident using a power tool?

11  A.  No.

12  Q.  Did you ever have a near miss?

13        MR. TOBIN:  Objection.

14  A.  No.

15  Q.  What type of cabinets did you make at

16    that job at Fellsway Cabinets or what

17    woodworking?

18  A.  A lot of kitchen cabinets.

19  Q.  Did you do other woodworking besides

20    making cabinets?

21  A.  Very little.  From time to time a

22    specialty would come through but it was

23    predominately the cabinet making.

24  Q.  Would it be fair to say that by the end

Michael Watson, 8/4/2005

44

1   A.   I believe it had to be 1998.

2   Q.   So for about two years.

3   A.   Approximately, yes.

4   Q.   What did you do after that?

5   A.   Laborers' Union Local 223.

6   Q.   What made you decide to switch from the

7        Painters' Union to a laborers' union?

8   A.   The work was closer.  The Big Dig was

9        very up and running at that point and it

10       took me two minutes to get to work as

11       opposed to an hour on Deer Island.

12  Q.   Tell me about the jobs you had from the

13       time you joined the Laborers' Union in

14       1998.

15  A.   The first one I worked was at Lafayette

16       Place in downtown Boston.  I worked for

17       a plastering company.

18  Q.   What did you do for them?

19  A.   Our job was to mix the plaster and

20       supply them with the materials where

21       they needed them, basically set up their

22       plasterers' job so they could work.

23  Q.   What was the name of the company?

24  A.   Cape Cod Plasterers.

Michael Watson, 8/4/2005

45

1   Q.   For how long did you have that job?

2   A.   About four months.

3   Q.   Did you use any power tools?

4   A.   With them, no.

5   Q.   What is the next job you had?

6   A.   I went to work for J. Cashman working in

7        the Fort Point Channel area near the

8        Post Office.

9   Q.   J. Cashman is a big contractor on the

10       Big Dig.

11  A.   Yes.  He specializes in pile-driving

12       work, that type of work but that's not

13       what I was really doing.

14  Q.   What were you doing?

15  A.   General laborer's work, setting up,

16       doing cleaning, jack-hammering, a lot of

17       chipping.  I did some pile work, built

18       lagging walls, pile drivers.

19  Q.   Did you use any construction saws?

20  A.   Chain saws from time to time.  On the

21       lagging walls.

22  Q.   What type of chain saw?

23  A.   Stihl and we had Husquvarna.

24  Q.   So working for J. Cashman you used chain

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

46

```
 1        saws and they were Stihl and Husquvarna.
 2   A.   Yes, both gas-operated.
 3   Q.   What would you do with those chain saws?
 4   A.   Cut the wood that you use for the
 5        lagging walls.
 6   Q.   How long did you work for Cashman?
 7   A.   Six months.
 8   Q.   That takes us up to when, '99 sometime?
 9   A.   Yes.
10   Q.   What was your next job through the
11        Laborers' Union?
12   A.   I worked for Trevi Icos.
13   Q.   What type of company is that?
14   A.   They primarily do slurry panels.
15   Q.   What the concrete gets poured into?
16   A.   The walls in the tunnel.  Not the finish
17        walls, the actual footing walls.
18   Q.   What did you do for them?
19   A.   Poured a lot of concrete.  Keeping the
20        area clean.  They do a lot of digging
21        and ensuring the area stays clean,
22        really.  There are a lot of trucks
23        coming in and out and making sure the
24        trucks get in and out.  When the
```

Michael Watson, 8/4/2005

47

```
 1          concrete comes, you pour concrete until
 2          the wall is finished.  I poured a lot of
 3          concrete.
 4     Q.   Did you use any tools?
 5     A.   Air tools, pneumatic tools.
 6     Q.   No saws.
 7     A.   No saws.
 8     Q.   How long did you work for Trevi Icos?
 9     A.   About a year.
10     Q.   This gets us up to sometime in 2000.
11     A.   Yes.
12     Q.   What was the next job you had through
13          the Laborers' Union?
14     A.   I worked chipping brick at U.Mass.
15          Boston, Chapman.
16     Q.   What does Chapman do?
17     A.   They are a waterproofing company.
18     Q.   What did you do for them?
19     A.   Chipped brick.
20     Q.   Did you use any tools?
21     A.   Drills.
22     Q.   How long did you work for them?
23     A.   A couple of months, three months, maybe.
24     Q.   What was the next job you had?
```

Michael Watson, 8/4/2005

48

```
 1    A.    Modern Continental.

 2    Q.    When did you start working for Modern

 3          Continental?

 4    A.    The spring of 2001.

 5    Q.    Did you work for them right up until

 6          December 5, 2001 when you had your

 7          accident?

 8    A.    Yes.

 9    Q.    When you worked for Modern Continental

10          was it always on the Big Dig?

11    A.    Yes.

12    Q.    It wasn't some other construction

13          project.

14    A.    No.

15    Q.    What was Modern Continental's role as a

16          contractor on the Big Dig?

17    A.    During the time I was working for them

18          they were the general contractors.

19    Q.    During the time you worked for Modern

20          Continental was it always on one site of

21          the Big Dig?

22    A.    Yes.

23    Q.    Where was that site?

24    A.    Atlantic Avenue.
```

Michael Watson, 8/4/2005

67

1          hammers.  I think that's about it.

2    Q.    Would it be fair to say that before your

3          accident, both on the Modern Continental

4          job and other jobs that you had had, you

5          had had a lot of experience climbing up

6          and down ladders of various types?

7    A.    Yes.

8    Q.    Describe the saw that you were using

9          when you were injured on December 5,

10         2001.

11   A.    It's approximately two feet long.  It

12         has a foot long saw blade on one end

13         with a guard partially surrounding it.

14         From the blade to the other end is a

15         rectangular-type shape and the very last

16         portion of it is a handle to hold with a

17         trigger and the switch to activate it

18         and locate it.

19   Q.    Are you right-handed incidentally?

20   A.    Right-handed, yes.

21   Q.    Who owned the saw, Modern Continental?

22   A.    Yes.

23   Q.    When was the first time you had ever

24         used it?

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

68

1   A.   This particular saw?

2   Q.   Yes.

3   A.   Probably three weeks to a month prior to

4        the accident.

5   Q.   Had you ever used a saw of that type

6        before you started using the saw

7        involved in your accident three weeks to

8        a month before the accident?

9   A.   Yes.

10  Q.   When had you first used a saw of that

11       type?

12  A.   I don't remember the first time.  It

13       would have been sometime working with

14       the laborers.  When exactly I don't

15       remember.

16  Q.   Do you remember which job?

17  A.   It had to be on the J. Cashman job.

18  Q.   Do you know the manufacturer and the

19       make and model of that saw that you

20       first used on the J. Cashman job?

21  A.   I know they had Stihl saws there.

22  Q.   You told us about Stihl chain saws on

23       that job and you also used the chop saw?

24  A.   A few times on that job.  Not very

Michael Watson, 8/4/2005

69

1      often.

2  Q.  You think it was also made by Stihl?

3  A.  I know it was.

4  Q.  What would you do with it on the Cashman

5      job?

6  A.  On that particular job we used it

7      cutting pipe.

8  Q.  Did you receive any instruction or

9      training in how to use it on the Cashman

10     job?

11 A.  I don't remember.

12 Q.  Did you read any Owner's Manuals

13     literature about it?

14 A.  No.

15 Q.  How many times did you use it on the

16     Cashman job?

17 A.  A handful, five in the course of six

18     months.

19 Q.  Can you estimate the number of hours of

20     use total?

21 A.  Maybe an hour at a time.

22 Q.  That was an electric saw as well.

23 A.  That was gas.

24 Q.  That was not below ground.

Michael Watson, 8/4/2005

70

```
 1   A.   No.
 2   Q.   Did you use a chop saw or what is called
 3        a cut-off saw, a saw of the type
 4        involved in your accident on any other
 5        occasion besides your use of the saw for
 6        three weeks to a month before the
 7        accident and your use of this Stihl
 8        gas-operated saw on the Cashman job?
 9   A.   I can't recall any time.
10   Q.   The only occasions when you remember
11        using a saw of the type involved in your
12        accident were when you used the
13        gas-operated saw on the Cashman job and
14        when you used the accident saw for three
15        weeks to a  month before the accident.
16   A.   Those two I remember.
17   Q.   Those are the only times you can
18        remember using a saw of this general
19        type?
20   A.   The only times I can remember, yes.
21   Q.   Tell me about your use of the accident
22        saw during the three weeks to a month
23        before the accident and by that I mean
24        what did you do with it, how often did
```

Michael Watson, 8/4/2005

71

1        you use it, etcetera?

2   A.   We were down below the tile stripping so

3        there would be times when we would be

4        taking the wood off and I wouldn't be

5        using the saw.  That would go on for a

6        couple of hours.  Then I would go back

7        to using the saw to cut the ribs of the

8        rebars that were sticking out of the

9        wall.  The last week or so there was a

10       lot more of the saws being used.  The

11       wood had been just about done.  I was

12       going around cutting anything that was

13       still there.  There were big sections

14       that hadn't even been touched yet but

15       the last week it was pretty much an

16       everyday thing pretty much all day with

17       some exceptions.  Setup time or cleanup

18       time or moving time, moving from one

19       spot to the next they had to bring all

20       the tools that were involved in cleaning

21       up the wall after I'm done.  The last

22       week, all that week, Monday, Tuesday to

23       Thursday, that's all we have been doing.

24   Q.   During that last week you were pretty

Michael Watson, 8/4/2005

72

```
 1        much using the saw constantly?
 2   A.   Yes.  A lot of these jobs you have
 3        different people doing different things
 4        and you take turns.  The last week
 5        that's all I was doing, I was the saw
 6        guy.
 7   Q.   When you say that's all you were doing
 8        did you use the saw to cut anything
 9        other than cut the rebars flush to the
10        wall?
11   A.   I don't remember.
12   Q.   That's what you primarily remember using
13        it for.
14   A.   Yes.
15   Q.   Before you started using the saw
16        involved in your accident on the Modern
17        Continental job did you get any
18        instruction from anybody at Modern
19        Continental on how to use it?
20   A.   Not that I remember.
21   Q.   Did you feel you needed any instruction
22        or did you feel you really knew how to
23        use the saw?
24   A.   I felt like I knew how to use the saw.
```

Michael Watson, 8/4/2005

73

1     I was very comfortable with that.

2  Q.  Did you have any problems with it during

3     the period of time right up until the

4     accident happened?

5  A.  No.

6  Q.  When you were cutting rebars during that

7     last week particularly leading up to the

8     accident were you always on a ladder?

9  A.  No.

10  Q.  Sometimes you were, sometimes you

11     weren't?

12  A.  Yes.

13  Q.  Over the last week before the accident

14     over what distance in the tunnel were

15     you cutting these rebars?

16  A.  To clarify we are now underneath the

17     tunnel.

18  Q.  What do you call this area underneath

19     the tunnel?

20  A.  The part we were working on was right

21     near the Vent Shaft Building.

22  Q.  Can you estimate the number of rebars

23     you had cut right up until the accident?

24  A.  No.

Michael Watson, 8/4/2005

74

1   Q.   Was it hundreds?

2   A.   Hundreds.

3   Q.   You were aware before the accident that

4        the blade continued to turn for some

5        period of time after you released your

6        finger from the trigger, weren't you?

7   A.   Yes.

8   Q.   And that was something you could see.

9        The blade would continue to rotate for

10       some time after you released your finger

11       from the trigger.

12                    MR. TOBIN:  Objection.

13  Q.   If you were looking at the blade after

14       you released your finger from the

15       trigger you could see that for some

16       period of time it continued to turn,

17       correct?

18  A.   Yes.

19  Q.   Could you hear it until it stopped?

20  A.   Yes.

21  Q.   And that's something you were aware of

22       before your accident from your

23       experience with the saw.

24  A.   Yes.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

75

1    Q.    You knew that it didn't stop immediately

2          as soon as you released your finger from

3          the trigger.

4    A.    Yes.

5    Q.    Did you know before your accident about

6          how long it took the blade to close down

7          between when you released your finger

8          from the trigger and when it finally

9          came to a stop, approximately?

10   A.    No.

11   Q.    It was a matter of a number of seconds?

12   A.    Yes.

13   Q.    Did you realize before your accident

14         that if part of your body came into

15         contact with the coasting blade even

16         after you released your finger from the

17         trigger you could be hurt?

18                   MR. TOBIN:  Objection.

19   A.    Yes.

20   Q.    And you knew you had to be careful to

21         keep the coasting blade away from your

22         body even if it wasn't under power,

23         correct?

24                   MR. TOBIN:  Objection.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

76

 1   A.   Still spinning.

 2   Q.   Still spinning after you released your

 3        finger from the trigger.  That's what I

 4        am referring to as coasting.

 5   A.   Yes.

 6   Q.   And you knew that a coasting blade, one

 7        that was still spinning even after you

 8        released your finger from the trigger of

 9        the saw could injure you if you came

10        into contact with it.

11   A.   Still spinning, yes.

12   Q.   How would you turn the saw on, activate

13        the saw?

14   A.   There are two --  there's a name for it,

15        I don't know the name for it, type of

16        switching but you have to press those

17        two buttons to trigger it.  When you are

18        holding it you can't pull the trigger.

19        It locks.

20   Q.   The switch locks?

21   A.   Something like that.  You have to press

22        the button to unlock the lock to pull

23        the trigger.

24   Q.   You have to press a button in order to

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

77

```
1        unlock the trigger so that you can press

2        the trigger to start the saw.

3    A.  Yes.

4    Q.  Up until your accident did that

5        mechanism, that switch lock work

6        properly as far as you knew?

7    A.  As far as I know.

8    Q.  As far as you knew you weren't able to

9        depress the trigger of the saw unless

10       you first depressed the switch lock, is

11       that right?

12   A.  Right.

13   Q.  At any time had you read the Owner's

14       Manual for the saw that was involved in

15       your accident before your accident

16       happened?

17   A.  No.

18   Q.  At any time before your accident

19       happened had you read the Owner's Manual

20       or any Safety Manual for any chop saw or

21       saw of this type?

22   A.  On this job or any time?

23   Q.  At any time before December 5, 2001 had

24       you read any Owner's Manual for any chop
```

Michael Watson, 8/4/2005

80

1  Q.  Do you still have the pants you were

2       wearing when you were injured?

3  A.  I don't.

4  Q.  What type of blade was in the saw?

5  A.  A steel-cutting fiber-type blade.

6  Q.  Do you know the dimensions of it?

7  A.  I don't.

8  Q.  Do you think you would recognize it if I

9       showed you a picture?

10  A.  One like the one I was using?

11  Q.  Yes.

12  A.  Yes.

13             [Group of photographs marked

14             Watson Exhibit Nos. 1

15             through 5 for

16             Identification.]

17  Q.  I'm going to show you a photograph we

18      have just marked as Exhibit 1 for

19      Identification and ask you if you

20      recognize what is shown in that

21      photograph.

22  A.  Yes.  It's the blade of a saw sitting on

23      some wood with some stay forms on the

24      left.

Michael Watson, 8/4/2005

81

 1   Q.   Do you know whether the blade shown in

 2        Exhibit 1 is the blade that was in the

 3        saw at the time of your accident?

 4   A.   I don't know.

 5   Q.   Did the blade that was in the saw at the

 6        time of the accident look like the one

 7        that is shown in Exhibit 1?

 8   A.   Yes.

 9   Q.   I'm going to show you a photograph that

10        is marked Exhibit 2 and ask you if you

11        recognize what is in that photograph.

12   A.   Yes.  The scene is the tunnel that

13        connects the tube.  This is

14        perpendicular to the actual tunnel

15        itself.  One end is going to the actual

16        vent building and the other end is

17        leading to the shaft.

18   Q.   Have you seen that photograph before?

19   A.   Yes, I have.

20   Q.   Does that photograph show the place

21        where your accident happened?

22   A.   No, it doesn't, not the exact place.

23   Q.   How far from the area shown in the

24        photograph marked Exhibit 2 is the exact

Michael Watson, 8/4/2005

89

```
 1        how tall was the room?  How much
 2        distance between the floor and the
 3        ceiling where you were at when the
 4        accident happened?
 5    A.  Probably fifteen or twenty feet.
 6    Q.  The surface was concrete, right?
 7    A.  Yes.
 8    Q.  Was it level?
 9    A.  Where I was working was level.  It was
10        ten, fifteen, twenty feet from the
11        actual incline.  I wasn't working on the
12        incline.
13    Q.  You were on a ladder when the accident
14        happened.
15    A.  Yes.  When the accident actually
16        happened was I on the ladder?  At the
17        base of the ladder.
18    Q.  What type of ladder was it?
19    A.  It's generally a straight ladder.
20    Q.  Not a stepladder?
21    A.  Not a stepladder.  One portion of it I
22        guess would be a good way to describe
23        it.  It has feet.  It leans up against
24        the wall you are working on.
```

Michael Watson, 8/4/2005

90

1   Q.   What was it made of?

2   A.   Aluminum.

3   Q.   How tall was it?

4   A.   I don't remember how tall it was.  It

5        had to be under fifteen feet.  More than

6        ten, probably twelve.

7   Q.   Had you placed it up against the wall?

8   A.   Yes.

9   Q.   What was the height from the floor to

10       the ceiling of the rebars that you were

11       cutting?  Were the rebars up all along

12       the level?

13  A.   They ran up from the floor to the

14       ceiling.

15  Q.   In height from the floor to the ceiling?

16  A.   Fifteen to twenty feet.

17  Q.   Going up from the floor to the ceiling

18       how many rebars would there be?

19  A.   I don't remember.

20  Q.   How far apart were they spaced

21       approximately?

22  A.   Three feet.

23  Q.   Going up from the floor to the ceiling.

24  A.   In every direction.  It's probably a

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

91

1        standard number.  About three feet.

2    Q.   Were you cutting from the top going down

3         to the bottom or were you working in the

4         opposite direction from the floor up to

5         the ceiling?

