UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL WATSON, INDIVIDUALLY, AND AS FATHER AND NEXT FRIEND OF JOHN WATSON,<br>　　　　　　　　　　Plaintiff,<br>v.<br><br>ELECTROLUX PROFESSIONAL OUTDOOR PRODUCTS, INC.,<br>　　　　　　　　　　Defendant. | CIVIL ACTION<br>NO: 04-11782DPW |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO THE DEFENDANT, ELECTROLUX PROFESSIONAL OUTDOOR PRODUCTS, INC.'S, MOTION TO PRECLUDE EXPERT TESTIMONY AND FOR SUMMARY JUDGMENT**

The Plaintiff hereby submits the following memorandum in opposition to the Defendant, Electrolux Professional Outdoor Products Inc.'s ("Electrolux"), Motion to Preclude Expert Testimony and for Summary Judgment.

## INTRODUCTION

This is a product liability case brought by Michael Watson and his blind infant son, John Watson, against Electrolux arising out of an incident that occurred on May 5, 2001. As a result of being injured by a defective saw manufactured by Electrolux, Mr. Watson suffered permanent injuries including a severed peroneal nerve in his left leg resulting in foot drop and the inability to return to work as a Union Laborer.

## FACTS

On May 5, 2001, Michael Watson, then age 30, was working as a laborer for Modern Continental Construction Company on the I-93 Third Harbor Tunnel project. On that day, Mr. Watson was working in a tunnel below the travel lanes cutting rebar that protruded from the tunnel walls. The environment in which Mr. Watson was working was noisy and lighted by

portable lighting units (See Deposition of Michael Watson, pp. 87-88 and 102 attached as **Exhibit 1**). To protect himself, Mr. Watson was wearing a hard hat, ear plugs, eye protection and work gloves, just as he always did. (See **Exhibit 1**, Depo. of M. Watson, pp. 79, 94,102, and Affidavit of Michael Watson, ¶ 3, attached as **Exhibit 2**).

In order to cut the rebar, Mr. Watson was using a model k2300 electric power saw manufactured by Partner, a division of the defendant, Electrolux (See Photographs of exemplar k2300 attached as **Exhibit 3**). The k2300 is essentially a simple machine which consists of an electric motor mounted in a housing. (See Letter from L. Wilder dated September 29, 2005, p. vi-vii, attached as **Exhibit 4**). The motor drives a set of gears that, in turn, causes a blade mounted on front of the saw to spin rapidly. *Id*. There is a front handle and a rear handle on the saw. *Id*. It is equipped with a blade guard and an interlock mechanism. *Id*. The interlock mechanism requires that the button, or "trigger lock," which is mounted just below the trigger and on the inside of the rear handle of the saw, be pushed before the trigger can be pulled. *Id*.

For the weeks prior to his accident, Mr. Watson had been frequently using the subject saw to cut rebar in the tunnel. (**Exhibit 1**, Depo. of M. Watson, p. 72). During the week prior to his accident Mr. Watson was the "saw guy" whose exclusive job was to repeatedly cut rebar from the wall using the subject saw. *Id*. Prior to the day of the accident, Mr. Watson had no difficulty with any of the mechanisms or operation of the subject saw and, on the day of the accident, the interlock was operational. (*Id*. at pp.73 and 77). At no time did Mr. Watson deactivate the interlock on the subject saw. (**Exhibit 2**, Affidavit of M. Watson, ¶ 1). The locations of the rebar protruding from the wall varied from close to the floor, to as high as the twenty-foot ceiling (**Exhibit 1**, Depo. of M. Watson, p. 90).