6    A.   I did all my floor work.  The ceiling

7         work had been done, too.  There was

8         staging we had down there to give us a

9         way to work up to the top.  The ladder

10        work would have been the intermediate

11        ones.

12   Q.   The really high ones you didn't use a

13        ladder, you used staging?

14   A.   Yes.

15   Q.   Was the staging available to be used?

16   A.   At that point there wasn't any in the

17        area, no.

18   Q.   Where was the staging?

19   A.   I don't know.  There wasn't any in the

20        immediate area.

21   Q.   Could you have used staging to make the

22        last cut that you made before you were

23        injured?

24   A.   Would it have been another option?

Michael Watson, 8/4/2005

92

1   Q.   Yes.

2   A.   I guess so, yes.

3   Q.   Why didn't you do that?

4   A.   It wasn't available and the ladder works

5        just as well if not better.  It's not a

6        height.

7   Q.   Along the surface of the wall where the

8        rebar that you had just cut before your

9        accident was located, on that surface

10       had you cut any other rebars just before

11       the accident happened?

12  A.   From the ladder?

13  Q.   I think you told me that you had cut the

14       lower ones, is that right, along that

15       same surface of wall?

16  A.   Right.

17  Q.   And that didn't involve using a ladder.

18  A.   No.  It's low.

19  Q.   What about the higher ones, had they

20       been previously cut by somebody else or

21       did you cut those?

22  A.   Some hadn't been cut.  I was going back

23       and doing some things that had been

24       missed or overlooked.  Had every one of

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

93

```
 1        the top ones been cut already?  I have

 2        to say no.  That had been done

 3        previously to when I was doing it, I

 4        believe.  Someone had been up there

 5        before me.

 6    Q.  Had you cut any other rebars besides the

 7        last one that you cut before your

 8        accident with the ladder in the same

 9        position that it was at the time you

10        made that last cut?

11    A.  I don't remember.

12    Q.  Was the last rebar that you cut just

13        before you were injured the only rebar

14        that you cut with the ladder in that

15        same position?

16    A.  Once again I don't remember.

17    Q.  How high above the floor was the rebar

18        that you cut just before your injury,

19        approximately?

20    A.  Ten feet.

21    Q.  As you were looking at the rebar did you

22        place the ladder or was the ladder

23        positioned to the left or to the right

24        of that rebar?
```

Michael Watson, 8/4/2005

94

1  A.  To the right.

2  Q.  The ladder is to the right of the rebar

3      and how far to the left of the ladder

4      was the rebar?

5  A.  I couldn't tell you how far.

6  Q.  Feet or inches?

7  A.  A foot.  Not too far, far enough where I

8      could cut it.  I don't know.

9  Q.  Were you wearing safety goggles at the

10     time of your injury?

11 A.  Yes.

12 Q.  Why don't you describe to me how the

13     accident happened.

14 A.  I was probably five or six rungs up on

15     the ladder.  I had the saw in my hand.

16     I start the saw.  I make the cut.  I

17     stop the saw, took my finger off the

18     trigger.  Repositioned the saw in my

19     left hand and make sure I position

20     myself on the ladder because I have to

21     reach across my body and make sure that

22     the cut was made flush.  In this

23     particular case the rebars just fell off

24     so I had to reach across to make sure

Michael Watson, 8/4/2005

95

1    it's flush.  That's basically what I did

2    and to make sure it's flush I

3    repositioned my hands so I can grab onto

4    the saw and work my way down the ladder

5    by the guard and one step at a time

6    descend down the ladder until I am at

7    the bottom and when I am at the bottom I

8    switch the saw position so I can

9    actually walk with the saw down in a

10   comfortable position so my hand is now

11   on the base, not the blade end but the

12   base of the saw and it's down by my side

13   and at that point in some way it came in

14   contact with my leg and cut my leg.

15  Q.  What rung of the ladder did you say you

16      were on when you made the cut to the

17      best of your memory?

18  A.  The fifth or the sixth.

19  Q.  How many rungs were there on this

20      ladder?

21  A.  I'm not exactly sure how tall the ladder

22      was.  If it was twelve feet there would

23      be approximately twelve rungs.

24  Q.  Your feet are about halfway up the

Michael Watson, 8/4/2005

96

1       ladder?

2   A.   Yes.

3   Q.   You didn't start the saw until you got

4        positioned to make the cut, is that

5        right?

6   A.   That's right.

7   Q.   How did you start the saw?

8   A.   I pressed the lock off, pulled the

9        trigger.  Once the saw was started

10       proceeded to make the cut on the rebar.

11  Q.   You understand what I mean when I refer

12       to the front handle of the saw and the

13       rear handle of the saw?

14  A.   Would the front be the blade?

15  Q.   I'm going to refer to the front handle

16       as the handle closer to the blade.

17  A.   Okay.

18  Q.   I'm going to refer to the rear handle as

19       the handle just above the trigger.

20  A.   Okay.

21  Q.   Do you understand now?

22  A.   Yes.

23  Q.   As you made the cut where was your left

24       hand?

Michael Watson, 8/4/2005

97

```
 1   A.   The front.

 2   Q.   Your left hand is on the front closer to

 3        the blade.

 4   A.   Yes.

 5   Q.   And your right hand is on the rear

 6        handle where the trigger is.

 7   A.   Yes.

 8   Q.   You make the cut of the rebar, correct?

 9   A.   Yes.

10   Q.   And then you said you repositioned the

11        saw after you made the cut?

12   A.   Yes, because now I have to hold it to

13        keep my balance on the saw.  My right

14        hand is off the handle.

15   Q.   When you say you reposition, the first

16        thing you do is take your right hand off

17        the rear handle, right?

18   A.   No.  It would be that I would move my

19        left hand.  The handle on the guard on

20        the blade side makes the turn and I was

21        just repositioned to get a better hold

22        of it.

23   Q.   So you don't take your left hand off the

24        front handle.  You just change the
```

Michael Watson, 8/4/2005

98

1        position of your left hand on the front

2        handle, is that what you are saying?

3    A.  That's correct.

4    Q.  And you do that because you are about to

5        check to see whether you have cut the

6        rebar flush to the wall.

7    A.  Yes.

8    Q.  And you are going to do that by taking

9        your right hand and feeling whether you

10       cut the rebar flush to the wall.

11   A.  That's correct.

12   Q.  And at some point you do that, you take

13       your right hand off the rear handle and

14       you reach over and feel whether the

15       rebar has been cut flush to the wall,

16       correct?

17   A.  That's right.

18   Q.  And when you did that had the blade

19       stopped turning when you were feeling

20       the wall to see if the rebar was cut

21       flush to the wall?

22   A.  No.

23   Q.  It was still turning?

24   A.  Given the time, yes, right after the

Michael Watson, 8/4/2005

99

```
 1        cut.  There's a lot of noise.  In this
 2        particular instance the blade should
 3        still be spinning.
 4   Q.   You had just removed your finger from
 5        the trigger.
 6   A.   Yes.
 7   Q.   As you are reaching with your right hand
 8        over across your body to feel whether
 9        the rebar to your left had been cut
10        flush with the wall the blade is still
11        turning, it's coasting.
12   A.   Yes.
13   Q.   Was the rebar cut flush to the wall as
14        far as you remember?
15   A.   Yes, it was.
16   Q.   What's the next thing you do after you
17        determine that?
18   A.   I am done with that cut so I go down the
19        ladder.  Now I have to reposition my
20        hand again on the blade away from me.
21   Q.   You are still talking about
22        repositioning your left hand.
23   A.   Yes.
24   Q.   So what do you do now?
```

Michael Watson, 8/4/2005

100

```
 1   A.   I'm repositioning for balance so I want
 2        to get a good hand on the saw so I can
 3        still keep my balance going down.
 4        That's what the repositioning is for.
 5   Q.   That's how you repositioned that second
 6        time.  How do you reposition it that
 7        second time?
 8   A.   Now it would be more towards to get a
 9        better grip so I can work my hands to
10        guide myself down the ladder so I can
11        keep my balance.
12   Q.   How do you reposition your left hand on
13        the front handle the second time?
14   A.   I want a better grip on the handle
15        itself.  I'm holding it in one hand now
16        moving down the ladder but I need my
17        balance on top of it.  I have a better
18        grip where the guard is, more toward the
19        guard.  When I'm making the cut my
20        hand's sort of parallel away from it.
21        When I actually start to go down the
22        ladder I want it sort of right on the
23        guard so it's a good way to balance
24        myself and have a good hand on the saw.
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

101

1  Q.  So you slide your left hand closer to
2      the guard.
3  A.  Yes.
4  Q.  The first time you reposition it in
5      order to feel whether the rebar has been
6      cut flush to the wall how do you
7      reposition your left hand then?
8  A.  It's difficult to explain.  I reposition
9      it after I let go with the right hand
10     just so I can turn it a little bit so I
11     can reach over and grab it.  When I'm
12     making my cut it's over here away from
13     me so I'm just really guiding it.  When
14     I want to reactivate the saw I just want
15     to grab it a little closer and the
16     second resposition going down the ladder
17     is just to make sure I have a good grip
18     on it when I start to move for balance
19     sake because now I'm moving so my
20     balance is critical.
21  Q.  When you are moving down the ladder
22     where is your right hand?
23  A.  It's on the rail.
24  Q.  On the right-hand rail of the ladder?

Michael Watson, 8/4/2005

102

1   A.   Yes.

2   Q.   Where is the saw as you are moving down

3        the ladder?

4   A.   In my left hand.

5   Q.   At some point as you are going down the

6        ladder has the blade come to a stop?

7   A.   Not to  my knowledge.  Given that it cut

8        me on the bottom I have to say no, it

9        hadn't.

10  Q.   Could you hear it still moving?

11  A.   No.  At this point I have ear plugs.

12  Q.   You had ear plugs?

13  A.   Yes.  Besides the noise of the saw

14       there's machinery moving around

15       overhead.  There are air tools chipping.

16       There's a lot of stripping.  There's a

17       lot of noise.  It's not a comfortable

18       noise.

19  Q.   What rung were you on when you were cut?

20  A.   Whether or not my foot is actually on a

21       rung or not I don't remember but I am at

22       the bottom of the ladder.  Whether I was

23       leaning with my left foot on I don't

24       remember.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

103

```
 1   Q.   As you are going down the ladder your
 2        left hand is on the front handle of the
 3        saw and your right hand is on the right
 4        rail of the ladder.
 5   A.   Yes, as I am descending.
 6   Q.   Where was your left hand and where was
 7        your right hand at the time the blade
 8        made contact with your left leg?
 9   A.   When I reached the bottom of the ladder
10        I switched the position of my hands from
11        the front to the rear.
12   Q.   You are at the bottom of the ladder and
13        your left hand is still on the front
14        handle and your right hand on the
15        ladder.
16   A.   Yes.  When I reached the bottom I
17        switched positions of my left hand from
18        the front position to the rear position
19        so I could walk with it.
20   Q.   Now you move your left hand which had
21        been on the front handle to the right
22        and put your right hand on the front
23        handle.
24   A.   Yes, temporarily so I could switch to
```

Michael Watson, 8/4/2005

104

```
 1          the left so I released my left hand from
 2          the front, put my left hand on the rear.
 3    Q.    So you put your left  hand which had
 4          been on the front handle on the rear
 5          handle.
 6    A.    Yes, I transferred it.
 7    Q.    And you put your right hand which had
 8          been on the ladder on the front handle.
 9    A.    I put my right hand on the front first,
10          let go with my left.
11    Q.    You first put your right hand which had
12          been on the ladder on the front handle
13          and then you released your left hand
14          from the front handle and put it on the
15          rear handle.
16    A.    That's correct.
17    Q.    And what is the next thing that happened
18          after you changed hands that way.
19    A.    The next thing I remember is feeling a
20          tingling in my leg.  This is after some
21          point when I had put it down by my side
22          it had come in contact with my body.  I
23          felt a tingling sensation in my foot.  I
24          wasn't sure exactly what happened.  I
```

Michael Watson, 8/4/2005

105

1     didn't know what came in contact with my

2     leg.  I felt I had banged it.  When I

3     took my next step that's when I knew I

4     had cut myself.  I couldn't feel my

5     foot.

6  Q.  Did you ever start to saw again after

7     you released the trigger just before

8     reaching your right hand over to feel if

9     you had cut the rebar flush to the wall?

10  A.  No.

11  Q.  How much time would you say went by

12     between when you released your finger

13     from the trigger when you were on the

14     fifth or sixth rung of the ladder and

15     when the blade came in contact with your

16     leg?

17  A.  I'm not sure.  I don't know.

18  Q.  Can you estimate?

19  A.  Less than a minute.

20  Q.  But beyond that you can't say?

21  A.  Not really.

22  Q.  Enough time for all those things that

23     you just described to happen.

24  A.  Yes.

Michael Watson, 8/4/2005

106

```
 1              [Short recess.]
 2  Q.  Let's go back, Mr. Watson, to the point
 3      where you were making the cut of this
 4      last rebar just before you were hurt.
 5      As you were making that cut where was
 6      the saw in relation to your body?
 7  A.  In front of me off to my left making the
 8      cut.
 9  Q.  How high was it in relation to your
10      shoulders?
11  A.  Between my shoulders and my waist.
12  Q.  And there was a ladder that you were on,
13      correct?
14  A.  That's correct.
15  Q.  And it was leaning up against the wall,
16      correct?
17  A.  Yes.
18  Q.  What angle, approximately, did the
19      ladder make with the wall?
20  A.  I wouldn't be able to tell you that.
21  Q.  Let's start with a forty-five degree
22      angle.  Did it make an angle less than
23      forty-five degrees which would put it
24      more parallel or closer to being
```

Michael Watson, 8/4/2005

107

1     parallel with the wall or more than

2     forty-five degrees which would have it

3     coming out more from the wall?

4             MR. TOBIN:  Objection.

5  Q.  Do you understand the question?

6  A.  I do.  I'm not sure.

7  Q.  Can you draw a diagram showing your

8     approximate position into the ladder in

9     reference to the wall?

10  A.  How the degrees go, no.

11  Q.  Can you tell me how far away from the

12     wall the feet of the ladder were?

13  A.  At the time, no, I can't.  I couldn't be

14     exact.

15  Q.  Between the time you made the cut of the

16     rebar and the time when your accident

17     occurred you repositioned your hands

18     three times on the saw.  The first time

19     you did so, according to your testimony,

20     was when you repositioned your left hand

21     on the front handle after you cut the

22     rebar in order to reach your right hand

23     over to see if the rebar was cut flush

24     to the wall.  The second time you

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

108

1     repositioned your left hand on the front

2     handle of the saw was when you did so in

3     order to go down the ladder, and the

4     third time you repositioned your hands

5     was when you got to the bottom of the

6     ladder or near the bottom of the ladder

7     and you reached your right hand which

8     had been on the ladder over to the front

9     handle and took your left hand which had

10    been on the front handle and moved it to

11    the rear handle in order to carry the

12    saw, is that right?

13  A.   Yes.

14  Q.   I just wanted to make sure I got the

15    sequence.  I think I described it

16    accurately.  With that in mind as we

17    told you we have an exemplar saw here.

18    It's not the saw involved in your

19    accident.  I'm going to ask you to just

20    show as best you can how you were

21    holding the saw at the various points in

22    time that you just described.  Okay?

23  A.   Sure.

24          MR. BARRY:  Just so the

Michael Watson, 8/4/2005

109

1 record is clear we are not plugging the

2 saw in.  We are not turning the saw on

3 and I will also represent to you that

4 this exemplar does not even have a blade

5 in it.

6     [Saw marked Watson Exhibit

7     No. 6 for Identification.]

8 Q. Do you recognize the exemplar saw we

9 have just marked as Exhibit 6 as a saw

10 similar to the one that you were using

11 at the time of your accident?

12 A. Yes.

13 Q. Do you notice any differences that you

14 can identify now between the saw that

15 we've marked as Exhibit 6 and the saw

16 that was involved in your accident?

17 A. Nothing outstanding.  Handles, blade.

18 Q. Would you just demonstrate, first of

19 all, how you were holding the saw in

20 terms of positions of your left and

21 right hands at the time you made the cut

22 of the rebar just before your accident.

23     MR. TOBIN:  Just before he

24 does his demonstration the present

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

110

1    conditions don't closely or accurately

2    reflect the conditions of the accident

3    and we are not waiving any rights to

4    object to any photographs taken in this

5    deposition.

6    Q.   My question is limited to how he was

7         holding the saw in terms of the position

8         of his left and right hands on the saw

9         at the time he made the cut.

10   A.   In making the cut it would have been

11        something like this.

12   Q.   We have Mr. Gustafsson here and he is

13        going to photograph you holding the saw

14        in that position.

15                   [Photograph File

16                   No. 000-0848 marked Watson

17                   Exhibit No. 7 for

18                   Identification.]

19   Q.   I'm going to ask you, Mr. Watson, to

20        position your hands on the saw as they

21        were when you were feeling to make sure

22        the rebar was cut flush to the wall.

23                   MR. TOBIN:  Your hands on

24        saw.

Michael Watson, 8/4/2005

111

```
 1   Q.   Your right hand is obviously not on the
 2        saw when you are feeling over.
 3   A.   Right.
 4   Q.   Where was your right hand as you felt
 5        over.
 6                  [Witness complying.]
 7   Q.   Show where your left hand was when you
 8        were reaching over with your right hand
 9        to see if the rebar was cut flush to the
10        wall.
11                  [Witness complying.]
12                  [Photograph File
13                  No. 100-0850, Time 11:27
14                  marked Watson Exhibit No. 8
15                  for Identification.]
16   Q.   Now would you show me the position of
17        your left and right hands on the saw at
18        the moment when the blade came in
19        contact with your leg.
20                  [Witness complying.]
21   A.   As I was bringing it down it would have
22        been something like this.
23   Q.   When you got to the bottom of the ladder
24        you told us that you moved your right
```

Michael Watson, 8/4/2005

112

1       hand to the front handle of the saw,

2       correct?

3    A.  Right.

4    Q.  And you moved your left hand to the rear

5       of the saw, correct?

6    A.  Right.

7    Q.  Were both hands on the saw at the same

8       time?  That is, after you moved your

9       right hand to the front handle and your

10      left hand to the rear handle?

11   A.  Yes, they would have been.

12   Q.  Would you show that position just before

13      you were cut.

14              MR. TOBIN:  Note my

15      objection.

16              [Witness complying.]

17              [Photograph File

18              No. 100-0851, Time 11:30

19              marked Watson Exhibit No. 9

20              for Identification.]

21   Q.  My final question is the one I asked

22      before that you objected to.  At the

23      moment you felt the blade contact your

24      left leg your right hand is not on the

Michael Watson, 8/4/2005

113

```
 1        saw at all and your left hand is holding
 2        the rear handle.
 3              MR. TOBIN:  Objection.
 4   Q.   Where are your hands when you felt the
 5        blade contact your leg?
 6   A.   Whether my right hand was actually on
 7        the saw at this time I'm not exactly
 8        sure of.  It could have been one hand at
 9        the time just when I was bringing it
10        down to let it go.  When it hit the side
11        of my body was my right hand still on
12        the handle?  I'm not certain.
13   Q.   Do you know where your left hand was?
14   A.   The left hand was on the rear handle.
15   Q.   As you were going down the ladder after
16        you made the cut and before the blade
17        came in contact with your left leg where
18        was the saw in relation to your body?
19   A.   In front and about shoulder level as I
20        was going down the ladder.
21   Q.   Directly in front of you?
22              MR. TOBIN:  Objection.
23   A.   Yes.
24   Q.   It wasn't to your left or right?
```

Michael Watson, 8/4/2005

114

1    A.    It was in my left hand.

2    Q.    But it was in front of you more than to

3          your left.

4                   MR. TOBIN:  Objection.

5    A.    It was in front of me with respect to

6          the ladder.  My hand was touching the

7          ladder.  The saw was in my left hand and

8          fell from the ladder.

9    Q.    Do you know one way or the other whether

10         the blade was still spinning as you were

11         going down the ladder?

12   A.    No.

13   Q.    Do you know one way or the other whether

14         you reactivated the saw between the time

15         you released your finger from the

16         trigger and when your accident happened?

17   A.    No.

18   Q.    Was there ever a point when both your

19         hands were on the front handle?

20   A.    When I was switching my right would have

21         been on the front handle to take the

22         weight of the saw and I put my left hand

23         on the right rear.

24   Q.    Will you demonstrate that.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Michael Watson, 8/4/2005

115

```
 1   A.   I had it in this hand something like

 2        this.