At the time of his accident, Mr. Watson was cutting a piece of rebar located approximately 10 feet above the floor of the tunnel. (**Exhibit 1**, Depo. of M. Watson, p. 93). Mr. Watson climbed a ladder and cut the rebar relatively quickly and efficiently, but unfortunately, on this occasion, he suffered severe injuries when he reached the base of the ladder. In order to make the cut, Mr. Watson climbed up to the fifth or sixth rung of a ladder (*Id*. at p. 95). From there, he grasped the saw by holding the rear handle with his right hand and the front handle with his left hand. (*Id*. at pp. 96-97). He activated the saw and cut the rebar. After finishing the cut, he took his right hand off of the rear handle and deactivated the saw as he released the trigger. (*Id*. at p. 99). Mr. Watson then readjusted his left hand on the front handle of the saw and reached over with his right hand to make sure the cut rebar was flush with the wall (*Id*. at pp. 97-98).

After determining that the rebar had been cut flush with the wall, Mr. Watson again repositioned his left hand on the front handle of the saw so that he could support the saw while holding onto the ladder with his right hand and descending to the ground. (**Exhibit 1**, Depo. of M. Watson, pp. 100-101). When he got to the bottom of the ladder, Mr. Watson took his right hand and gripped the saw by the front handle then removed his left hand from the front handle and gripped the saw by the rear handle with his left hand. (*Id*. at pp. 103-104). After lowering the saw to his side, and while gripping the rear handle of the saw with only his left hand, Mr. Watson felt the blade come into contact with his leg. (*Id*. at pp. 103-104). At first he didn't know what happened, but when he went to take a step he could not feel his foot and realized that he had been injured. (*Id*. at p. 105). Mr. Watson suffered deep lacerations to the peroneal nerves in his left leg as a result of the accident. He has permanently lost feeling and control of his left foot, resulting in a foot drop, which causes him the have difficulty with his balance and walk with an

altered gait. (See Surgical Dictation from Boston Medical Center attached as **Exhibit 5**).

The Plaintiff retained Leslie N. Wilder, P.E. to investigate his accident.  Mr. Wilder is a licensed professional engineer in three states. (**Exhibit 4**, Wilder Sept. 29, 2005 Letter, p. iii). He has a Masters Degree in Mechanical Engineering from Stanford University and a Masters Degree in Electrical Engineering from New York University. *Id*.  He is a board certified forensic engineer and professional ergonomist. *Id*.  Mr. Wilder has been found qualified in a number of jurisdictions to testify as an expert engineer including the United States District Courts of New York, New Jersey and Connecticut. *Id*.  Mr. Wilder has been an engineer for forty two years and has spent the last fifteen years as a forensic engineer investigating accidents on behalf of both plaintiffs and defendants that involve a range of mechanical and electric products. *Id*. He has investigated no fewer than 22 accidents that involved a variety of model powered saws.  (See Affidavit of Leslie N. Wilder, ¶ 5, attached as **Exhibit 6**). Mr. Wilder also has extensive practical experience in the private sector regarding all aspects of mechanical, electromechanical, and electronic product development, manufacturing and marketing. (*Id*. at ¶ 1). He has served as lead engineer with the responsibility for product development and manufacturing, including four years with the Hopp Press Inc., two years with Mechtronic Corporation, and five years as Director of Engineering at AMF Incorporated.  (**Exhibit 5**, Wilder Sept. 29, 2005 letter, p. iii).  Product lines for which Mr. Wilder has been responsible include lawn and garden tractors, exercise equipment, motorcycles, telephonic equipment, electronic measuring devices  and electronic switches and relays. *Id*.  Mr. Wilder holds fourteen patents which involved the design of electronic devices. *Id*.

Mr. Wilder's analysis of the subject accident, the product, and his suggested alternative designs for the subject product, involve the application of basic principles of engineering and physics in which he has extensive training and experience. (**Exhibit 6**, Affidavit of L. Wilder, ¶ 2). As part of his investigation of the accident, Mr. Wilder conducted a number of tests with an exemplar k2300 including a simulation of the accident sequence, timing of the coasting blade, fast action photography to determine spin up time of the blade, cuts with the saw, manipulations to determine if the saw could be inadvertently activated, and general handling of the saw to understand its operational characteristics. (See Deposition of Leslie N. Wilder, pp. 58-62, attached as **Exhibit 7**). Mr. Wilder also examined other electric saws and conducted tests using similar saws equipped with blade braking mechanisms. (*Id.* at pp. 140-141).