 3                      [Witness demonstrating.]

 4                      [Photograph File

 5                       No. 100-0852, Time 11:34

 6                       marked Watson Exhibit No. 10

 7                       for Identification.]

 8   Q.   Would you demonstrate again the position

 9        of your hands when both your left and

10        right hands were on the front handle of

11        the saw.

12                      [Witness demonstrating.]

13                      [Photograph File

14                       No. 100-0853, Time 11:36

15                       marked Watson Exhibit No. 11

16                       for Identification.]

17   Q.   Had you taken any steps to walk with the

18        saw before you felt the blade contact

19        your leg?

20   A.   No.

21   Q.   Were you on level ground when you felt

22        the blade contact your leg?

23   A.   I was at the base of the ladder.  I'm

24        not sure whether one foot was still on a
```

Michael Watson, 8/4/2005

116

1   rung.  If I'm on the bottom I'm still on

2   the ladder and I just want to switch

3   hands so I can move.

4 Q. So you were facing the ladder and the

5   wall when you felt yourself being cut.

6 A. Yes.

7 Q. Did you ever slip just before the

8   accident happened?

9 A. No.

10 Q. Did you ever lose your footing?

11 A. No.

12 Q. Did you ever tell anybody you did?

13 A. No.

14 Q. Did the saw ever kick back immediately

15   before the accident?

16 A. There was some sort of jerk.

17 Q. Not as a result of the accident, before

18   the accident.

19 A. No.

20 Q. Was the accident caused by a kickback?

21      MR. TOBIN:  Objection.

22 A. Not that I am aware of, no.

23 Q. Did you ever say in describing the

24   accident, "I go to turn the saw off and

Michael Watson, 8/4/2005

118

 1      says in response to a question put to

 2      you about how the accident happened, "I

 3      go to turn the saw off and it came down

 4      and it brushed my leg and it cut my leg

 5      and cut the peroneal nerve," would that

 6      be an accurate description of how the

 7      accident happened?

 8  A.  It's an overall description.  Not really

 9      because it's a general description of

10      what happened.

11  Q.  Are you sure that you had, in fact,

12      turned the saw off before the accident

13      happened?

14  A.  Absolutely.

15  Q.  How do you know that?

16  A.  Well, to turn the saw off just take my

17      finger off the trigger it would have to

18      because my right hand is now reaching

19      across my body to check the rebar so I

20      only have one hand to carry the saw.

21  Q.  There were no witnesses to the accident?

22  A.  Not that I am aware of.  I am aware of

23      only one other person who was on the

24      side with me.

Michael Watson, 8/4/2005

120

1   A.   Yes.

2   Q.   Did you describe how the accident

3        happened to any people in the Emergency

4        Room of Boston City Hospital?

5   A.   To any great detail, no.  I told them I

6        cut my leg and that it was a saw and the

7        type of saw.

8   Q.   What happened to the saw that was

9        involved in your accident?

10  A.   I have no idea.

11  Q.   Did you ever see it after that day?

12  A.   No.

13  Q.   Did you ever talk to anybody at Modern

14       Continental about where it went or what

15       happened to it?

16  A.   No, I never really had any contact.

17  Q.   Have you used any power tools since your

18       accident?

19  A.   I used a drill once.  No saws.

20  Q.   Do you mind if I look at your injury?

21  A.   Not at all.

22  Q.   You are wearing an orthotic device of

23       some sort on your left leg.

24  A.   Yes.

EXHIBIT B

# PARTNER

**Illustrated Parts List   2000-05  CD**

### K2300 EL - 12"  1993 - 2000

### K2300 EL -14"   1997 - 2000

Identify by a **Green** or **Silver** colored
serial number plate

| PARTNER | K2000  Mark II | |
|---|---|---|
| Partner Ind. Products AB Sweden | | |
| | | |

| PARTNER | K2000  Mark II | |
|---|---|---|
| Partner Ind Products AB Sweden | | |
| | | |

108 30 01-12

# PARTNER®

EXHIBIT C



FILE NO. 100-0848

EXHIBIT NO. 7

EXHIBIT D

**SABON***INDUSTRIES, INC.*                                     Leslie N. Wilder, P.E.

150 Jennie Lane • Fairfield, Connecticut 06824 • 203/255-8880

September 29, 2005

Jonathan E. Tobin
Finneran, Byrne & Dreschler, L.L.P.
50 Redfield Street
Boston, MA 02122

**EXHIBIT**

*LW  3/27/06*
*No 1    Cr*

Re: Watson v. Electrolux

Dear Mr. Tobin,

Enclosed is my investigative report regarding the above matter. Enclosed also is a current CV describing my qualifications, my four-year testimony listing, and the following information, pursuant to Rule 26.

Compensation for my work in this matter is at the rate of $350.00 per hour. If required, deposition testimony is at a rate of $1400.00 per half-day (4 hours) or any part thereof, including travel, plus out-of-pocket or travel costs. Court testimony is at a rate of $2800.00 per day or part thereof, including travel, plus any out-of-pocket or travel costs.

Within the last ten years I have published an article entitled <u>Avoiding the Pitfalls of the Too-Obvious Defect</u> in the Journal of the National Academy of Forensic Engineers, (174 Brady Avenue, Hawthorne, New York 10532) Volume XIV No. 2, December 1997.

In the event that I might have to further explain my opinions and reasoning as provided in my report, I might have to utilize or refer to reference items listed in the report, any underlying data, the exemplar of the subject saw, demonstrative equipment and/or other exemplar power tools or equipment.

Thank you for this opportunity to be of service.

Sincerely,

Leslie N. Wilder

## Leslie N. Wilder, P.E.          Four-Year Testimony List

| Case | Attorney | Depo | Trial | Note | Jurisdiction |
|------|----------|------|-------|------|--------------|
| Nelson Lopez v Delta | Robert Baumgarten | | 4/18/2002 | | US District Court, Eastern District of NY |
| Varela v Hobart | Kenneth Berkowitz | 5/4/2004 | | | NJ Superior Ct, Hudson County  HUD-L-1146-01 |
| Pak Wai Li v. Liebert Corp. et al | Paul Brozdowski | 6/15/2000 | 8/28/2002 | | US District Court, District of CT |
| Estate of David Young | Vincent Ciecka | 5/19/2005 | | | NJ Superior Court, Mercer Cty, Docket |
| Calvo v DoALL | Russell Jamison | 3/30/2004 | 8/25/2005 | | US District Court, Eastern District of NY CV 01 1297 |
| Cuozzo v. Atlantic Medical Imaging, et al | Eric Katz | | 1/15/2004 | | NJ Superior Ct, Middlesex Cty, New Brunswick |
| Leclerc v Scotchman Industries, Bewo | Ronald Kidd | 11/20/2003 | | | Hampden Superior Ct., MA - Civil Action 00-1121 |
| Nardello v Borough of  Naugatuck | Joseph Mengacci | 8/5/2002 | | | CT Superior Court, J.D. of Waterbury at Waterbury |
| Hassey v Silver Eagle | Andrew Mimnaugh | 8/23/2001 | 12/12/2001 | | US Distr. Ct, District of NJ  [Camden, NJ] |
| Goldberg v General Wire Spring Co. | Vincent Musto | 10/6/1998 | 11/1/2001 | | CT Superior Ct  JD of Fairfield at Bridgeport |
| Katherine Amyotte v Kaola Bear Kare, | Nancy Sachs | 3/27/2002 | | | CT Superior Ct: JD of Stamford/Norwalk at Stamford |
| Maresca v Werner | Howard Suckle | 8/27/2003 | | | US District Ct, Southern District |
| Hemchandra Shertukde v Yard-Man | Mark Vidone | 12/3/2003 | | | US District Ct., District of CT #3:02CV620 (CFD) |
| Dudley v. Sears, Roebuck & Co. | William White | | 4/30/2002 | | NY Superior Court, Cty of Washington  Index 7929D |
| McDermott v Ariens | Frank Zeccola | 2/20/2001 | 12/5/2001 | | NY Supreme Court, Orange County |
| Castellucci v CMI | Jeffrey Zonna | 10/11/2001 | | | US District Court, District of New Jersey |

9/28/2005

Notes:

**LESLIE N. WILDER, P.E.**                                                         203/255-8880
150 Jennie Lane • Fairfield, CT 06824

| | |
|---|---|
| **Professional:** | B.S.   Mechanical Engineering   - Columbia University   1956 |
| | M.S.   Engineering Mechanics   - Stanford University   1957 |
| | M.S.   Electrical Engineering   - New York University   1959 |
| | Licensed Professional Engineer  - New York, California, Connecticut |
| | Board Certified Diplomate Forensic Engineer |
| | Board Certified Professional Ergonomist |
| | Fourteen patents granted. |

- National Academy of Forensic Engineers (Past President)
- American Society of Mechanical Engineers
- National Society of Professional Engineers
- Human Factors and Ergonomics Society
- Tau Beta Pi Engineering Honor Society
- American Society for Testing & Materials
- Society of Automotive Engineers
- International Society for Skiing Safety

**Services:**
- Product Liability Analysis
- Expert Testimony
- Accident Reconstruction
- Alternative Product Designs
- Engineering Consultation
- Product Testing

**Expertise:**
- Mechanical Engineering
- Electrical Engineering
- Human Factors/Ergonomics
- Cumulative Trauma Disorders
- Product design
- Failure analysis
- Safety
- Manufacturing

**Product Knowledge: (partial)**
- mowers and garden equipment
- snow throwers
- skis, boots and bindings
- bicycles
- sports and recreational products and equipment
- ladders, chairs and stools
- power and hand tools, shop equipment
- industrial and production machinery
- vehicles, seat belts and brakes
- automatic doors and mechanisms
- appliances, switches and electromechanical devices

**Industry Experience:**

1983-
present

President
SABON INDUSTRIES, INC.                                          Fairfield, Connecticut
Designed and manufactured ergonomic computer accessories.
Consulting services in engineering, human factors, product development
and marketing for Stanley Tools, ATT, and other industrial firms. Forensic
consulting, product analyses and expert witness services for the legal
profession and insurance industry.

LESLIE N. WILDER                                                    page 2

1986-90    Vice President and General Manager
           THE HOPP PRESS, INC.                          Newark, New Jersey
           Responsible for product development, manufacturing, sales, marketing, and
           administration.  Products include product identification and pricing systems.

1982-83    Executive Vice President
           MECHTRONICS CORPORATION                   Stamford, Connecticut
           Responsible for product development, manufacturing and administration for
           this manufacturer of specialized mechanical and electromechanical point-
           of-purchase displays.

1977-82    Director of Engineering, Leisure Products
           AMF INCORPORATED                          White Plains, New York
           Provided technical and business guidance to the $1 billion leisure and
           electrical divisions.  Responsible for product development, engineering and
           program analyses.  Reviewed and monitored over 100 engineering and
           product development programs annually.  Coordinated domestic and
           foreign technical resources. Staff engineering responsibility for:
                        • Lawn and Garden lawn mowers and tractors
                        • Wheel Goods bicycles and mopeds
                        • Tyrolia ski bindings
                        • Head tennis racquets and skis
                        • Potter and Brumfield relays and switches
                        • Paragon timers and circuit protectors
                        • American Athletic and Whitely exercise equipment
                        • Hatteras, Sunfish and other boats
                        • Harley Davidson motorcycles

1968-77    Vice President Research and Development
           DICTAPHONE CORPORATION                          Rye, New York
           Responsible for all new product development and other engineering
           activities.  Established and managed the engineering and technical staff. In
           less than 5 years, new products developed accounted for 90% of profits.

1965-68    Manager of Research and Development
           ICORE INDUSTRIES                          Sunnyvale, California
           Engineering development responsibility for high speed, high precision,
           production-line inspection, weighing and control equipment. These products
           utilized mechanical, electronic and optical technologies and were used by
           companies such as General Mills and Proctor and Gamble.

1964-65    Research Specialist
           AUTONETICS/NORTH AMERICAN AVIATION         Anaheim, California
           Planned, coordinated and scheduled complex avionics systems programs.

1957-64    Member of Technical Staff
           BELL TELEPHONE LABORATORIES     Murray Hill and Holmdel, New Jersey
           Designed mechanical, electromechanical and electronic devices and equipment.
           Developed and patented the Bell System TRIMLINE telephone.

Date:    September 29, 2005
To:      Jonathan E. Tobin
         Finneran, Byrne & Dreschler, L.L.P.
         50 Redfield Street
         Boston, MA 02122


From:    Leslie N. Wilder, P.E.
         Sabon Industries, Inc.
         150 Jennie Lane
         Fairfield, CT 06430
         203 255 8880

Subject:  Michael Watson  v. Electrolux Professional Outdoor Products

## Summary of Investigation:

At your request, I have reviewed the information regarding Mr. Michael Watson's accidental injury involving a portable electric abrasive saw. This report summarizes my investigation, and in addition to any other information which may be referenced in this report, is based upon the following:

1. Inspection of a similar K2300 EL 12" exemplar saw
2. Copy of operating instructions for K2000 Mark II
3. 6 color copy photos and various photos on CD of a 2001 exemplar 14" K2300 saw
4. Deposition transcript and exhibits of Michael Watson, dated 8/4/05
5. Deposition transcript of Sven Gustafson and exhibits, dated 8/8/05
6. Copy of Partner K2300 EL Operator's Manual (108 88 09-70, 2001W05)
7. Copy of Partner K3000 EL Operator's Manual (1088897-26, 2003-08-26)
8. Copy of Partner Product Specification & Price List 2001
9. Copy of Partner K2300 EL 12" 1993-2000, K2300 EL-14" 1997-2000 Illustrated parts list (2000-05 CD and 108 30 01-12)
10. Copy of Partner K3000 Electric Spare Parts List (106 31 00-61)
11. Partner K3000 descriptive page from www.partner-industrial.com
12. Partner (Jonsereds Power Products) Safety Manual printed 1995
13. Review of Defendant's Answers to Plaintiff's First Set of Interrogatories
14. Review of Defendant's Response to Plaintiff's First Request for Production of Documents
15. Modern Continental's accident investigation file
16. Review of Suleyken Walker's letter dated 8/2/05 and accompanying exhibits
17. Various medical records and photos of the injury
18. 7 U.S. Patents regarding electric braking mechanisms for electric power tools

19. Code of Federal Regulations, Title 29, Subtitle B, Ch. XVII, Occupational Safety and Health Administration, Dept. of Labor (OSHA) 7/88 and later

Based upon this investigation, it is my conclusion that the subject saw was defectively designed and unreasonably dangerous in that it lacked a braking means to quickly slow the saw blade to a stop when the machine's switch was released.

This report, and the opinions and conclusions reached are based upon the information received by the writer to this date, and may be subject to modification should new or additional pertinent information be received.

It is for the sole use of the addressee for possible litigation in connection with this incident, and for no other purposes. All rights are reserved by Leslie N. Wilder, P.E., and Sabon Industries, Inc.

## Background:

The plaintiff, Michael Watson, formerly of 39 Old Harbor Street, S. Boston, Massachusetts (DOB 8/15/70, 6-feet 1-inch tall, 175 pounds) had been employed at Modern Continental Construction of Cambridge Massachusetts since May 21 of 2001 as a laborer. On December 5 of that year, he was using a portable electric abrasive saw at a below grade worksite on the I-93 roadway to cut projecting steel reinforcing bars flush with a concrete wall from which they projected.

In general, based upon Mr. Watson's testimony (Reference 4, pp 94-104) the immediate events leading up to his injury are as follows: At one point, he was on the fifth or sixth rung of a ladder, cutting a rod to his left. As a right-handed person, he was using the saw with his left hand on the forward (loop) grip and his right hand on the rear handle. After cutting the rod, he released the trigger switch, repositioned his left hand on the loop handle, and confirmed that the rod had been cut flush with his right hand. He then readjusted the grip of his left hand on the saw for balance, and started down the ladder with his right hand on the right rail of the ladder. Upon reaching the bottom of the ladder, he transferred his grip on the saw to hold it with his left hand by the rear handle in order to more conveniently carry the saw. At some point in this process, the saw blade, which was still spinning (also referred to as coasting or coast down), contacted his left leg, causing laceration and nerve injuries below the knee.

Mr. Watson stated that he had used cutting saws in the past, and that he had used the subject saw over a period of perhaps three weeks to a month to cut hundreds of such rods on that jobsite prior to that date. On that date, except for a lunch break, he had worked from 7:00 AM to approximately 2:30 PM when he was injured. He described the work environment as noisy, and with work lights being used which created many shadows. He was wearing safety goggles and earplugs.

## Description of Saw:

This subject K2300 EL saw is manufactured by the Partner subdivision of the Electrolux Professional Outdoor Products of Sweden, and was in production in the 1992-2003 time period. It consists essentially of an electrical motor driving a circular abrasive blade

Jonathan E. Tobin, Esq. - Watson v. Electrolux        - 2 -        Leslie N. Wilder, P.E.

through a gear reduction mechanism. The motor is housed such that it can be hand-held using two handles. The rear handle incorporates a spring loaded finger-operated motor switch which can be actuated when an interlock button is depressed. The forward handle is of a loop design. The motor's axis of rotation is generally fore and aft, and the blade rotation is at right angles to the motor axis and is such that the bottom of the blade rotates backwards toward the user. A semi-fixed guard surrounds the upper portion of the blade, and encompasses somewhat more than half the circumference of the blade. The rotational orientation of the guard is manually adjustable to minimize debris from flying back toward the operator. Neither the saw nor the operator's manual contained any warnings regarding the blade hazard due to coasting, as provided by some other saw manufacturers.

It is not clear whether the subject saw had a 12-inch or 14-inch diameter blade, both of which were offered by Partner, the two versions differing only in the diameter of the blade and the size of the guard. The saw is rated at 15 amperes at 120 volts AC and 4500 revolutions per minute.

The defendant indicated coast-down (stopping times after release of the trigger switch) of 10-12 seconds for the 12-inch EL 2300 (Walker, Reference 15) and 12-15 seconds for the 14-inch blade (Gustafson, Ref. 4, page 72, line 21). An exemplar 12-inch K2300 EL tested by this investigator was found to have a coast-down time of 12.7 seconds.

Discussion:

Unguarded spinning saw blades on power tools are certainly hazardous, as accidental bodily contact with a spinning blade can result in severe injuries. For this reason, it is appropriate to physically guard the blades to the maximum extent possible without compromising the tool's ability to perform its function. For example, retractable blade guards have been a standard feature on hand-held circular saws and on radial-arm and miter saws for many years. An additional approach to reducing the hazard of a spinning blade is to ensure that the blade slows to a stop quickly when the machine is turned off.

Because the blade guard on the subject saw does not completely cover the blade when the saw is withdrawn from the workpiece, it is especially important that the blade stops as quickly as possible.

Blade braking mechanisms have been offered on power saws for many years. Both mechanical and electrical braking means have been employed to accomplish this. Radial arm saws at least as far back as the 1960's have incorporated mechanical blade braking mechanisms to quickly stop the blade once power is shut off. It is common for miter saws and hand-held circular saws of more recent vintage to utilize electrical means to brake the motor to a stop. Such means, often referred to as dynamic braking, are based upon the concept of switching the electrical current paths within the motor circuitry so that the motor effectively becomes a generator under load, where electromagnetic fields are created that oppose continued rotation of the motor armature, causing the kinetic energy of the spinning motor to be rapidly dissipated. There have been many approaches to accomplishing this, as evidenced by the numerous extant designs and patents.

That these approaches are both economically and technically feasible are illustrated by the following examples:

About 10 years ago, Makita, a manufacturer of electric saws manufactured a model 5007NB-A circular saw which differed from their model 5007NB only in the addition of an electric brake feature, which served to bring the blade to a rapid stop when the trigger was released. At that time, the electric brake model retailed for approximately $164 compared to approximately $130 for the non-braked 5007NB

The construction of the two saws was almost identical, with only the brushes, switch, armature and field assemblies differing between the models. A replacement field assembly for the NB-A cost $44.00, as compared to $35.00 for the non-braked model, and the NB-A switch cost $10.00 as compared to $9.00 for the NB model. The costs of the brushes and armature were the same for both models. The cost difference between the two models, on a retail, parts replacement cost basis, was thus only $10.00. Current Makita models 5007FAK and 5007FK (with and without blade brakes) retail for approximately $127 and $105, respectively, a similar small difference.

DeWalt, another well-known manufacturer of electrically operated tools offers the 120 volt, 15 ampere 5800 rpm model DW 369CSK 7 1/4 inch circular saw, as well as the identically specified DW368 model, which differs only in that the former includes electrical braking, while the latter does not. The saws retail for approximately $129.99 and $109.99, respectively. Assuming a ratio of approximately 3 or 4 to one between the retail price and manufacturing cost, the additional cost to manufacture the braked version is approximately $5.00- $7.00.

As another comparison, consider the current DeWalt model 708 4000 rpm 12-inch miter saw. This saw is also rated 15 amperes at 120 volts and provides dynamic braking.

This DeWalt is a larger, and significantly more complex device than the Partner saw. Each contains a motor and associated housing, an interlocked operator switch and power cord, blade mounting means, and an upper blade guard. Each has a cutting blade, with the Dewalt's carbide-tipped steel saw blade retailing for approximately $55, compared with a 14-inch abrasive blade at approximately $15. The Partner saw utilizes a gearbox, which the Dewalt does not, but the Dewalt has a large base, with two different angle adjustment mechanisms, a belt and two pulley drive mechanism, and adjustable and lockable fences. In addition, the Dewalt has an automatically retracting lower blade guard, a sawdust collector and a motor head slide mechanism. The DeWalt has many more parts and functions than the Partner saw. Yet it sells for approximately $550-$600, as compared with $660 for the Partner K2300 EL.

A test of the DeWalt's stopping time was conducted by mounting two 10-inch steel blades on the DeWalt. The combined polar moment of inertia of the two blades, which weighed 3.03 pounds is approximately 6 percent greater than that of a 14-inch Partner abrasive blade. The DeWalt stopped the blades in less than 2 seconds.

In addition to Dewalt, other manufacturers of power tools, such as Delta and Ridgid, also offer miter saws of similar power, functionality size and price. They, too, provide blade brakes. For example, the Ridgid model MS1290LZ 15 ampere, 120 volt, 4000 rpm, 12-inch miter saw sells for $569.00 and includes dynamic blade braking. Its Owner's Manual indicates a stopping time of less than 6 seconds, but actual testing of the saw revealed a blade stopping time of approximately 2.6 seconds. A test of a Delta Model 3260 12-inch miter saw showed a stopping time of less than 2 seconds with the blade brake enabled, and approximately 5 1/2 seconds under free coast down (mains power removed, trigger depressed).

The foregoing discussion and examples indicate that dynamic blade braking for electric saws in the $130 - $600 price range is practicable, inexpensive, and effective.

The concept of blade braking is not unique to power saws. For example, safety standards exist to restrict the time it takes for rotating impellers and augers on snow throwers and for the blades of power lawn mowers to stop once the operating controls have been released. Such products routinely meet these stopping time requirements.

### Machine Safety and Accident Prevention:

The product safety hierarchy is well known: A product should first be designed to be non-hazardous. If this is not possible, then the hazards should be guarded against. If this is not feasible without compromising the product's utility, only then should warnings and/or training be used to reduce the risk.

Warnings are never a substitute for an inherently safe design, or one where hazards can be guarded against. The reason for this is simple. No matter how good the training or warnings, or how well intentioned the user, accidents can lead to an injury if an unguarded hazard exists.

Consistent with this, OSHA (Occupational Safety and Health Standards - 29 CFR, Part 1910) (Ref. 19) requires that all employee-operated machinery be guarded, as follows:

**Subpart O:    Machinery and Machine Guarding**
**Standard 1910.212:  General requirements for all machines.**
**1910.212(a) Machine guarding.**
**1910.212(a)(1)**

> Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.

In my opinion, the subject Partner saw does not comply with this safety requirement as it lacked sufficient means to reasonably protect the operator.

**Conclusion:**

It was foreseeable by the manufacturer that the K2300 EL would be used in an environment that might be sufficiently noisy to mask the coast down sound of a still-spinning blade, or that users would wear hearing protection. It was also foreseeable that the saw would be held and used in a variety of positions, passed from one hand to another as a user changed positions or moved from one location to another, and that, given the lack of a full mechanical blade guard, that the unguarded portion of the blade might inadvertently come into contact with a user's body during such maneuvers.

It is incumbent upon the manufacturer to provide protection against the known hazard of a spinning blade to the extent reasonably possible. Since braking of motor-driven tools is a well-known and commonly applied technique for reducing the hazards of such tools, Partner could and should have provided such a feature.

As previously noted, hazards should first be designed out of a machine, or guarded against. The K2300 EL incorporated neither effective guarding nor adequate operator safety warnings.

If the plaintiff had been using a saw equipped with either mechanical braking, or the electrical dynamic braking such as offered by Delta, DeWalt , Makita and Ridgid, the saw blade would have stopped or been going more slowly before it contacted the plaintiff's leg. This would have prevented or reduced the likelihood of injury. In the absence of a blade brake, operator warnings would have made the saw a safer device.

Because it was both technically and economically feasible to have had a blade brake on the K2300EL at the time of its manufacture, the lack of such a safety feature makes the design of the Partner K2300 EL defective and unreasonably dangerous.

To a reasonable degree of engineering certainty, it is my opinion that it is more likely than not that this defect was a proximate cause of this accident and injury.

Leslie N. Wilder, P.E.

EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL WATSON, INDIVIDUALLY,
AND AS FATHER AND NEXT FRIEND
OF JOHN WATSON, PPA
     Plaintiff

v.

ELECTROLUX PROFESSIONAL
OUTDOOR PRODUCTS, INC.
     Defendant

CIVIL ACTION NO. 04-11782 DPW

## AFFIDAVIT OF LENNART GUSTAFSSON

I, Lennart Gustafsson, state as follows under the pains and penalties of perjury:

1.     Until April 16, 2006 when I retired from that position, I was Vice President of the Defendant, Electrolux Outdoor Products, Inc. ("Electrolux"), whose division Partner Industrial Products ("Partner") is the designer and manufacturer of the Partner K2300 electric power cutter that is the subject of this action.

2.     I received the equivalent of a B.A. in Mechanical Engineering from Aschebergs Gymnasiet in Sweden in 1967. Beginning in 1969, I was employed in various engineering capacities by Partner. From the late 1980's until my retirement from Partner in 2003, I was President of United States Operations for Partner. Thereafter, I became Vice President of Electrolux until my retirement last month.

3.     During the course of my employment with Partner and Electrolux, I became familiar with the design of the Partner K2300 and its predecessor and successor power cutter models. I am also familiar with the design of power cutters made by Partner's competitors.

4.    The following companies make 12" and 14" hand-held electric power cutters that compete with Partner power cutters in the marketplace: Bosch, DeWalt, Hitachi, Makita, and Milwaukee. None of these power cutters have so-called blade brakes or motor brakes. Indeed, to the best of my knowledge and belief, no power cutter manufacturer incorporates a blade brake on its electric power cutter.

5.    In my positions with Partner and Electrolux I have been responsible for responding to customer complaints with respect to Partner power cutters and have also been responsible for product liability claims against Partner and Electrolux arising out of the use of Partner power cutters.

6.    Apart from this case, no customer or user of a Partner electric power cutter has complained to Partner or Electrolux about an alleged danger of a coasting blade. Nor, apart from this case, has any user of a Partner electric power cutter filed a lawsuit against Partner or Electrolux alleging a danger from a coasting blade. This has been confirmed by my review of company records.

7.    Power cutters are different from portable circular saws and stationary miter saws. Power cutters are not as frequently used to make repetitive cuts (where blade brakes can enhance productivity) and are used by professional users, mostly in the construction industry, to cut steel or masonry, as opposed to wood.

8.    When used to cut steel, the cutter wheel on the power cutter is an abrasive blade, which is resin bonded, has no "teeth" and is "dull" compared to blades used on wood cutting saws such as circular saws and miter saws. Abrasive blades are not "aggressive" and must be forced into the material in order to perform their cutting function.

2

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18

DAY OF MAY, 2006.

Lennart Gustafsson

377631

3

# EXHIBIT F

1

Volume: I
Pages: 1 - 184
Exhibits: 1 - 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*********************
MICHAEL WATSON, INDIVIDUALLY,
AND AS FATHER AND NEXT FRIEND
OF JOHN WATSON, PPA,
     Plaintiff,

    vs.          CIVIL ACTION NO.
               04-11782DPW

ELECTROLUX PROFESSIONAL
OUTDOOR PRODUCTS, INC.,
     Defendant.
*********************


DEPOSITION of LESLIE N. WILDER,

taken on behalf of the Defendant, pursuant

to the Federal Rules of Civil Procedure

before Eileen Baker, Registered Professional

Reporter and Notary Public within and for

the Commonwealth of Massachusetts, at the

offices of Sugarman, Rogers, Barshak &

Cohen, P.C., 101 Merrimac Street, Boston,

Massachusetts, on Monday, March 27, 2006,

commencing at 10:26 a.m.


SHEA COURT REPORTING SERVICES
(617) 227-3097

4

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                    At the offices of Sugarman, Rogers,

 3          Barshak & Cohen, P.C., 101 Merrimac Street

 4          Boston, Massachusetts, on Monday, March 27,

 5          2006, commencing at 10:26 a.m.

 6                         STIPULATIONS

 7                    It is hereby stipulated and agreed

 8          by and between counsel for the respective

 9          parties that the reading and signing will

10          not be waived.  The sealing and filing are

11          waived.

12                    It is further stipulated and agreed

13          that all objections, except objections to

14          the form of the questions, and motions to

15          strike will be reserved until the time of

16          trial.

17                    LESLIE N. WILDER,

18          being first duly sworn, was examined and

19          testified as follows:

20                    DIRECT EXAMINATION

21          BY MR. BARRY:

22     Q.   Would you tell us your name, please, sir?

23     A.   I'm Leslie Wilder, L-E-S-L-I-E, W-I-L-D-E-R.

24     Q.   Where do you live, Mr. Wilder?
```