As a result of his investigation, Mr. Wilder concluded that, to a reasonable degree of engineering certainty, Mr. Watson's injury could have been prevented or mitigated by the incorporation of both a blade brake mechanism and an effective interlock into the design of the k2300. (**Exhibit 7**, Depo. of L. Wilder, pp. 178-179). Mr. Wilder explained that the presence of the deep laceration in Mr. Watson's left leg indicates that the blade was forcibly spinning at the time it came in contact with his leg. (*Id.* at p. 71-72 and 82). The two reasons that the blade was caused to be rotating when it contacted Mr. Watson's leg are: 1.) the saw did not have a blade brake to quickly reduce the coasting of the blade after deactivation; or 2.) the location of the interlock on the saw permitted Mr. Watson to inadvertently activate the saw. (See Letter from Leslie N. Wilder dated March 24, 2006, attached as **Exhibit 8**).

Mr. Wilder further explained that blade-braking mechanisms on electric saws with rotating blades are commonly used and that the technology to employ such a mechanism on the

subject saw has been readily available since the 1960's as indicated by multiple patents describing the design of such mechanisms. (**Exhibit 4**, Wilder Sept. 29 letter, pp. vii and x). He further explained that, based on his testing, an abrasive blade on the subject saw measuring 12" or 14" could have been made to stop in approximately two seconds if a blade braking mechanism had been incorporated into the design of the k2300. (*Id*. at p. viii and **Exhibit 7**, Depo. of L. Wilder, pp. 116-118). Without a blade brake the blade will continue to spin for 10-15 seconds after deactivation. (*Id*. at p. vii).

Additionally, Mr. Wilder will testify that the concept of interlocks designed so that the user could not readily reactivate the saw when he did not intend to is also commonly applied in the power tool industry. (**Exhibit 6**, Affidavit of L. Wilder, ¶ 4). Mr. Wilder proposed several different designs for the interlock on the k2300 which would have prevented the accident, including having the "trigger lock" component of the interlock mechanism "...recessed, guarded, or positioned away from an operator's normal operating grip on the handle". (**Exhibit 8**, Wilder March 24, 2006 letter). In fact, Electrolux itself has established that the interlock could be better designed by changing the location of the "trigger lock" component of the interlock from inside the rear handle of the saw, to a location on the side of the rear handle, when it designed and manufactured the k3000 electric saw, which is the successor model to the k2300. (See Deposition of Sven Lennart Gustafsson, pp. 76-79 attached as **Exhibit 9** and Photograph of the k3000 attached as **Exhibit 10**).

## ARGUMENT

The Defendant now moves for Summary Judgment predicated on the allegation that Mr. Wilder is not qualified to testify regarding the electric saws and that his opinions regarding the

accident and design of the subject saw were not reached using reliable methodology. As elaborated further below, the Defendant's allegations regarding Mr. Wilder's qualifications are unfounded. He is a trained and extensively experienced mechanical and electrical engineer with advanced degrees in both of those fields. The Defendant's suggestion that Mr. Wilder's opinions are not the result of reliable methodology are equally unfounded, because not only has Mr. Wilder performed testing to confirm his opinions, he also reached his conclusions by using basic, generally-accepted and widely-used engineering principles regarding power tool safety that have been applied to the power tool industry for many years.

The Defendant tries mightily to assert that the k2300 is significantly different from other power tools available to the public in an attempt to suggest that the generally-accepted safety principles discussed by Mr. Wilder should not apply to the subject saw. However, Electrolux is unable to provide any substantive differences which set the k2300 saw apart from the greater family of electric saws that use simple electric motors to power a rapidly rotating blade and which are regularly equipped with safety devices, such as blade brakes and interlocks. For example, the Defendant attempts to suggest that the k2300 is not used to make repeated cuts. This assertion is completely contradicted by the evidence in this case as Mr. Watson testified that for the week prior to his accident, his job was to go through the tunnel and repeatedly cut rebar. The Defendant repeatedly attempts to create a distinction between the k2300 and other electric saws, but is unable to provide any foundation for the suggested distinction.