5

```
 1    A.    In Fairfield, Connecticut.

 2    Q.    What is your occupation?

 3    A.    I'm an engineer.

 4    Q.    What type of engineer?

 5    A.    Mechanical and electrical, mostly

 6          mechanical.

 7    Q.    When you say mostly mechanical why do you

 8          say that?

 9    A.    I have degrees in both electrical and

10          mechanical engineering, but the matters that

11          I get involved in tend to be mostly

12          mechanical.

13    Q.    Where you have matters that require the

14          expertise of an electrical engineer do you

15          refer those or consult with an electrical

16          engineer?

17    A.    Depends on the issues.

18                MR. BARRY:  Can we mark this as

19          Exhibit 1.

20                (Exhibit No. 1 Report 9/29/05

21          marked for identification.)

22                (Exhibit No. 2 Profile marked for

23          identification.)

24                (Exhibit No. 3 CV marked for
```

6

```
 1          identification.)

 2   Q.     Mr. Wilder, do you do business under any

 3          particular corporate or business name?

 4   A.     Yes.

 5   Q.     What is it?

 6   A.     Sabon Industries, Incorporated.  That's

 7          S-A-B-O-N.

 8   Q.     Is that a private company?

 9   A.     It's a corporation.

10   Q.     Private corporation?

11   A.     Yes.

12   Q.     Privately held?

13   A.     Yes.

14   Q.     Who owns it?

15   A.     I do.

16   Q.     Anybody else?

17   A.     No.

18   Q.     How long has it been in existence?

19   A.     Since mideighties started out as a

20          non-corporate entity and then it changed to

21          a corporate entity, somewhere around 1986 or

22          thereabouts.

23   Q.     Is it organized under the laws of the State

24          of Connecticut.
```

7

```
 1    A.    Yes.

 2    Q.    Where is its principal place of business?

 3    A.    150 Jennie Lane, J-E-N-N-I-E, Lane in

 4          Fairfield, Connecticut.

 5    Q.    Is that where you live?

 6    A.    Yes.

 7    Q.    Does it have any other place of business?

 8    A.    No.

 9    Q.    Does it have any other employees besides

10          yourself?

11    A.    No.

12    Q.    If I were to go to Sabon Industries and

13          visit the place of business of Sabon

14          Industries what would I see?

15    A.    You would see a residence with laboratory

16          facilities in there.

17    Q.    What type of laboratory facilities are

18          there?

19    A.    Well, there is space available and used with

20          machinery, test equipment, tools and it's

21          reserved for pretty much Sabon Industries'

22          work.

23    Q.    In the course of your work as a forensic

24          engineer do you ever consult with other
```

11

```
 1          understand the question.

 2    A.    Well I think I understand the question, but

 3          I'm not sure.  It's the report that I was

 4          asked for.

 5    Q.    You understand that this case, the Watson

 6          case, is pending in federal court?

 7    A.    Yes.

 8    Q.    Do you understand that the federal courts

 9          have a rule that experts are required to

10          disclose their opinions by submitting a

11          written report that includes all of the

12          opinions they intend to testify to at trial

13          and the bases for those opinions?

14    A.    Yes.

15    Q.    And is the report that you submitted that is

16          part of Exhibit 1 the report that you

17          submitted with that understanding --

18    A.    Yes.

19    Q.    -- that it contains all the opinions that

20          you expect to testify to at trial and the

21          basis for those opinions?

22    A.    As of that time, yes.

23    Q.    Now, Exhibit 1 also includes your CV,

24          correct?
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

12

```
 1    A.    Yes.