I.  **Plaintiff's Expert Witness is Qualified to Render Opinions Regarding the Subject Product.**

In order to testify as an expert under Fed.R.Evid 701, an individual must be qualified by knowledge, skill, experience, training or education to render the proffered testimony. *Bogosian v. Mercedez-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997). Mr. Wilder is a trained engineer who has earned advanced degrees from reputable institutions in the fields of both mechanical and electrical engineering. His extensive knowledge of these fields is reflected in the fact that he holds professional engineering licenses in three different states. Mr. Wilder is also certified by boards of his peers as an expert in forensic engineering and ergonomics.

As pointed out by the Defendant, Mr. Wilder has extensive experience in the investigation of accidents like the accident in which Mr. Watson was injured. In fact, Mr. Wilder has spent the last fifteen years as a forensic engineer investigating many different types of accidents. During those years, Mr. Wilder has investigated no fewer than twenty two different accidents involving the use of powered saws. The Defendant inaccurately suggests that Mr. Wilder is not qualified as an expert because all of his experience in the analysis of product design and failure comes from his work in litigation. The case law does not suggest that such experience should be rejected. In fact, given his extensive experience as a forensic engineer, Mr. Wilder is particularly qualified to investigate accidents like the one in which Mr. Watson was injured, particularly because it involved a powered saw.

What the Defendant fails to recognize is that not only does Mr. Wilder have extensive accident investigation experience, but Mr. Wilder also has extensive practical experience in the private sector involving the fields of mechanical and electrical engineering. During the forty two

years that he has been an engineer, Mr. Wilder has amassed extensive experience in the design, development, manufacturing and marketing of both electrical and electromechanical devices like the subject saw. He has held numerous positions in the private sector where he was primarily responsible for the design, manufacturing and marketing of electronic and electromechanical product lines, such as lawn and garden tractors, exercise equipment, motorcycles, telephonic equipment, electronic measuring devices and electronic switches and relays. Mr. Wilder practical experience regarding both electrical and electromechanical devices also renders him qualified to testify in the present case. It should be further noted that Mr. Wilder has demonstrated knowledge in the field of product design by inventing and patenting fourteen different products.

    In arguing that Mr. Wilder is not qualified to testify regarding the subject saw, the Defendant attempts to portray the k2300 as a "complex power tool" which is beyond the understanding of Mr. Wilder. The Defendant is, in essence, attempting to argue that the k2300, which consists essentially of an electrical motor, a gear housing and a saw blade, is a highly complex product. However, the defendant has not, and cannot, provide a description of how the subject electric saw significantly differs from other electric saws on the market which use the same type of mechanism to drive the blade.

    Mr. Wilder has the education, training and experience necessary to help the jury understand the technical and scientific evidence in this case. He has repeatedly been found qualified to serve as an expert witness in courts around the country including cases in which the subject matter involved the design of powered saws. Accordingly, Mr. Wilder is qualified to testify under Fed.R.Evid. 701.

II. **The Opinions to be Offered by Plaintiff's Expert Mechanical Engineer Are The Product of Reliable Scientific Investigation and Reasoning.**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert may testify in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702. The Rule imposes a gate-keeping role on the trial court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In examining whether to admit an expert's testimony, a court should consider: (1) whether the theory or technique can be or has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential error rate; and, (4) the level of the theory or technique's acceptance within the relevant discipline. *Id*. at 593-94, 113 S.Ct. 2786. However, these factors are not definitive or exhaustive, and the trial judge has broad latitude to use other factors to evaluate reliability. *United States v. Mooney*, 315 F.3d 54, 61 (1st Cir.2002) (citing Kumho Tire Co., 526 U.S. at 153, 119 S.Ct. 1167). The trial judge may determine which of these factors to apply depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co.*, 526 U.S. at 150, 119 S.Ct. 1167. Once the trial Court determines the reliability of the expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to inferences and conclusions he draws from it and any flaws in his opinion may be exposed through cross-examination or competing expert testimony. *U.S. v.*

*Mooney*, 315 F.3d 54, 63 (1st Cir. 2002).