 2    Q.    Is that CV current as of the present time,

 3          and you can take a look at it, if you would

 4          like?

 5    A.    Yes.

 6    Q.    Can you identify the document that we've

 7          marked as Exhibit 2?

 8                (Document handed to witness.)

 9    A.    It's apparently something that was taken off

10          the web showing a listing for me through

11          almexperts.com.

12    Q.    What is almexperts.com?

13    A.    It's a publication, American Lawyer Media,

14          and this particular thing -- I believe I

15          have seen that before -- is my listing in

16          one of their expert directories.

17    Q.    Do you advertise your services through

18          almexperts.com?

19    A.    Yes.

20    Q.    Do you pay to do that?

21    A.    Yes.

22    Q.    Do you know how much you pay roughly?

23    A.    I believe it's about 600 a year, but it

24          depends.  They have a scale depending upon
```

13

```
 1          which directories you're in.

 2   Q.     And on page 2 of Exhibit 2 do the subject

 3          matters that are set forth there represent

 4          subject matters on which you claim to have

 5          expertise?

 6                    (Document handed to witness.)

 7   A.     In general, yes.

 8   Q.     Are there any that are listed there that you

 9          do not claim expertise in?

10   A.     If you would like me to look through them

11          carefully, I will.

12   Q.     Sure.

13   A.     Yes.

14   Q.     Which ones?

15   A.     No.  I'm answering your question that yes, I

16          have expertise in those fields.

17   Q.     Oh, okay.  I thought my prior question was

18          was there any in which you do not claim

19          expertise.  So, the answer is no to that

20          question?

21   A.     No.

22   Q.     Do you claim expertise in all of those

23          areas?

24   A.     Yes.
```

15

```
 1           there on the table?

 2   A.      Yes.

 3   Q.      Have you had any other publications at any

 4           time in the field of -- just period?

 5   A.      I have had many publications, but the others

 6           have been private while as a corporate

 7           employee.  So, they'd all be internal

 8           documents.

 9   Q.      Have you ever published any article on the

10           subject of power saws?

11   A.      No.  When you say publish you mean for

12           general consumption?

13   Q.      That's what I mean.

14   A.      No.

15   Q.      I'm not including any opinions that you have

16           written in connection with forensic matters.

17   A.      That's correct.

18   Q.      Let's get back to Mr. Baum for a moment.

19           You say you believe you spoke with him

20           before you rendered your September 29, 2005

21           report?

22   A.      Yes.

23   Q.      Did you, in fact, meet with him or was this

24           just a conversation?
```

```
 1          conversations with Mr. Baum?

 2   A.     I would have taken probably some notes to

 3          estimate the hours and the dollars, but I've

 4          tossed those notes.

 5   Q.     So, you no longer have any notes of any

 6          conversations with Mr. Baum of the subject?

 7   A.     That's correct.

 8   Q.     And you believe there were no more than two

 9          such conversations?

10   A.     There might have been a third conversation

11          when I called him back and I said it looks

12          like we're going to hold off on this, but we

13          might want to do it at some point in the

14          future.

15   Q.     And I take it you never did modify an

16          exemplar K23 power cutter or any power

17          cutter by putting an electric brake on it;

18          is that correct?

19   A.     That's correct.

20   Q.     Have you ever designed a power cutter

21          similar to the type involved in Mr. Watson's

22          accident?

23   A.     No.

24   Q.     Have you ever designed any power saw that
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

21

```
 1          actually went into production?

 2    A.    No.

 3    Q.    Have you ever used a power cutter similar to

 4          the one involved in Mr. Watson's accident to

 5          cut steel, concrete or anything with it?

 6    A.    I don't believe I've ever used a portable

 7          abrasive saw to cut steel.  I have used at

 8          least one abrasive saw in the past to cut

 9          steel, but it was a bench mounted saw.

10    Q.    Stationary tool?

11    A.    Yes.

12    Q.    What were the circumstances of using that

13          saw?

14    A.    Late sixties I believe.  I don't remember

15          what I was cutting or what reason, but it

16          was part of my employment with a company.  I

17          was making something and I remember cutting

18          using an abrasive saw.

19    Q.    On one occasion?

20    A.    I can't tell you that.  It was at least one

21          occasion, possibly more.

22    Q.    And that was not a saw that you owned, was

23          it?

24    A.    No.
```

22

```
 1    Q.   But you have never used a portable abrasive
 2         power cutter similar to the one involved in
 3         Mr. Watson's accident?
 4    A.   No.  I have put an abrasive blade on my own
 5         circular saw and I've used that from time to
 6         time, and I can't remember specifically now
 7         what I was cutting or when.
 8    Q.   But you're talking about a portable circular
 9         saw?
10    A.   Yes.
11    Q.   That would be a very different tool from the
12         one involved in Mr. Watson's accident,
13         wouldn't it?
14    A.   It would be different.
15    Q.   My question is focused on a power cutter
16         similar in design to the one involved in
17         Mr. Watson's accident.  Have you ever used
18         such a portable power cutter to cut
19         concrete, steel or any substance?
20    A.   I think so.
21    Q.   When?
22    A.   Probably two or three years ago.  I had some
23         masonry work being done at my home, and I
24         believe at one point I may have picked up
```

```
 1          the saw and made a cut in some stone and I

 2          believe it was a diamond-bladed saw.

 3     Q.   Do you know the manufacturer of the saw?

 4     A.   No.

 5     Q.   But it was a saw that you held with two

 6          hands when you were operating it?

 7     A.   Yes.

 8     Q.   With the left hand on the top front handle

 9          and your right hand on the rear handle where

10          the trigger was?

11     A.   I have no recollection of what the saw

12          looked like, but I would imagine that would

13          have been the way I would have held it.

14     Q.   Other than that one occasion, have you ever

15          used a power cutter similar to the one

16          involved in --

17     A.   I don't believe so.

18     Q.   -- in Watson's accident?  Is a diamond blade

19          different from an abrasive blade?

20     A.   Well, yes, in the sense that it uses a

21          diamond as the cutting media and it's

22          impregnated into a steel blade; whereas,

23          this abrasive blade does not use a steel

24          core and it doesn't use diamond grit.
```

34

```
 1          first get those tests?

 2    A.    I don't remember.

 3    Q.    Again, without looking at your file?

 4    A.    Correct.

 5    Q.    Did you ever meet Mr. Watson?

 6    A.    No.

 7    Q.    Did you ever speak with him?

 8    A.    No.

 9    Q.    Among the materials you reviewed were his

10          deposition in which he, among other things,

11          described how the accident happened; is that

12          correct?

13    A.    I did read his deposition.

14    Q.    Did you read his answers to interrogatories?

15    A.    I don't believe so.

16    Q.    Were you given his answers to

17          interrogatories?

18    A.    No.

19    Q.    Did you ask for them?

20    A.    No.

21    Q.    Did you think it was important to read his

22          written description in his answers to

23          interrogatories concerning how the accident

24          happened?
```

41

```
 1          can't say?

 2    A.    I can't say precisely, no.

 3    Q.    So, as far as you know he was either

 4          completely on the ladder, partially on the

 5          ladder or completely on the ground when his

 6          accident happened, and you can't say which

 7          of those possibilities is the case; is that

 8          right?

 9    A.    That's correct.

10    Q.    Was the blade coasting or was it under power

11          when Mr. Watson was injured?

12    A.    I don't know.

13    Q.    Is it equally probable in your mind that it

14          was coasting and under power?

15    A.    I can't answer the question.

16    Q.    Do you assign any greater probability to the

17          blade being coasting, on the one hand, or

18          under power on the other at the time he was

19          injured?

20    A.    I simply don't have enough information to

21          make that determination.

22    Q.    So, you simply don't know?

23    A.    I simply don't know.

24    Q.    As you sit here now it's equally probable in
```

42

```
 1          your mind the blade was coasting when he was

 2          injured as it is that it was under power

 3          when he was injured?

 4    A.    I didn't say that.  I said I really don't

 5          know.

 6    Q.    When you wrote your September 29th, 2005

 7          report was it your understanding that the

 8          blade was coasting at the time he was

 9          injured?

10    A.    Yes.

11    Q.    What did you base that understanding on?

12    A.    I based it essentially on the assumption

13          that he had started down the ladder,

14          descended the ladder and then somehow at the

15          bottom or near the bottom the saw somehow

16          struck his leg, and the only way that I

17          could envision that happening at the time

18          was that the blade was still coasting.

19    Q.    What information, if any, have you received

20          since you wrote your September 29th report

21          that causes you to now not know whether the

22          blade was coasting or had power?

23    A.    Well, specifically I reviewed the videos,

24          and in viewing the videos I noticed that it
```

43

1            was possible for the saw to be triggered in

2            normal handling, which I hadn't anticipated

3            before.

4   Q.   What videos are you referring to?

5   A.   There is one entitled Film Reconstruction

6            Sweden:  Descend ladder and cut leg.

7   Q.   Is that the film that you have in mind when

8            you say you now think it's possible that he

9            inadvertently started the saw?

10  A.   Yes.

11  Q.   Did that film have some narration to it?

12  A.   It was in Swedish.

13  Q.   Do you speak Swedish?

14  A.   No.

15  Q.   Do you understand Swedish?

16  A.   No.

17  Q.   Did you have it translated?

18  A.   No.

19  Q.   Do you know what the man was saying as he

20           was demonstrating what was shown in the

21           video?

22  A.   No.

23  Q.   You understand that on this K2300 saw there

24           is an interlock device that requires that

44

```
1              one depress a button before you can pull the

2              trigger to start the saw?

3    A.   Yes.

4    Q.   Do you know whether that was operative and

5              functional during the demonstration that you

6              referred to?

7    A.   I don't know that.

8    Q.   What was it about reviewing the video that

9              now leads you to question, if that's a fair

10             way of putting it, whether the blade was

11             coasting when Mr. Watson had his accident?

12   A.   Well, it wasn't so much that the blade was

13             coasting or that the video showed that the

14             blade was coasting.  What I was referring to

15             in the video is that the blade could be

16             inadvertently powered.

17   Q.   Besides now thinking that the blade can be

18             inadvertently powered, is there any other

19             reason that causes you to question whether

20             the blade was coasting at the time of

21             Mr. Watson's accident?

22   A.   I'm not sure I can answer that completely.

23             I would think that primarily almost

24             exclusively the video demonstrated the
```

```
 1              possibility of inadvertently powering the

 2              saw, and that's what caused me to look back

 3              at the situation and see whether or not

 4              there was an alternative to the blade

 5              coasting.

 6    Q.   So, before you saw that video -- and as you

 7         sit here now you don't remember when you

 8         first saw it; is that right?

 9    A.   I'm sorry?

10    Q.   Do you remember when you first saw the video

11         that we're talking about, the Swedish video?

12    A.   Within the past two weeks.

13    Q.   Before you saw that video within the last

14         two weeks did you receive any other

15         information that led you to question whether

16         the blade was coasting when Mr. Watson had

17         his injury?

18    A.   Not really.

19    Q.   You had previously received Mr. Gustafsson's

20         and Dr. Funk's reports that were submitted

21         around mid November of 2005, right?

22    A.   Yes.

23    Q.   You read those reports?

24    A.   Yes.
```

60

```
 1    A.    I am looking for it and I don't see it
 2          myself.
 3    Q.    Do you think you might have done that test
 4          or those tests that you just described in
 5          response to getting the defendant's expert
 6          reports?
 7    A.    No.
 8    Q.    After they did those tests and those tests
 9          were shared with you?
10    A.    No.  I did it before that and I'm fairly
11          certain that in my notes will have the date
12          that I actually did it.
13    Q.    Okay.
14    A.    No, I don't see it in my report which
15          surprises me, but I don't see it.
16    Q.    Did you perform any other tests in
17          connection with your work on this case?
18    A.    I performed the coastdown test, yes.
19    Q.    What did you do in regard to that test?
20    A.    I timed how long it took the blade to stop
21          from the release of the trigger.
22    Q.    And that is in your report I believe,
23          correct?
24    A.    I believe it is.
```

```
 1   Q.   How long did it take for the blade to coast

 2        down from the time the trigger was released?

 3   A.   The number in my mind says 12.7 seconds.  I

 4        may or may not have that correct.

 5   Q.   Have you performed any other tests besides

 6        the ladder descending test and the coastdown

 7        time test in connection with your work on

 8        this case?

 9   A.   Yes.

10   Q.   What other tests have you performed?

11   A.   I did take a video of the startup time of

12        the saw, which was inconclusive.  It's on

13        that CD that you noticed that I said that's

14        it probably not worth copying.  It's just

15        two videos of the starting of the saw

16        lasting a couple of seconds each.  And I

17        also manipulated the saw after seeing these

18        videos to see whether I could accidentally

19        or inadvertently trigger the interlock and

20        the trigger.  I could, yes.

21   Q.   Have you now told us about all of the tests

22        that you've done in connection with your

23        work on the Watson case?

24   A.   I also handled the saw quite a bit, but --
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

65

```
 1          would seem to be also acceptable.
 2    Q.    What is your basis for that conclusion with
 3          regard to the relationship between the
 4          startup time of the saw and the braking time
 5          of the saw, if there is a blade brake on it?
 6    A.    If an operator can withstand the inertia
 7          loading of startup, then they would be able
 8          to handle the inertia loading of a slowdown,
 9          if it was the same or longer in terms of
10          time.
11    Q.    Is there a risk with blade brakes, electric
12          blade brakes that they can cause the blade
13          to come loose from the arbor under certain
14          circumstances?
15    A.    I'm not sure.
16    Q.    That's not something you considered in
17          connection with the case?
18    A.    I considered it, but considering there are
19          many, many saws out on the market, all of
20          which had blade brakes, this seems to be,
21          not to be an issue.
22    Q.    Are there any power cutters similar to the
23          one Mr. Watson was using that had blade
24          brakes prior to December 2001 when this
```

66

```
 1          accident happened?

 2    A.    I'm not aware of any.

 3    Q.    Are you aware of any power cutters similar

 4          to Mr. Watson's power cutter that has a

 5          blade brake even today?

 6    A.    No.

 7    Q.    You mentioned Makita and Dewalt portable

 8          circular saws in your report?

 9    A.    Yes.

10    Q.    Do you know whether either of those

11          companies manufacture power cutters?

12    A.    I don't believe either of them do.

13    Q.    Do any other manufacturers besides Partner

14          manufacture power cutters similar to the

15          Partner power cutter involved in

16          Mr. Watson's accident?

17    A.    I don't know.

18    Q.    If they do and if they do not have blade

19          brakes, are they all defective in your

20          opinion?

21    A.    If they're similar to this power cutter, I

22          would say so, yes.

23    Q.    There are many portable circular saws that

24          do not have blade brakes, correct?
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

74

1          that, have you?

2    A.    I would change the word imagine to say I'm

3          quite sure that I could drive that saw into

4          my leg after an 11-second coastdown and do

5          some damage to my skin or leg.

6    Q.    You haven't done any test to confirm what

7          you have just said?

8    A.    No, I did not.

9    Q.    Do you know the rate at which the blade

10         loses energy during the coastdown period?

11   A.    I did see a chart, I believe Dr. Funk put

12         together, but I don't remember any of the

13         details of it, but clearly it loses energy

14         as it slows down.

15   Q.    And do you know whether that rate is an

16         arithmetic rate or geometric rate?

17   A.    It goes as the square of the velocity.

18   Q.    So, if the coastdown time, for example, is

19         12 seconds, it would lose, the blade would

20         lose more than half of its speed at the end

21         of six seconds of coasting?

22   A.    Yes.

23   Q.    Did you do any tests that were designed to

24         determine whether Mr. Watson's injury

```
 1           occurred while the blade was coasting or

 2           under power?

 3     A.    No.

 4     Q.    I think you told me if this was a coasting

 5           blade that produced his injury you didn't

 6           perform any test to determine the energy

 7           required to produce the injury, correct?

 8     A.    That's correct.

 9     Q.    Now, if the saw instead of, if the blade

10           instead of coasting were under power when he

11           was injured, do you know for what period of

12           time it had been under power?

13     A.    I don't think anybody would know that.

14     Q.    So, if it was under power you can't say for

15           how many seconds it was under power,

16           correct?

17     A.    That's correct.

18     Q.    Now, let's talk about this idea of possible

19           inadvertent activation of the saw that you

20           mentioned in your recent letter.

21                 MR. BARRY:  Let's get this marked.

22                 (Exhibit No. 4 Letter 3/24/06

23           marked for identification.)

24                 (Document handed to witness.)
```

```
 1   Q.   But you have no evidence that he
 2        inadvertently turned it on and then just as
 3        inadvertently turned it off, do you?
 4   A.   I'm trying to cover what the possible events
 5        were leading up to this accident, and I
 6        don't know what precisely happened and I'm
 7        trying to cover the alternatives.  This is
 8        one alternative.
 9   Q.   You can't say to a reasonable degree of
10        engineering certainty that Mr. Watson
11        inadvertently activated the saw, can you?
12   A.   I can say to a reasonable degree of
13        engineering certainty it's certainly
14        possible that he did so.  Whether he did or
15        not, I don't know.
16   Q.   And you can't say to a reasonable degree of
17        engineering certainty whether the blade was
18        coasting or under power at the time of his
19        injury, correct?
20   A.   No, I cannot say that.
21   Q.   When did you first consider the possibility
22        of whether Mr. Watson inadvertently started
23        the saw?
24   A.   After seeing the videos.
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

81

```
 1    Q.   That was not something that you had thought
 2         about before your September 2005 report?
 3    A.   That's correct, or if I thought about it, it
 4         is unconscious, because there was an
 5         interlock there and I played with it and it
 6         just looked to me as if it was a reasonable
 7         interlock, but --
 8    Q.   Go ahead.
 9    A.   -- I didn't anticipate that it could be
10         inadvertently actuated.
11    Q.   You have an exemplar saw here, correct?
12    A.   Yes.
13    Q.   And the interlock is functional on this saw?
14    A.   Yes.
15    Q.   Can you demonstrate using the exemplar saw
16         how Mr. Watson possibly inadvertently turned
17         it on?
18    A.   I can try.
19              MR. BARRY:  This is where the video
20         operator has a role here.  Can we take a
21         short break?
22              (Brief recess.)
23    Q.   I think you indicated, Mr. Wilder, before
24         the break that you said it was possible that
```

```
 1            the saw was under power shortly before the

 2            accident, correct?