Mr. Wilder's opinions are the result of his thorough analysis and reasoned conclusions based on the available evidence. At its core, Mr. Wilder's analysis of the accident and the product involves the application of basic principles of engineering and physics. More specifically, Mr. Wilder's analysis of the subject saw involves the application of well-known, tested and generally-accepted principles of safety that have been applied to the power tool industry for many years . "Where expert testimony is based on a scientific principle the validity of which is well established, questions concerning the reliability of expert testimony usually are limited." 29  Charles A. Wright & Victor J. Gold, Fed.Prac. & Proc. Evid § 6266 (2006).

After reviewing the evidence and testing the product, Mr. Wilder concluded that it is equally probable that the accident occurred in one of two ways. Namely, that the blade was either coasting down when it struck Mr. Watson's leg, or that the saw was inadvertently activated after Mr. Watson had shut the saw off causing the blade to once again be powered. Using generally-accepted safety principles in the power tool industry, Mr. Wilder also concluded that a blade brake and an effectively designed interlock would have prevented Mr. Watson's injury or reduced the severity of the injury.

A.  <u>A Blade Braking Mechanism on the K2300 Would Have Prevented Mr. Watson's Injury</u>.

Mr. Wilder reached his conclusion regarding the need for a blade brake on the subject saw by first reviewing the material available regarding Mr. Watson's accident and, then, by conducting testing to see if the blade brake would have prevented the accident. In order to test the stopping time of a blade braking mechanism, Mr. Wilder used a DeWalt mitre-saw with a blade brake incorporated into its design. Mr. Wilder mounted two 10" metallic blades on a the

mitre-saw to simulate a load on the mitre-saw that was similar to the load created by an abrasive blade like the one mounted on the subject saw at the time of the accident.  The power output of the mitre-saw was essentially identical to that of the subject saw, in that they are both equipped with a 120 volt, 15 ampher, electric motor.  Using the stopping time in the tests with the mitre-saw for comparison, Mr. Wilder then calculated how long it would take to stop a 12" and 14" abrasive saw blade using the mechanism in the mitre-saw.  His calculations revealed that a 12" and a 14" abrasive blade could be stopped in approximately 2 seconds.  Without a blade brake the blade will continue to coast for 10-15 seconds.

     Mr. Wilder also conducted testing to determine approximately how long it would have taken Mr. Watson return to the base of the ladder and concluded that it would take far longer than two seconds.  (**Exhibit 7**. Depo. of L. Wilder, pp 142-144).  Consequently, Mr. Wilder concluded that the presence of the blade brake on the subject saw would have prevented the accident as the blade could be stopped within 2 seconds, which is well before Mr. Watson would have reached the base of the ladder and lowered the saw to his side.

     After confirming that a blade brake would have prevented Mr. Watson's accident through testing, Mr. Wilder attempted to determine if the subject saw could be equipped with a blade brake. In his September 29, 2005 letter, Mr. Wilder indicates that the technology to equip the subject saw with a blade brake is readily available.  He identifies and describes several model saws that are equipped with blade brakes and which are of a substantially similar design in that they are essentially made up of an electric motor that drives a rapidly spinning saw blade.  He also references patents for electronic blade brakes which date back to the 1960's.  As a result of this reasoning, Mr. Wilder concluded that because the technology is readily available and is

incorporated into the design of similar saws, that the subject saw could have been designed with a blade brake. There is nothing unique about the subject saw which indicates that the readily available technology needed to incorporate a blade brake into the design of the k2300 could not be easily accomplished.  Indeed, aside from Electrolux's claim that Mr. Wilder has not specifically designed and tested a blade brake on the k2300, it has not provided any reason why its electric saw could not be equipped with a blade brake like so many other electric saws on the marker already are.