 3    A.      Well, you asked me whether or not I knew to

 4            a reasonable degree of engineering certainty

 5            whether the saw was powered or whether it

 6            was coasting down, and in each case I

 7            answered I can't, but I can say with a

 8            reasonable degree of engineering certainty

 9            that it was some combination of the above.

10            It could have been coasting.  It could have

11            been powered or it could have been coasting

12            down and powered while coasting down or

13            after it had completed coasting down.

14                 I can tell you that that happened,

15            because the accident occurred, but I can't

16            tell you which or in what proportion these

17            possibilities exist.

18    Q.      And one of the possibilities is that the saw

19            was fully under power at the time of the

20            accident?

21    A.      Yes.

22    Q.      I think you also said that when you first

23            wrote your report that you were aware that

24            there's a trigger lock on the saw, correct?
```

1            So, there is any number of ways in

2      which somebody could have transferred or

3      moved or supported the saw, and I can't be

4      sure how, except to show that with the two

5      items right in close proximity and in

6      proximity to where your hand would actually

7      grasp the saw to carry it, you can actuate

8      it.  And it's designed that way, so that you

9      don't need to move too far away from where

10     you are to actuate it.  That doesn't make

11     sense.

12  Q.  No, no, no.  It makes sense to me.  Do you

13     have any information one way or another as

14     to whether the trigger lock was operative

15     and functioning as it was intended to

16     function on the day of Mr. Watson's

17     accident?

18  A.  Only by presuming that if it wasn't, that

19     might have come out in some way, but I have

20     no knowledge.

21  Q.  One way or another?

22  A.  One way or another.

23  Q.  Have you heard of a practice in the

24     construction industry of defeating the

93

```
 1   Q.   Would it be difficult to defeat the trigger
 2        lock by removing it?
 3   A.   I did not open up this saw, so I don't know.
 4        I mean it probably could have been removed
 5        or bypassed or something, but again I'd have
 6        to open it and see what the mechanism looked
 7        like, and I haven't done that.
 8   Q.   If the trigger lock were defeated in some
 9        way, it would be easier to inadvertently
10        start the saw than if it were functioning
11        properly, correct?
12   A.   Yes.
13   Q.   If that had happened -- and I understand
14        that you're not saying that it did -- and
15        Mr. Watson had inadvertently activated the
16        saw, that wouldn't be a design problem with
17        the saw, would it, if somebody had defeated
18        the interlock?
19   A.   That's correct.
20   Q.   Now, you didn't have an opportunity to
21        examine the saw that was involved in
22        Mr. Watson's accident?
23   A.   Correct.
24   Q.   The actual saw?
```

94

```
 1   A.   I want to think about that last answer just
 2        a little more for a second, and I haven't
 3        given it any consideration at this point
 4        because the interlock did exist, but there
 5        are ways to design triggers to make them
 6        less susceptible to inadvertent operation,
 7        and that would be some sort of a barrier
 8        nearer the trigger, so that you can't bump
 9        it accidentally.
10             And given what you've said, if we
11        take this particular saw, as it is designed
12        and remove the interlock, I would say yes,
13        the trigger would be more easily actuated,
14        but it's not, it should not be meant to be
15        construed as in general that removing an
16        interlock always makes it much more -- let
17        me change that.
18             I'm saying in general triggers
19        could be designed so that they're configured
20        with respect to the handle, so that they are
21        less susceptible to being actuated.  This
22        one is not.
23   Q.   I'm not sure I understand that answer.
24   A.   Okay.
```

95

```
 1    Q.    You agree with me that if the trigger lock
 2          had been defeated, it would be easier then
 3          if the trigger lock were functioning
 4          properly to inadvertently activate the saw?
 5    A.    On this particular saw, yes.
 6    Q.    On this particular saw?
 7    A.    Yes.
 8    Q.    And if that had happened ---
 9              MR. TOBIN:  That?
10    Q.    Somebody had -- if, in fact, the trigger
11          lock had been defeated before Mr. Watson's
12          accident and, in fact, he had inadvertently
13          activated the saw, the cause of the
14          inadvertent activation wouldn't be a design
15          problem with the trigger lock.  It would be
16          the fact that somebody had defeated it,
17          correct?
18    A.    I don't know that I can answer that question
19          yes or no, because I then have to consider
20          whether or not the whole handle could have
21          been configured such that even if the
22          trigger lock were removed that the trigger
23          would be less susceptible to actuation.
24              But I would have to agree with you
```

1           that once the trigger lock is removed

2           regardless of what kind of design there was,

3           it only stands to reason that it could be

4           more easily inadvertently actuated, but as I

5           said, this one does not have any other

6           protective design about that handle and the

7           trigger, and this trigger is completely

8           exposed.

9                   So, if the interlock was not there,

10          the trigger would be more susceptible to be

11          inadvertently triggered.  That's a long way

12          of saying it.

13    Q.    I was asking you about the fact that you

14          never had an opportunity to examine the

15          actual saw; am I correct about that?

16    A.    That's correct.

17    Q.    As an engineer would you like to have had

18          the opportunity to inspect the actual saw

19          involved in Mr. Watson's accident?

20    A.    Yes.  It's always good to see the subject

21          piece of equipment, yes.

22    Q.    Why would you have wanted to see the

23          equipment itself?

24    A.    Well, my tests were done on an exemplar.  I

97

```
 1          don't know how well used the saw was that he
 2          was using.  It may very well have been that
 3          the bearings had worn in very well.  The saw
 4          was loose and a coastdown time might have
 5          exceeded 20 seconds instead of 15 seconds if
 6          the saw was very free and easy.
 7               I would certainly want to see
 8          whether the interlock was functioning,
 9          whether the trigger functioned or whether
10          there was anything else unusual that I don't
11          see from the exemplar.
12   Q.     An opportunity to inspect the saw might have
13          permitted you to come to a more informed
14          opinion as to how Mr. Watson's accident
15          occurred?
16   A.     I don't know that it would have, because I
17          think some of the circumstances of the
18          accident are just unknown.
19   Q.     Do you agree, Mr. Wilder, that if
20          Mr. Watson's accident had happened while the
21          blade was still coasting after he had
22          initially turned it off following completion
23          of his cut and without his inadvertently
24          activating the saw, then under that
```

98

```
 1          circumstance the design of the trigger lock

 2          would not have played any causal role in his

 3          accident?

 4     A.   If it had just been coasting down?

 5     Q.   Correct.

 6     A.   Yes.

 7     Q.   You agree with me?

 8     A.   Yes.

 9     Q.   And conversely, if his accident had happened

10          after he did inadvertently activate the saw

11          and while the saw was under full power, then

12          the lack of an electric brake or blade brake

13          would not have played any causal role in the

14          accident, correct?

15     A.   Yes.

16     Q.   I think you told me earlier that you can't

17          say to a reasonable degree of engineering

18          certainty which of these two accident

19          scenarios was the one that he actually had,

20          correct?

21     A.   Or some combination.

22     Q.   Or some combination or some other one,

23          correct?

24     A.   Yes, I agree.
```

103

```
 1              of time on that, because it looked, at least

 2              on the face of it, as if it would have been

 3              difficult or impossible to implement.  So, I

 4              didn't go any further in that direction.

 5    Q.   And you're not purporting to offer such an

 6              opinion at the trial of this case that it

 7              was defective, because it didn't have a

 8              lower retractable blade guard, are you?

 9    A.   No.

10    Q.   Are power cutters such as the one Mr. Watson

11              was using generally used by the same

12              category of users as are portable circular

13              saws and mitre saws?

14    A.   That's a tough question to answer, because

15              the user is really defined by what the

16              project is, and most circular saws that I'm

17              familiar with would span the population from

18              home owner, do-it-yourselfers, to

19              professional tradesmen, where I think power

20              cutters I think are probably almost always

21              used by professional -- not professional,

22              but people that are dedicated to commercial

23              use.

24    Q.   Maybe that's another way of saying it.  The
```

104

```
1            type of power cutter that Mr. Watson was

2            using is designed to be used by the

3            professional user, not the home owner,

4            do-it-yourselfer, correct?

5    A.      I don't think it's specifically designed to

6            be used by a professional user.  I think it

7            is what it is, and it tends to be used by

8            professional users, just because that's the

9            nature of what they're used for.

10   Q.      Would that have any affect on whether you

11           think there is a type of person who

12           generally uses power cutters?  Would that

13           have any bearing on whether you think power

14           cutters should come with blade brakes or

15           not?

16   A.      I haven't really considered that except to

17           the degree that I'd say offhand right now

18           without much more thinking I see a lot of

19           accidents with all sorts of saws and very

20           often it's the professional tradesmen,

21           because of their familiarity or long-time

22           exposure to these saws that make them more

23           at risk than the average do-it-yourselfer.

24   Q.      When did you first reach an opinion that
```

```
 1          separate entity before this case.

 2    Q.    So, the first time you came to that

 3          conclusion with regard to power cutters is

 4          in connection with your work on this case?

 5    A.    Well, I don't see the power cutter as much

 6          different than an ordinary hand-held saw,

 7          except to the extent that it doesn't have

 8          this additional -- it's heavier, beefier,

 9          maybe a little harder to handle, but it

10          doesn't have the retractable guard, and

11          that's the only distinction.  I did not say

12          power cutters are a different animal.

13                When I got this particular

14          investigation and thinking about it, the

15          more I thought about it the more I realized

16          blade brakes certainly could have been and I

17          suspect in the future will be applied to

18          this class of tool.

19    Q.    Your opinion that you express in Exhibit 1

20          that the power cutter that Mr. Watson was

21          using was defective because it lacked a

22          blade brake, that was an opinion that you

23          arrived at in connection with and for the

24          purposes of this litigation, correct?
```

107

```
 1    A.    Yes.

 2    Q.    You had previously come to opinions that

 3          other types of power saws are defective

 4          because they lack blade brakes?

 5    A.    Yes.

 6    Q.    When did you first come to that opinion with

 7          regard to any power saw?

 8    A.    I simply don't remember.

 9    Q.    Have you ever advised any government or

10          industry group of your opinion that power

11          saws without blade brakes are defective and

12          dangerous?

13    A.    No.

14    Q.    Have you done any research to determine the

15          frequency of coasting blade accidents with

16          power cutters like the one Mr. Watson was

17          using?

18    A.    No.

19    Q.    Are you aware of any empirical data that

20          shows the extent to which, if any, that the

21          coasting blade represents a hazard to an

22          experienced user of a power cutter?

23    A.    Other than Dr. Funk's testing, I think it's

24          obvious on the face of it that there is a
```

1         hazard.

2    Q.   What I'm trying to distinguish is the hazard

3         that's presented by a coasting blade of a

4         power cutter.  Are you aware of any data or

5         statistics or empirical evidence that

6         indicates the extent to which coasting

7         blades on power cutters have hurt people?

8    A.   I'm not aware of any statistics or of any

9         studies that have put that kind of data

10        together.

11   Q.   Did you consider it important to know the

12        degree to which, if any, a power cutter is

13        dangerous to an operator without a blade

14        brake before coming to the conclusion that

15        it requires a blade brake?

16             MR. TOBIN:  I'm not sure I

17        understand.

18   A.   Would you say that again, please?

19   Q.   It was an awkward question.  Did you

20        consider it important to know the extent to

21        which, if any, a coasting blade on a power

22        cutter represents a danger to the operator

23        before you came to the opinion that power

24        cutters need to have blade brakes?

1       kind of braking effect that the Dewalt motor

2       had, either a 12- or 14-inch blade would

3       have stopped in approximately two seconds or

4       could have been made to stop in about two

5       seconds also.

6  Q.   Did you discuss your work to determine the

7       stopping time of a blade with a blade brake

8       on a Partner saw with any other engineer?

9  A.   No.

10  Q.   Maybe you can just tell me how you went

11      about figuring out based on the stopping

12      time of the blade in a mitre saw how you

13      felt, how quickly you felt the blade brake

14      in a power cutter would have stopped the

15      blade?

16  A.   Yes.  Let me try to do it by way giving an

17      analogy if I can.  It may be easier to

18      describe.  Picture a car that has a set of

19      wheels on it and a set of brakes on the

20      wheels and you step on the brakes and the

21      car will stop in 50 feet or 10 seconds or

22      whatever it is.  And now, if you would like

23      to know given the same sort of technology

24      for brakes how long would a heavier car or a

1           MR. TOBIN:  Note my objection.  You

2           can answer if you understand the question.

3    A.    I'm not sure I can understand the question.

4           I can try to answer it without perhaps fully

5           understanding it, but ---

6    Q.    I don't want you to do that.

7           MR. TOBIN:  I don't want you to do

8           that.  Let's just go off the record for a

9           second.

10          (Discussion off the record.)

11   Q.    You'd never designed a power cutter at all,

12         correct?

13   A.    That's right.

14   Q.    And you certainly haven't designed a blade

15         brake for a power cutter, correct?

16   A.    That's correct.

17   Q.    You never prepared any design drawings or

18         prepared a prototype model of a power cutter

19         with a blade brake, true?

20   A.    That's correct.

21   Q.    And you never tested a power cutter with a

22         blade brake either, correct?

23   A.    That's correct.

24   Q.    You never had any formal training with

SHEA COURT REPORTING SERVICES
(617) 227-3097

```
 1            respect to designing or manufacturing blade

 2            brakes for power cutters, true?

 3    A.      I have had formal training in engineering

 4            which would be applied to such a design.  I

 5            have that training, yes.

 6    Q.      If this power cutter had had a blade brake

 7            on it, do you have any basis for knowing how

 8            long the blade brake would have taken to

 9            stop the blade?

10    A.      I have some basis for that, yes.

11    Q.      What basis do you have for that?

12    A.      Well, first of all, I preface it by saying

13            without the design in place and without

14            knowing what the design goals were, I think

15            the design goals could be met to whatever

16            degree desired.

17                 What I'm saying is if someone said

18            to me this blade brake must have stopped the

19            saw within one second or two seconds or six

20            seconds, I have the feeling that it

21            certainly could be implemented, but in

22            general, yes, what I did was is I went out

23            and looked at other saws of similar power,

24            did some rough, I won't say back of the
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

111

1          envelope calculations, but I have done some

2          calculations, and I came to the conclusion

3          that if they had blade brakes similar to

4          what's on the market now that the blade

5          could have stopped in approximately two

6          seconds.

7               Now, I have no doubt that it could

8          have been improved or degraded depending

9          upon what the goals were.

10    Q.    And you're basing that, just so I

11         understand, on the stopping power of blade

12         brakes that are on other types of saws,

13         including portable circular saws and mitre

14         saws?

15    A.    Primarily the mitre saw, because I think the

16         wattage of the motor was similar and the

17         blade size was similar, and all I did was

18         took effectively the stopping ability of, I

19         think it was the Dewalt specifically, and

20         applied that with some modifications and

21         adjustments for the weight of the abrasive

22         blades, and in my report I said something

23         about the Partner's abrasive blade.

24               I don't know precisely what brand

112

```
 1          was used, but I did look up the weight of

 2          the 12- to 14-inch abrasive blade based on

 3          the exemplar that I have, did those

 4          calculations and came up with the numbers

 5          that indicated that seemed to me perfectly

 6          reasonable to stop the blade within two

 7          seconds.

 8    Q.    Again, that is based on the stopping time of

 9          you said the Dewalt mitre saw?

10    A.    The Dewalt and I think Ridgid was in the

11          same ballpark.  Ridgid is another

12          manufacturer.

13    Q.    You said you did some calculations there?

14    A.    Yes.

15    Q.    Are they in your notes?

16    A.    Yes.  It would have been in handwriting.

17    Q.    Are these the notes?  (Indicating)

18    A.    No.

19    Q.    Maybe you can pull them out.

20                (Brief recess.)

21                (Documents handed to counsel.)

22                MR. BARRY:  If we could have the

23          court reporter mark these separately.

24                (Exhibit No. 5 Handwritten Notes
```

```
 1            lighter car going at either somewhat faster

 2            or slower speeds could be made to stop.

 3                   And that's essentially what I did.

 4            Instead of it being a linear speed where a

 5            body is moving in a straight line and you're

 6            dragging it to a stop, this is a product

 7            that is spinning, and that's an analogy.

 8                   What I did is I looked at the

 9            Dewalt saw that had I believe a 12-inch

10            steel blade on it and I replaced the steel

11            blade with two -- I don't have my numbers

12            here, but I think with two 10-inch steel

13            blades.  I bolted them on to the Dewalt saw

14            instead of the saw blade that was on there

15            originally, and I saw how fast it came to a

16            stop, and it was just under two seconds.

17    Q.     That was slower than it would have stopped

18           with the single blade?

19    A.     I think so, yes.  Basically, I then said

20           that represents, given the Dewalt saw's

21           speed, that represents the braking power of

22           the motor.  Now, let's apply that braking

23           power of the motor to a 12- or 14-inch

24           abrasive blade, instead of the two 10-inch
```

117

1       blades.

2              So, at one point it's as if we

3       measured the car that stopped, the car that

4       weighed a thousand pounds and stopped in 50

5       feet.  And now what we did is we changed the

6       car to a 2,000 pound car or a 1,500 pound

7       car going at a slightly different speed,

8       assuming that the brakes were as effective

9       or as ineffective as the first one was, and

10      I just ran the numbers and these are rough.

11      That's just to see whether it came out in

12      the same ballpark.

13             And what it turned out to be is

14      that if we put a 12- or 14-inch blade on

15      that Dewalt, which wasn't possible to do,

16      because physically it just didn't fit right,

17      and again the Dewalt saw also ran a

18      different speed, with a 14-inch blade it

19      would take 1.06 times, six percent longer

20      time to stop than what I tested the two

21      10-inch blades to be stopped at, which would

22      have meant two and a quarter seconds,

23      something like that.