      The Defendant attempts to call into question Mr. Wilder's testing by suggesting that the DeWalt mitre-saw he used for his testing was substantially different from the subject saw. However, Electrolux offers absolutely no discussion of how the mitre-saw is so different that a blade braking mechanism like the one in the DeWalt mitre-saw could not be incorporated into the k2300.  That is because, the mitre saw, like the k2300, consists essentially of a 120 volt, 15 ampher, electric motor driving a saw blade at a rapid pace. There is no significant distinction to be made.  The blade braking mechanism involves reversing the polarity in the electric motor, which then provides resistance and stops the blade from spinning.  The technology exists to incorporate a blade brake into the Dewalt mitre-saw, which is more complex in terms of its ability to orient the blade at different angles, but which has a substantially similar mechanism as that of the k2300 to drive-power the blade.  It is reasonable to conclude that the less complex k2300 could be readily designed with a blade brake.

      The Defendant also suggests that Mr. Wilder's opinions regarding the blade brake are invalid because he did not test to see if an abrasive blade could cut into human skin.  Mr. Watson's serious leg injury is indisputable proof that an abrasive blade can cut deeply into

human skin.  Mr. Wilder was asked about testing to determine if the abrasive blade under the circumstances of the accident was performed and he explained that the variables were so great that he did not think that any accurate testing could be done. (**Exhibit 8**, Depo. of L. Wilder, pp. 71-72).  Notably, Electrolux offers no other source for Mr. Watson's injury, which leaves the spinning abrasive blade as the only logical cause of the injury.

Electrolux attempts to call into question Mr. Wilder's opinions regarding the blade brake because he has done no research regarding the danger posed by the spinning blade. Again, Electrolux's argument fails to recognize the obvious. It is well recognized in the power tool industry that a rotating blade presents a hazard to users.  This is an uncontroverted fact that Electrolux cannot dispute. There was no need for Mr. Wilder to conduct statistical testing to establish a principle that is already so well known and acknowledged.

Finally, Electrolux criticizes Mr. Wilder's opinions regarding the blade brake as unreliable because he has done no testing to see how a blade brake would adversely affect the k2300.  This criticism, like the others, relies on an alleged, but completely unsupported, claim that the subject saw is radically different from other electric saws on the market.  Mr. Wilder describes several electric saws in his September 29, 2006 letter which are equipped with blade brakes.  These similar saws did not experience any adverse effects as to safety or utility after being equipped with a blade brake.  It is thus technically feasible to equip a saw with the same power and similar design as that of the subject saw with a blade brake, without incurring serious operational difficulties or creating safety issues.

As explained above, Mr. Wilder's opinions regarding the blade brake are based on testing and principles which have been established to be generally-accepted in the power tool industry.

They are scientifically valid and are the result of reasoned application of the testing results and generally accepted principles to facts of the case.

B.      An Effectively Designed Interlock on the k2300 Would Have Prevented Inadvertent Activation of the Saw Thereby Preventing Mr. Watson's Accident.

After considering the evidence regarding Mr. Watson accident and testing with an exemplar saw, Mr. Wilder continued to consider the available evidence to ensure that his opinion encompassed other possibilities that would explain what happened to Mr. Watson. In viewing video of other individual's manipulating the subject saw, Mr. Wilder was caused to consider inadvertent activation of the saw as a possible alternative cause of Mr. Watson's accident.  To test this possibility, Mr. Wilder used an exemplar k2300 and reenacted the accident sequence to see if the interlock on the subject saw prevented inadvertent activation of the saw.  Through repeated trials, Mr. Wilder learned that in two separate scenarios, the interlock on the subject saw failed to prevent inadvertent activation.  Consequently, he clarified his initial opinion with the final opinion being the result of a thoughtful, systematic and thorough inquiry into the subject accident.