24             And the same thing -- that was the

118

1          14-inch blade and with the 12-inch blade it

2          would have stopped in about 1.1 seconds,

3          something like that.  And the whole purpose

4          was not to do an exhaustive mathematical

5          analysis.

6                    A lot of it was ballparking based

7          on some numbers that I got for weights of

8          the 14-inch abrasive saw, to show that given

9          the state of technology now, that the Dewalt

10         motor, which is about the same size, same 15

11         amperes, 120 volt motor, it could bring

12         these blades to a stop in approximately two

13         seconds.  That's the whole purpose of it.

14    Q.   As an engineer have you ever attempted to

15         answer the question why, if it's the case,

16         no manufacturer of power cutters uses a

17         blade brake on its saws?

18    A.   I could make some, I won't say guesses, but

19         I can come up with some possible

20         explanations.

21    Q.   What possible explanations do you think

22         there are?

23    A.   One would be inertia in the industry.  It

24         hasn't been done.  Nobody is clamoring for

```
 1          is the date of your report.
 2   A.     I don't have it down.  I sometimes don't
 3          write everything down that I do, but it
 4          would have been done sometime shortly after
 5          receiving it.
 6   Q.     And you were mindful of the fact that you
 7          had 30 days to provide any supplements to
 8          your own expert report in view of what was
 9          in defendant's expert report?
10   A.     At that time I didn't have any supplemental
11          report to provide.
12   Q.     When did you first have a supplemental
13          report to provide?
14   A.     Within the last two weeks after getting the
15          videos when I suddenly realized that it was
16          possible to inadvertently actuate the
17          interlock.
18   Q.     And Exhibit 12 is the letter to you
19          transmitting the videos; is that fair to
20          say?
21                  (Document handed to witness.)
22   A.     Yes.
23   Q.     What's the date of that letter?
24   A.     March 16th, 2006.
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

143

```
 1          reconstruction climb down test where you

 2          were timing how long it took to climb down

 3          the ladder from the fifth or sixth rung

 4          where Mr. Watson said he was?

 5   A.     Yes.

 6   Q.     As you testified earlier, you got about nine

 7          seconds?

 8   A.     Yes.

 9   Q.     That was done before your report obviously?

10   A.     Yes.  That's Exhibit 9?

11   Q.     Yes.

12              MR. BARRY:  Mark that.

13              (Exhibit No. 13 ANSI B7.5-1983

14          marked for identification.)

15              (Document handed to witness.)

16   Q.     This is Exhibit 13.  Was that sent to you by

17          Mr. Tobin?

18   A.     Yes.

19   Q.     And did you find that of any relevance to

20          any of your opinions in this case?

21   A.     No.

22   Q.     That takes care of that.  That makes it

23          easy.  Do I understand correctly that the

24          first time you reached an opinion that there
```

144

```
 1              might have been a problem with the interlock

 2              on the saw that Mr. Watson was using was

 3              after you received the videos about two

 4              weeks ago, and particularly the Swedish

 5              video?

 6   A.    Yes.

 7   Q.    Did you think at all one way or the other

 8              about the design of the interlock before

 9              that point in time?

10   A.    Before that period of time I operated the

11              interlock and it looked to me at the time

12              that it would have been difficult to

13              impossible to accidentally actuate the

14              trigger, and especially in the way

15              Mr. Watson had described what happened, I

16              had envisioned the saw hanging down and as

17              it hangs down why it pulls away from your

18              hand.  You come away from the interlock.

19                   And frankly, the learning process

20              and things gel slowly and when I saw the

21              video and this gentleman who first he was

22              tossing the saw, passing it from one hand to

23              the other actuating it and then he held it

24              hanging down and actuated it, and I said oh,
```

145

1       my goodness, that's possible.  I didn't

2       think it was possible.

3               I tried it.  I found it very

4       difficult to do, almost impossible with my

5       bare hand, and I put a work glove on and I

6       found then it became possible to do it with

7       a saw hanging down.  And then I had realized

8       with someone that handled this saw all the

9       time, he probably, it probably became second

10      nature to him to actuate it, and it may have

11      been instinctively in grasping the saw that

12      he did it or then in passing it from one

13      hand to the other the weight of the saw

14      caused the interlock button to be depressed.

15      And at that point I realized that this

16      interlock button is not in the right place

17      for safety.

18  Q.  So, it wasn't that you didn't think about

19      the issue before?

20  A.  It's hard to say.  I can't say that I sat

21      down and wrote everything out and said what

22      do I think about and what don't I think

23      about.  I looked at it.  I saw it.  I

24      recognized it was an interlock.  It didn't

146

```
 1            -- it simply didn't occur to me that it

 2            could be inadvertently actuated.

 3     Q.     Have you ever designed an interlock or

 4            trigger lock for a power saw?

 5     A.     No.

 6     Q.     You've never done a design drawing or

 7            developed a prototype for a trigger lock for

 8            a power saw, have you?

 9     A.     No.

10     Q.     And therefore, you haven't tested any

11            alternate design trigger lock or interlock

12            for a power saw, have you?

13     A.     Other than for the purposes of this

14            deposition, I've done some mental design, of

15            course, saying what would I do, what do I

16            think would be a better interlock, a safer

17            interlock, and I don't need to actually put

18            pen to paper to do that.  And I think there

19            are alternative ways of doing it that would

20            have prevented inadvertent operation.

21     Q.     What alternative ways are there of doing it

22            that would have prevented an inadvertent

23            operation?

24     A.     I am going to have to preface this by saying
```

147

1          I haven't been hired to redisign the saw,

2          and in engineering designs you try an

3          approach.  You experiment with it and you

4          test it on people.  You see whether it works

5          or not.  Then you redesign it and you refine

6          it, and what we're doing here is artificial

7          in the sense that all I'm going to be able

8          to give you is some two or three approaches

9          to what I would take, and then after working

10         with them, trying some prototypes, testing

11         them on people, they would either be

12         modified or discarded or what.

13              But number one, this is a heavy saw

14         and when you grasp it and hold it you need

15         to apply some force to the handle to be able

16         to control this weight.  Therefore that

17         handle is not only to guide it when cutting.

18         It's also a handle that one uses to move the

19         saw around from one hand to the other and

20         carry it.

21              I wouldn't put the interlock

22         unprotected as it is in that handle, because

23         in holding the weight of the saw, depending

24         upon how one holds it, if you tip the saw

SHEA COURT REPORTING SERVICES
(617) 227-3097

148

 1          like this and the weight is on the

 2          interlock.  So, I number one, would move the

 3          interlock out of the internal cavity of the

 4          handle.  I would probably start by putting

 5          it up on top of the handle, so that it could

 6          be reached by the thumb and I would have put

 7          some barriers around the side of it.  Maybe

 8          it's a slide switch, a slide push switch, so

 9          that one has to kind of awkwardly reach up

10          front to get it and then put your hand back

11          into a comfortable position for holding the

12          trigger down.

13              No. 2, I might have put a barrier

14          around, similar to the interlock that's

15          there now, except not leaving it exposed as

16          it is, but having it in kind of a barrier

17          area, so one has to use the tip of one's

18          finger to actuate it, and it would have to

19          be done in such a way that if you bumped

20          into it you would be bumping into the

21          barrier rather than just the point of the

22          trigger.

23              And the third alternative would be

24          something that required a simultaneous press

149

```
 1           of two fingers in another area.  Once that
 2           was done and the trigger was pulled you
 3           could release it.  It's in a sense analogous
 4           to the two-handed operation that's needed on
 5           punch presses.
 6   Q.      I'm sorry.
 7   A.      Those are three approaches that I would
 8           start with and what would come out
 9           eventually might look just like that or it
10           might look different depending upon what the
11           results were.
12   Q.      So, it would be fair to say that these are
13           concepts or approaches that you've thought
14           about, but haven't actually designed out or
15           tested?
16   A.      That's correct.
17   Q.      Have you discussed with any other engineers
18           these concepts about an alternate design
19           trigger lock?
20   A.      No.
21   Q.      You can't recall ever using yourself a power
22           cutter with such an alternate design trigger
23           lock as you sit here now, can you?
24   A.      I can't recall.  I don't know whether the
```

1        saw actually did use, had or didn't have

2        such an interlock or any interlock.  I just

3        don't know.

4              MR. BARRY:  Can we take just a few

5        minutes and then we'll move on to one other

6        topic and then we will be finished.

7              (Discussion off the record.)

8              (Brief recess.)

9   Q.   Mr. Wilder, I think you may have said this

10       already, but would it be accurate to say

11       that your opinion about the trigger lock was

12       developed in connection with and for

13       purposes of this case?

14   A.   The comments that I have made about this

15       particular trigger lock, but I would have

16       had the same thoughts about another device

17       having a trigger lock if that was implicated

18       in the accident.

19   Q.   Right, but, I mean, you came to that opinion

20       about this trigger lock in connection with

21       your work on this case?

22   A.   This trigger lock in connection with this

23       work on this case.

24   Q.   Correct.

1    A.    But I have looked into and given opinions on

2           other two-handed and other safety devices on

3           other machines.  So, I've considered how one

4           can protect against inadvertent operation in

5           other matters, not just in this matter.

6    Q.    Had you ever, before you came to the opinion

7           about the trigger lock on Mr. Watson's saw,

8           expressed the opinion that a trigger lock on

9           any other portable abrasive power cutter,

10          using your definition of power cutter, was

11          defective?

12    A.    No.

13    Q.    Now, in your report that we marked Exhibit 1

14          you ---

15    A.    I'm sorry, let me clarify that a little bit,

16          because it goes way back, and it's not a

17          power cutter, but if you -- are you

18          restricting your question to a power cutter?

19    Q.    It was about power cutters, yes.

20    A.    Then my answer stands.

21    Q.    Was there another case in which you had

22          a ---

23    A.    It wasn't a power cutter.

24    Q.    You expressed some opinions about warnings

154

```
1            said that.  I don't remember him saying

2            that.

3    Q.    But I think you said earlier in this

4            deposition that you would expect that

5            Mr. Watson would in any case have understood

6            that the coasting blade, that the blade

7            continues to coast after the trigger is

8            released, and that a coasting or spinning

9            blade can cause injury, correct?

10   A.    Yes.  The warnings, in light of my new

11           understanding of the defect, can be the

12           interlock, I would expand the warnings to be

13           not only of the danger of the spinning

14           coastdown blade, but also inadvertent

15           grasping of the handle in such a way as to

16           actuate the trigger.

17   Q.    So, there should be a warning about that you

18           say?

19   A.    Well, I really think warnings are a second

20           line of defense.  The real issue is the

21           design.

22   Q.    Okay.  I take it you haven't actually sat

23           down to write additional warnings for this

24           saw, true?
```

155

1    A.    That's correct.

2    Q.    And you haven't actually tested the effect

3          of any different warnings on the saw?

4    A.    No.  That would be a process where you would

5          write several and test them on groups of

6          people, etcetera.  That would be quite a

7          project.

8    Q.    Not something you have done?

9    A.    Not something I have done.

10   Q.    You're not aware of any data or studies

11         indicating the effect that warnings about

12         the coasting blade or warnings about the

13         inadvertent starting of the saw would have

14         on users of power saws, are you?

15   A.    There are lots of studies having to do with

16         the effect of warnings on people in all

17         sorts of products.  I know of none

18         specifically with respect to power cutters.

19   Q.    Let me just ask you for a moment about some

20         of your prior testimony.  You have

21         testified, you have been consulted in a

22         number of cases over the years, a number of

23         litigation matters, correct?

24   A.    Yes.

156

```
 1   Q.   And you have testified many times on
 2        deposition and also in trials, true?
 3   A.   Yes.
 4   Q.   Can you estimate the number of times before
 5        today that you have given deposition
 6        testimony?
 7   A.   It would be just an estimate.  I'd say rough
 8        estimate probably 40 to maybe 50 times.
 9   Q.   How many times have you testified in trial?
10   A.   Approximately I'd say two dozen times.
11   Q.   You testified about a wide range of
12        different products, true?
13   A.   Yes.
14   Q.   And you have found according to your
15        testimony a number of different products to
16        be defective, true?
17   A.   I found products to be defective and I've
18        also found products not to be defective.
19             MR. TOBIN:  Not to interrupt you,
20        if you're going to ask questions about prior
21        testimony and you're going to use prior
22        testimony to cross-examine my witness, I
23        want to make sure the subject testimony is
24        marked as an exhibit and is available.
```

1          MR. BARRY:  The subject

2     testimony ---

3          MR. TOBIN:  You've got prior

4     testimony in your hands and you're asking

5     him about it.

6          MR. BARRY:  It's not prior

7     testimony.  It's work product that I've done

8     on the basis of reviewing transcripts that I

9     have gotten.  It's not -- do I have

10    depositions in my hand?  I don't.

11         MR. TOBIN:  If you're going to use

12    a quote from deposition testimony, I want it

13    marked and available.

14         MR. BARRY:  I am not going to quote

15    from it.  I mean, I have reviewed prior

16    testimony.  I have got boxes of it, to be

17    honest with you, in my office, and I have a

18    summary that my paralegal has done here.

19    So, I'm not sure.

20         MR. TOBIN:  Well, I think I'm

21    entitled -- if you're using prior testimony

22    to cross-examine the witness, I think I'm

23    entitled to it, whether it be produced as a

24    request for production of documents or

```
 1              whether it be marked as exhibits at

 2              deposition.  We can discuss it later.  I

 3              suppose if you're not going to quote from it

 4              here today, we can discuss it later.

 5                    MR. BARRY:  I'm not.

 6   Q.   Have you testified on behalf of the

 7              plaintiff in a case involving an abrasive

 8              cut-off saw?

 9   A.   Yes.

10   Q.   And have you found that saw to be defective?

11   A.   Yes.

12   Q.   Have you testified for the plaintiff in a

13              case involving an abrasive saw/brush cutter?

14              Let me back up.

15   A.   I remember a brush cutter.

16   Q.   I was going to change it to brush cutter.

17              Have you testified in a case for plaintiff

18              involving a brush cutter?

19   A.   I don't believe I testified, and you'd have

20              to show me the case, but I don't believe I

21              ever got to testify with respect to brush

22              cutter.  I may have.  I just simply don't

23              remember, but I don't recall anything having

24              to do with an abrasive blade on a brush
```

159

1          cutter.

2     Q.   Coelho vs Kalamazoo?

3     A.   That's in Massachusetts, correct?

4     Q.   Could be.  I don't know.

5     A.   Yes, I remember that.  It was not a brush

6          cutter.  It was a cut-off saw, an abrasive

7          cut-off, a fixed machine.  It was a chop

8          saw, if you will.

9     Q.   Did you testify for the plaintiff?

10    A.   Yes.

11    Q.   Did you find it to be defective?

12    A.   It was defective.

13    Q.   Have you testified for the plaintiff in a

14         case involving an automatic door?

15    A.   Yes.

16    Q.   Did you find the door to be defective?

17    A.   Yes.

18    Q.   Did you testify in a case involving an

19         automatic sliding electric door?

20    A.   Yes, I believe so.

21    Q.   For the plaintiff?

22    A.   Yes.

23    Q.   Did you find that to be defective?

24    A.   Yes, it was.

160

```
 1    Q.    Previously testified in a case involving a

 2          baby changing table?

 3    A.    Yes.

 4    Q.    For the plaintiff?

 5    A.    Yes.

 6    Q.    Did you find that product to be defective?

 7    A.    Yes.

 8    Q.    Did you testify in a case or cases involving

 9          bicycles?

10    A.    Yes.

11    Q.    For the plaintiff?

12    A.    Yes.

13    Q.    Did you find the bicycle to be defective?

14    A.    There were more than one bicycle case, and

15          if it turned out that I testified,

16          undoubtedly I found it defective.

17          Otherwise, it would not have reached

18          testimony.

19                When I don't find it defective and

20          attorney for the plaintiff calls on me, it

21          never gets to deposition or trial.  I

22          explain that it's not defective and the case

23          -- I don't see any more of the case.

24    Q.    So, you found more than one bicycle to be
```

161

```
 1        defective?

 2   A.   Yes.

 3   Q.   You testified for the plaintiff in a case

 4        involving a car wash?

 5   A.   Yes.

 6   Q.   That involved a death?

 7   A.   Yes.

 8   Q.   Did you find the car wash to be defective?

 9   A.   I would have to thing about that a little

10        more.  It was not just the car wash.  It was

11        the configuration of the whole structure and

12        where the doors were and where the car wash

13        carriage moved.  It was more complex than

14        just the machine.

15   Q.   Was there a defect in the overall machinery?

16   A.   There was a defect in the overall layout of

17        the car wash, considering the building and

18        the door.  What it was is there was a door

19        right next to the path of the brushes that

20        came by, a door through which somebody tried

21        to get to before the car wash carriage came

22        by, and he didn't make it.

23   Q.   Have you testified in a case for the

24        plaintiff again involving a chain saw?
```

162

```
 1   A.   Yes.

 2   Q.   Have you found, did you find the chain saw

 3        to be defective?

 4   A.   The one I'm thinking of blew apart.  It was

 5        defective.

 6   Q.   What was the defect in the car wash?

 7   A.   The car wash was the ---

 8   Q.   Excuse me, I'm sorry, the chain saw case.

 9   A.   As I recall the mechanism flew apart during

10        normal use and the chain whipped around and

11        took out someone's eye.

12   Q.   Do you know who the manufacturer of the

13        chain saw was?

14   A.   I don't remember.

15   Q.   You've testified in at least one circular

16        saw case, correct?

17   A.   Yes.

18   Q.   And that was for the plaintiff?

19   A.   Yes.

20   Q.   Did you find it to be defective?

21   A.   Yes.

22   Q.   Have you testified in slip and fall cases?

23   A.   Yes.

24   Q.   For the plaintiff?
```

163

```
 1   A.   Sometimes.  Sometimes for the defendant.

 2   Q.   Did you testify in a case against Hobart

 3        involving a commercial meat grinder?

 4   A.   Yes.

 5   Q.   And testified there for the plaintiff?

 6   A.   Yes.

 7   Q.   Did you find the meat grinder to be

 8        defective?