The first instance in which Mr. Wilder found that the interlock on the subject saw did not prevent inadvertent activation was if the operator was wearing a glove and held the rear handle of the saw.  In such a case, it was possible, even with the saw hanging at the user's side, to depress the "trigger lock" and squeeze the trigger.  This is because the "trigger lock" is located very close to the trigger and on the inside of the rear handle.  The work glove fills the space between where the user's hand grasps the trigger and the "trigger lock" resulting in the trigger lock being depressed.   Mr. Wilder was able to repeatedly reproduce such an inadvertent activation when he

was wearing work gloves. The scenario is consistent with the events on the day of the accident because Mr. Watson was wearing safety gear, including work gloves, just as he always did. The Defendant suggests that there is no evidence that Mr. Watson was ever wearing work gloves because it was not part of his deposition testimony. In fact, Mr. Watson was never specifically asked by the defendant if he was wearing work gloves, just as he was never asked if he was wearing ear plugs. At trial, Mr. Watson will testify that whenever he worked using the subject saw, he regularly wore a hard hat, eye protection, ear plugs and work gloves.

The second scenario where the interlock on the subject saw did not prevent inadvertent activation was when the user reached across his body with his hand and gripped the front handle of the saw while using his other hand to grip the rear handle. In that case, the saw was forced back toward the user, driving his index finger into the "trigger lock" by a combination of the weight of the saw and the weight of the user's arm. Mr. Wilder demonstrated his testing regarding this second method at his deposition. This scenario is also consistent with Mr. Watson's accident, because Mr. Watson testified that when he reached the bottom of the ladder he was holding the saw in his left hand by the front handle. He then reached across his body with his right hand and gripped the top handle. Next, Mr. Watson removed his left hand from the front handle and gripped the rear handle in order to carry the saw at his side. Mr. Wilder's repeated testing yielded the reliable conclusion that it was also possible for Mr. Watson's accident to have occurred as a result of inadvertent activation.

In its Motion, the Defendant seems to completely disregard Mr. Wilder's testimony regarding his testing and his demonstration of this second inadvertent activation scenario. Electrolux points to no reason why such a theory is invalid or inadmissible. However, in

Footnote 59, the Defendant inaccurately suggests that Mr. Wilder somehow concluded that, while holding the saw in <u>one</u> hand, the weight of the saw could cause the interlock button to be depressed. At his deposition, Mr. Wilder provided an extensive description and a demonstration of how the saw could be inadvertently activated when Mr. Watson switched his grip on the saw at the bottom of the ladder and before he was carrying the saw in one hand. Mr. Wilder stated in his March 24, 2006, letter that the inadvertent activation could have occurred when Mr. Watson "...reached the bottom of the ladder, when he changed his grip on the saw, and prior to lowering it to his side." It is not clear to what the Defendant refers in its footnote, but it is certainly not the same as the opinion proffered and described by Mr. Wilder to which there appears to be no objection in the Defendant's Motion.

      With testing that confirmed inadvertent activation as another probable cause for Mr. Watson's accident, Mr. Wilder applied basic, generally accepted and widely used safety principles in the power tool industry to suggest an alternative design of the subject saw that would have prevented Mr. Watson's accident. The use of interlocks to protect against inadvertent activation of a power tool is a well-accepted and frequently employed safety feature in the power tool industry. For decades, interlocks like those suggested by Mr. Wilder, have routinely been incorporated into power tools similar to the subject saw with no adverse consequences. The presence of interlocks in so many instances recognizes that the phenomenon of inadvertent activation, particularly of an electric saw, is a well-known danger in the industry and that interlocks are a tested and effective way of avoiding the known danger.