 9   A.   Yes.

10   Q.   You testified in a case involving a

11        commercial woodworking shaping machine?

12   A.   Yes, Delta, D-E-L-T-A, I believe.

13   Q.   And that testimony was also for the

14        plaintiff?

15   A.   It was.

16   Q.   And you found the machine to be defective?

17   A.   And the judgment was found that it was

18        defective, yes.

19   Q.   So, the jury agreed with you in that case?

20   A.   Yes.

21   Q.   Case involving a diaper changing machine?

22   A.   A table that you see in a bathroom, usually

23        a little tray that comes down.  This

24        particular tray took off the tip of a little
```

164

```
 1          baby's finger.

 2     Q.   And you testified for the plaintiff?

 3     A.   Yes.

 4     Q.   Did you find the table to be defective?

 5     A.   Yes.

 6     Q.   Have you testified in a case for the

 7          plaintiff involving a die cutting machine?

 8     A.   I remember a case.  I don't know whether it

 9          was specifically called a die cutting

10          machine.

11     Q.   Grant versus Bobst?

12     A.   Yes, I do.

13     Q.   That was for the plaintiff?

14     A.   Yes.

15     Q.   And you found it to be defective?

16     A.   Yes.

17     Q.   Did you testify in a case involving a door

18          mechanism at the rear of an 18-wheeler

19          truck?

20     A.   Yes.

21     Q.   That was for the plaintiff also?

22     A.   Yes.

23     Q.   And you found the mechanism to be defective?

24     A.   And again, the jury agreed with us.
```

165

```
 1    Q.    Are you telling me about the cases in which

 2          the jury didn't agree with you?

 3    A.    No.

 4    Q.    There were some of those, right.

 5    A.    I'm sure there were.  I just don't remember

 6          any of them.

 7    Q.    Did you testify in a case involving a

 8          dumpster?

 9    A.    Yes.

10    Q.    That was for the plaintiff?

11    A.    Yes.

12    Q.    And did the jury agree with you in that

13          case?

14    A.    I don't think it went that far.  You'll have

15          to refresh my memory.  I believe it settled.

16    Q.    Before it settled you found the dumpster to

17          be defective?

18    A.    Yes.

19    Q.    Have you found electric circuitless saws,

20          one or more to be defective?

21    A.    Now you're going to have to ---

22    Q.    Circuitless must be circular saw.

23    A.    Circular saw.

24    Q.    That was a case of Corsino against Makita?
```

166

```
 1    A.    Yes.

 2    Q.    You found the circular saw to be defective?

 3    A.    Yes.

 4    Q.    Do you remember what the reason was?

 5    A.    I think it was because this was a

 6          left-handed gentleman operating the saw and

 7          the saw was designed for right-handed

 8          people.

 9                And now you're stretching my memory

10          a little bit, but as I recall, he tried to

11          do a cut by moving the lever forward and

12          exposing the blade, so he could either make

13          a plunge cut or make a steeply angled cut,

14          and his hand slipped off the lever into the

15          blade.  And I found that there were many

16          other saws on the market that were not

17          susceptible to having your hand slip off

18          like that.

19    Q.    Were you involved for the plaintiff in a

20          case involving an electrocution in

21          uninterruptible power supply with door

22          latch?

23    A.    Yes.

24    Q.    And that Harry Richardson was involved in
```

167

```
 1           that one, do you remember?

 2    A.     Yes, I remember that.

 3    Q.     How did you find him?

 4    A.     I didn't find him.  He was on the other side

 5           of the table.

 6    Q.     I meant how did you find him?

 7    A.     How did I find him?  I don't recall.

 8    Q.     Did you find the power supply or something

 9           about it to be defective?

10    A.     Absolutely.

11    Q.     How did that case turn out?

12    A.     The jury did not agree.

13    Q.     Have you found an emergency alarm switch to

14           be defective?

15    A.     Yes.

16    Q.     Have you found an extrusion machine in a

17           plastic pelletizing plant to be defective?

18    A.     Yes.

19    Q.     Food waste disposer to be defective?

20    A.     Yes.

21    Q.     What was the defect in that?

22    A.     It spit out a piece of a cup or a saucer and

23           took out a gentleman's eye.  It was a

24           commercial waste disposer.
```

168

```
 1    Q.    We've already talked about circular saws.
 2          What was the Hizal case against Makita?
 3          What was that about?
 4    A.    I believe that one was where that was one of
 5          the saws that was available both with and
 6          without a brake, and his did not have a
 7          brake, and I can't remember the details of
 8          how the accident occurred, but I felt that I
 9          think in that particular case for a few
10          dollars of manufacturing cost all the saws
11          should have had a brake.  It's like going in
12          and buying a car and them asking you whether
13          you want safety glass or not.
14    Q.    So, that was the defect, the lack of a
15          brake?
16    A.    Yes.
17    Q.    So, you found ladders, more than one of
18          them, to be defective?
19    A.    I found ladders that were not defective and
20          I found ladders that were defective.
21    Q.    Have you found lawn mowers to be defective?
22    A.    Some of them.
23    Q.    You testified for the plaintiff in Abdulai
24          versus Home Depot, a lawn mower case?
```

169

```
1    A.    Yes.

2    Q.    And there you found the product to be

3          defective?

4    A.    I don't think so.  I think there someone --

5          again, you're stretching my memory.  I

6          believe someone had modified the machine, I

7          believe at Home Depot, making it defective,

8          but I don't recall precisely what happened.

9          I know the machine had been modified.

10   Q.    Have you testified for the plaintiff that a

11         leaf blower was defective?

12   A.    Yes.

13   Q.    Have you testified for the plaintiff that a

14         lift for a connector of a tractor trailer

15         was defective?

16   A.    Yes.  Not a lift, but a connector.

17   Q.    A connector.  That was the Hassey versus

18         Silver Eagle case?

19   A.    Yes.

20   Q.    Have you testified that a log splitter was

21         defective?

22   A.    Yes.

23   Q.    A machine for elevating roofing materials,

24         conveying belt, conveyor belt?
```

170

```
 1    A.    It fell over, yes.

 2    Q.    That was defective?

 3    A.    Yes.

 4    Q.    Have you testified that at least one manlift

 5          was defective?

 6    A.    Yes.

 7    Q.    By the way, just because a product is

 8          involved in an accident doesn't necessarily

 9          mean it's defective, does it?

10    A.    As I said, you're slanting it in the sense

11          of the questions you's asking, because

12          you're only seeing the ones that I did find

13          defective.  There are many products that I

14          investigate that I conclude are not

15          defective, and then it never goes to the

16          deposition or trial, but there is no record

17          of those.

18    Q.    You found a milling machine to be defective?

19    A.    Yes.  No.  I'm sorry, I found the milling

20          machine to be not defective.

21    Q.    In the Calvo versus DoAll case?

22    A.    That's correct.  That was a defendant's

23          case.

24    Q.    I'll take that off my list.
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

171

```
 1    A.    Or add it to your list.  To the other list,
 2          and the jury agreed on that one.
 3    Q.    How about a moped, have you ever found a
 4          moped to be defective?
 5    A.    I simply don't remember that now.
 6    Q.    Fair answer.  Have you found a mooring dock
 7          to be defective?
 8    A.    Give me the name.
 9    Q.    I can't.  I would if I could.  I can't in
10          this case?
11    A.    There was a case that involved a boat and
12          someone jumping from the dock into the boat,
13          and I can't remember any more about that.
14          Oh, wait, wait, wait, wait.  I'm sorry,
15          mooring dock.  That was a walkway, I
16          believe, as part of the mooring dock, that
17          was a slip and fall on a long gangway
18          plankway going down to the mooring dock.
19    Q.    So, the dock wasn't defective?
20    A.    It wasn't the dock.  This was part of the
21          dock, but it was the ---
22    Q.    Have you found a nuclear medicine machine
23          and table to be defective?
24    A.    Yes.
```

172

```
 1   Q.   Have you found a plumber's power sewer auger
 2        or piper auger to be defective?
 3   A.   Electric snake, yes.
 4   Q.   You found that to be defective.  A pneumatic
 5        nail gun?
 6   A.   Yes.
 7   Q.   A pole snow trail, whatever that is, in
 8        Naber versus Win-Sum Ski Corp.?
 9   A.   I remember the case, but give me the title
10        that you have again.
11   Q.   N-A-B-E-R.
12   A.   No.  I remember the case, but what did you
13        call it?
14   Q.   Pole snow trail.  I'm reading from
15        something.  I don't know what that is.
16   A.   What it was was there were some bamboo poles
17        buried just under the snow with some parts
18        of them sticking out on a ski slope.
19   Q.   I agree with you on that one.
20   A.   The defendant did not.  He said the New York
21        State law specifically states hazards and
22        subsurface as hazards are not the ---
23   Q.   How did that defendant make out?
24   A.   We'll go off the record later.  He won.
```

173

```
 1   Q.   We'll talk about it.  Power drain cleaner,
 2        that's a snake.  You found that to be
 3        defective?
 4   A.   Yes.
 5   Q.   A rail saw?
 6   A.   Yes.
 7   Q.   A riding mower, you found those defective on
 8        some occasions?
 9   A.   More than one, sure.
10   Q.   A router, have you found a router to be
11        defective?
12   A.   Yes.
13   Q.   Have you found a roadway milling machine to
14        be defective?
15   A.   Yes.
16   Q.   Have you found a ski signal alarm system to
17        be defective on behalf of a plaintiff?
18   A.   Not that I can recall.
19   Q.   Lionetti versus Kapsan Standfort Corp.?
20   A.   I remember that case.  Nothing to do with
21        ski.  It was a ---
22   Q.   I said signal alarm system.
23   A.   I'm sorry.  Yes.  It was in a nursing home
24        or an assisted living home where there was a
```

174

```
1              pull cord for an emergency alarm that didn't

2              work.  The lady did fall and pulled the

3              alarm and all it did was came apart in her

4              hands, I think.

5    Q.    So, that you found to be defective?

6    A.    Yes.

7    Q.    You found ski boots to be defective?

8    A.    Yes.

9    Q.    And ski bindings to be defective?

10   A.    Yes.

11   Q.    Sneakers to be defective, at least one pair?

12   A.    One highly unusual kind of a sneaker, yes.

13         Very unusual.  I would not call it a

14         sneaker.

15   Q.    What was it?

16   A.    It was -- apparently it was a training shoe;

17         whereas, I recall the fore part of the shoe

18         was like two inches up in the air and there

19         was no heel.  So, you were supposed to

20         bounce around on that and strengthen your

21         calves, and what it did is snap somebody's

22         Achilles heel, Achilles tendon.

23              (Discussion off the record.)

24   Q.    Have you found a snow blower to be
```

175

```
 1          defective?

 2    A.    Yes.

 3    Q.    Stools or chairs to be defective on

 4          occasion?

 5    A.    Yes.

 6    Q.    Swimming pools and swimming pool filters to

 7          be defective?

 8    A.    Oh, yes.

 9    Q.    Have you found a stud gun to be defective?

10    A.    Yes.

11    Q.    Tables from time to time?

12    A.    Yes.

13    Q.    Trash compactor?

14    A.    I can't recall that.

15    Q.    Estate of David Young?

16    A.    Oh, yes.  More than a trash compactor.  It's

17          a baling machine for scrap paper and

18          cardboard killed someone.

19    Q.    Was it a death case?

20    A.    Yes.

21    Q.    Have you found a treadmill to be defective?

22    A.    Yes.

23    Q.    What was wrong with the treadmill?

24    A.    I'm trying to remember.  There was more than
```

```
1           one.  One of them ran backwards after

2           repair.  The serviceman came and the next

3           time they got on it ran ---

4    Q.     A welding helmet?

5    A.     Yes.

6    Q.     A wrench?

7    A.     Yes.

8    Q.     Have you done automobile accident

9           reconstruction cases?

10   A.     A little bit.

11   Q.     And you have done some slip and fall cases?

12   A.     Yes.

13   Q.     Would it be fair to say that the vast

14          majority of your cases are for the plaintiff

15          as opposed to the defendant?

16   A.     I don't know what you mean by vast majority.

17   Q.     What percentage, how would you break it

18          down?

19   A.     I would guess 80 percent.

20   Q.     For the plaintiff?

21   A.     Yes.

22   Q.     And over the last five years what percentage

23          of your income has been derived from work on

24          litigation matters?
```

177

1    A.    Essentially all of it.  I mean other than

2          investments and things like that.

3    Q.    Earned income?

4    A.    Earned income.

5                MR. BARRY:  I think that's all I

6          have.

7                MR. TOBIN:  I have got to ask a

8          couple.

9                        CROSS-EXAMINATION

10   BY MR. TOBIN:

11   Q.    I have a few questions for you just for

12         clarification.  A little bit earlier you

13         talked about different types of interlock

14         that could be incorporated into this saw.

15         Do you recall that?

16   A.    Yes.

17   Q.    The different types of interlocks you

18         described, are they used on power tools and

19         devices in the current market?

20   A.    There are many interlocks used on power

21         tools in today's market.

22   Q.    You talked about interlocks that are

23         recessed or guarded?

24   A.    Yes.

178

```
 1    Q.   Are there products on the market today that
 2         use such interlocks?
 3    A.   I've seen them.  I can't specifically pull
 4         one out right now to describe to you.
 5    Q.   But it's well accepted in the industry that
 6         they're used?
 7              MR. BARRY:  Objection to form.
 8    A.   I believe so, yes.
 9    Q.   Mr. Wilder, can you conclude to a reasonable
10         degree of engineering certainty that the
11         presence of a blade brake and an effective
12         interlock would have prevented Mr. Watson's
13         injury?
14    A.   Would have prevented or mitigated it if both
15         of those features were part of his saw.
16    Q.   Can you explain that, please?
17    A.   Well, I believe since we don't know or I
18         don't know precisely what happened, how much
19         of his injury was caused by coasting versus
20         how much of it might have been caused by a
21         powered on blade, since we don't know -- and
22         how much it might have been caused by a
23         coasting blade, the presence of both of
24         those safety devices, a blade brake and an
```

179

1          interlock in my opinion would have either

2          prevented or mitigated this injury.

3     Q.   Mr. Wilder, can you conclude to a reasonable

4          degree of engineering certainty that

5          Mr. Watson's injury likely took place when

6          he was near the bottom of the ladder?

7     A.   Yes.

8     Q.   Can you explain that conclusion for me,

9          please?

10    A.   Well, yes.  He climbed down the ladder

11         several steps, and if he had been injured

12         halfway up the ladder I doubt very much

13         whether he would have been able to

14         successfully negotiate the rest of the

15         ladder, and he certainly wouldn't have

16         testified that when and as he got to the

17         bottom the injury occurred.  He would have

18         said as I was going down the ladder or

19         something like that, but he specifically

20         testified that his foot was either on the

21         ground or just about on the ground and

22         that's when he felt the injury, became aware

23         of the injury.

24    Q.   A little bit earlier we talked about

180

```
 1            warnings.  Is there a warning on the device
 2            itself regarding the danger of a coasting
 3            blade?
 4    A.      No.
 5    Q.      Should there be a warning on the device
 6            itself?
 7    A.      Well, again, my opinion is that warnings
 8            were a second line of defense.  First line
 9            of defense is to design a machine which is
10            safe in and of itself as far as it can be
11            done.  A warning might or might not have
12            been helpful.  I can't tell you that.
13    Q.      Is there any kind of a warning on the device
14            regarding inadvertent activation?
15    A.      Not that I saw.
16    Q.      Finally, is there a warning on the device or
17            even in the owner's manual regarding whether
18            this particular device should be used while
19            climbing a ladder?
20    A.      I would have to look through that.  I don't
21            believe it says anything about that in
22            there, but I would have to look through the
23            manual again.  In any event, people in the
24            real world have to use ladders to sometimes
```

EXHIBIT G

| | | |
|---|---|---|
| English | page | 1 |
| Français | page | 10 |
| Español | página | 14 |
| Italiano | página | 18 |
| Deutsh | seite | 22 |
| Svenska | sidan | 26 |
| Suomeksi | sivulla | 29 |
| Norsk | side | 32 |
| Dansk | side | 35 |
| Netherland | blz. | 38 |
| Portugise | pág | 42 |
| Grekisk | page | 46 |

## Foreword

In order to ensure that your power cutter is the good Partner you have every right to expect, we advise you to devote a few minutes to reading through this book which is intended to make proper maintenance of the machine easier and also to show you how to carry out necessary checks and service work.

The power cutter is a tool with high cutting capacity and is fitted with protective components to make work as safe as possible. If these components are out of operation or if the machine is used carelessly or the wrong way, then it can cause injuries to the operator or people standing close to the machine.

For this reason you should read through the safety regulations very thoroughly.

Under no circumstances may a power cutter be modified from its original design unless the manufacturer has granted permission for this in writing. Non-authorized modifications can result in safety hazards.

**Partner Industrial**

## What is what? (Fig 4)

1. Cutter wheel    3. Lock button for switch
2. Guard          4. Switch

## Technical data

| | Voltage | r.p.m. | | |
|---|---|---|---|---|
| K2300 EL | 230V | 2300W | 4500 | Class 1* | Europa |
| K2300 EL | 110V | 2000W | 4500 | Class 1* | GB |
| K2300 EL | 120V | 15A–60Hz | 4500 | Class 1* | USA |
| K2300 EL | 100V | 1400W | 4500 | Class 1* | Japan |
| K2300 EL | 115V | 15A, 60 Hz–CSA | 4500 | Class 1* | CSA/Canada |

*The machine is not double insulated – must be grounded.

Disc diameter max. ........... 300 mm (12")
Weight ...................... 9.0 kg (20 lbs)

Sound level   A* 95
              B* 108

A* = Sound pressure level at the ear of the user dB (A) max. speed acc. to ISO/DIS 11201.
B* = Sound power level dB (A) acc. to ISO 3744.

Vibration level
Handle vibrations measured acc. to ISO/CD 8662-4, m/s²
Front handle 3,7
Rear handle 4,2



Fig. 1    Fig. 2    Fig. 3



Fig. 4