      In his March 24, 2006, letter, Mr. Wilder identified several commonly occurring interlock designs which prevent inadvertent activation. The suggested designs include recessing the

"trigger lock", placing a barrier over the "trigger lock" and relocating the "trigger lock" to a area on the product that was out of the reach of the operator's normal operating grip. Each of these designs would have prevented Mr. Watson's accident because they make it essentially impossible to accidentally depress the "trigger lock."

Mr. Wilder's opinion regarding an alternate design for the defective interlock incorporated into the k2300 does not call for the creation of a new technology. He is simply applying what is already well-known and widely available technology to a power tool that is substantially similar to various other electric saws on the market. The presence of interlocks on power tools similar to the k2300 is evidence that such technology, incorporated into the design of power tools, has been a tested, technically feasible and effective means of protecting against inadvertent activation. It is further evidence that interlocks do not result in adverse effects in the safety or utility of similar power tools.

Indeed, the Defendant itself has embraced this well-established principle in the design of the successor model to the k2300. On the k3000, Electrolux relocated the "trigger lock" from inside the rear handle of the saw to the side of the handle where it is less likely to be depressed when the user is carrying the saw with two hands. The "trigger lock" on the k3000 functions the same as the "trigger lock" on the subject saw with no adverse consequences to the tool in terms of safety or utility.

Thus, Mr. Wilder has tested the subject product under conditions similar to the accident scenario and found that it was possible to inadvertently activate the saw. He then applied generally accepted principles of safety in the power tool industry and identified commonly used alternative designs that would have prevented Mr. Watson's accident. The opinions he reached

are the result of testing and the application of principles generally accepted in the field of engineering, as well as designs well-established in existing power saws. Such opinions are reliable and admissible.

      The Defendant has suggested that Mr. Wilder's theory should be excluded simply because it was purportedly disclosed too late to be included as part of his trial testimony. At his deposition, Mr. Wilder forthrightly disclosed that only after thinking about the accident over a period of time, watching others manipulate the subject saw, and after additional testing of his own initial theory, did he reach an opinion that inadvertent activation was also a probable cause of Mr. Watson's accident and that the interlock was defectively designed. Plaintiff's disclosure of Mr. Watson's additional opinions clarifying his initial assessment was justified because the additional opinions were not known and did not exist prior to March 24, 2006. Furthermore, no harm came from the disclosure and Electrolux has not been able to identify any such harm. The supplementation to Mr. Wilder's opinions was made pursuant to the duty to do so under Fed.R.Civ.P. 26(e)(1). The presence in the rules regarding supplementation indicates that the Court recognizes that experts may continue to develop an understanding of a case as litigation progresses. The additional opinions were made well in advance of trial and in advance of Mr. Wilder's deposition, thereby providing the Defendant with ample opportunity to explore all of his opinions. *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir 2001)(No sanction required where the party can establish that the late disclosure was justified or harmless). The circumstances do not merit wholesale exclusion of Mr. Wilder's opinions.

III. **Plaintiff Has Submitted Evidence Such That There are Genuine Disputed Issues of Material Fact and Summary Judgment Is Not Appropriate.**

Electrolux has the burden of proof to establish that there exists no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. As discussed in detail above, the Plaintiff can submit reliable, scientific and admissible evidence through expert testimony to permit a jury to find that the subject saw was defective and caused Mr. Watson's accident. Under such circumstances it cannot be concluded as a matter of law that Electrolux is entitled to Summary Judgment.

## CONCLUSION

For the foregoing reasons, the Plaintiff requests that this Court deny the Defendant's Motion for Summary Judgment and permit the Plaintiff to have his case decided by a jury of his peers.

The Plaintiff
By his attorneys

/s/ Jonathan E. Tobin
Jonathan E. Tobin (641509)
Thomas Drechsler (134840)
FINNERAN BYRNE & DRECHSLER, LLP
50 Redfield St.
Boston, MA 02122
617-265-3900

## CERTIFICATE OF SERVICE

I, Jonathan E. Tobin, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copied will be sent to those indicated as non-registered participants on June 9, 2006.

/s/ Jonathan E. Tobin
Jonathan E. Tobin