# **EXHIBIT 7**

**Page 1**

```
                                    Volume: I
                                    Pages: 1 - 184
                                    Exhibits: 1 - 13

        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS

*********************
MICHAEL WATSON, INDIVIDUALLY,
AND AS FATHER AND NEXT FRIEND
OF JOHN WATSON, PPA,
      Plaintiff,

   vs.                    CIVIL ACTION NO.
                          04-11782DPW

ELECTROLUX PROFESSIONAL
OUTDOOR PRODUCTS, INC.,
      Defendant.
*********************
```

DEPOSITION of LESLIE N. WILDER, taken on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure before Eileen Baker, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac Street, Boston, Massachusetts, on Monday, March 27, 2006, commencing at 10:26 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 2**

APPEARANCES:

FINNERAN, BYRNE & DRECHSLER, LLP
(By Jonathan E. Tobin, Esq.)
50 Redfield Street
Boston, Massachusetts 02122
    On behalf of the Plaintiff

SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
(By David A. Barry, Esq.
and Suleyken D. Walker, Esq.)
101 Merrimac Street
Boston, Massachusetts 02114
    On behalf of the Defendant


Also Present
Lennart Gustafsson
George P. Libbares, Videographer

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 3**

INDEX

| WITNESS: | DIRECT/REDIRECT | CROSS/RECROSS |
|---|---|---|
| LESLIE N. WILDER | | |
| By Mr. Barry | 4 | |
| By Mr. Tobin | | 177 |

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| 1 | Report 9/29/05 | 5 |
| 2 | Profile | 5 |
| 3 | CV | 5 |
| 4 | Letter 3/24/06 | 75 |
| 5 | Handwritten Notes | 112 |
| 6 | Handwritten Notes | 113 |
| 7 | Handwritten Notes | 113 |
| 8 | Handwritten Notes | 113 |
| 9 | Handwritten Notes | 113 |
| 10 | Handwritten Notes | 113 |
| 11 | Letter 11/21/05 | 134 |
| 12 | Letter 3/16/06 | 134 |
| 13 | ANSI B7.5-1983 | 143 |

VIDEO TESTIMONY PAGES 83-84

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 4**

P-R-O-C-E-E-D-I-N-G-S

At the offices of Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac Street Boston, Massachusetts, on Monday, March 27, 2006, commencing at 10:26 a.m.

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the reading and signing will not be waived. The sealing and filing are waived.

It is further stipulated and agreed that all objections, except objections to the form of the questions, and motions to strike will be reserved until the time of trial.

LESLIE N. WILDER, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. BARRY:

Q. Would you tell us your name, please, sir?
A. I'm Leslie Wilder, L-E-S-L-I-E, W-I-L-D-E-R.
Q. Where do you live, Mr. Wilder?

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 57

| | | |
|---|---|---|
| 1 | Q. | That is you don't know whether he was climbing down from the ladder or whether he was all the way down and on the ground? |
| 4 | A. | I don't know that. |
| 5 | Q. | Do you know where his hands were when he was injured? |
| 7 | A. | Precisely, no. |
| 8 | Q. | Do you know what part of the saw, if any, his left hand was on when he was injured? |
| 10 | A. | My understanding his left hand was on the rear handle. |
| 12 | Q. | So, you believe that at the time of his injury he had already made the switch by putting his left hand which had been on the front handle to the rear handle? |
| 16 | A. | I believe so, yes. |
| 17 | Q. | Do you know how long after he made that switch from having his left hand on the front handle to the rear handle he was injured? |
| 21 | A. | No. |
| 22 | Q. | Have you performed any tests to determine how the plaintiff's accident happened? |
| 24 | A. | Yes. |

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 58

| | | |
|---|---|---|
| 1 | Q. | What tests did you perform? |
| 2 | A. | I did use a ladder and I did climb up on the fifth step, I believe it was the fifth step, and simulated going through the motions without the saw running and timed myself coming down and transferring hands, just as he described it, to see how long I could get that sequence of events. How long it would take me to do that sequence of events. |
| 10 | Q. | And what saw did you use in those tests? |
| 11 | A. | The exemplar that I had which is a 12-inch saw. |
| 13 | Q. | When did you obtain that exemplar? |
| 14 | A. | Early on. I don't remember precisely when, but early on when I got involved in this case. |
| 17 | Q. | So, you had it before your September 2005 report? |
| 19 | A. | Yes. |
| 20 | Q. | When did you perform the test that you just described? |
| 22 | A. | I think I have it in my notes, but I don't have them in front of me. |
| 24 | Q. | Was it before your September 2005 report? |

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 59

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | I don't believe you mentioned it in your report. Is there any reason why you don't? |
| 4 | A. | I'd have to look at my report. I think I did mention it, but I'm not sure. |
| 6 | Q. | Maybe I'm mistaken. How much time elapsed in your test? |
| 8 | A. | I think approximately nine seconds. |
| 9 | Q. | Was that test videotaped? |
| 10 | A. | No, it wasn't. |
| 11 | Q. | Did you repeat it several times? |
| 12 | A. | Yes. |
| 13 | Q. | Did you generally get nine seconds from the time that you started to descend the ladder to the time when you simulated his accident happening? |
| 17 | A. | I believe in my notes I actually have the -- I think it was at least three tests, and I actually have the times down, but it was plus or minus whatever that averaged out to about nine seconds, I believe. |
| 22 | Q. | Do you have your report there? |
| 23 | A. | I do. |
| 24 | Q. | Can you just point it to me because I --- |

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 60

| | | |
|---|---|---|
| 1 | A. | I am looking for it and I don't see it myself. |
| 3 | Q. | Do you think you might have done that test or those tests that you just described in response to getting the defendant's expert reports? |
| 7 | A. | No. |
| 8 | Q. | After they did those tests and those tests were shared with you? |
| 10 | A. | No. I did it before that and I'm fairly certain that in my notes will have the date that I actually did it. |
| 13 | Q. | Okay. |
| 14 | A. | No, I don't see it in my report which surprises me, but I don't see it. |
| 16 | Q. | Did you perform any other tests in connection with your work on this case? |
| 18 | A. | I performed the coastdown test, yes. |
| 19 | Q. | What did you do in regard to that test? |
| 20 | A. | I timed how long it took the blade to stop from the release of the trigger. |
| 22 | Q. | And that is in your report I believe, correct? |
| 24 | A. | I believe it is. |

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 61

```
 1  Q.  How long did it take for the blade to coast
 2      down from the time the trigger was released?
 3  A.  The number in my mind says 12.7 seconds.  I
 4      may or may not have that correct.
 5  Q.  Have you performed any other tests besides
 6      the ladder descending test and the coastdown
 7      time test in connection with your work on
 8      this case?
 9  A.  Yes.
10  Q.  What other tests have you performed?
11  A.  I did take a video of the startup time of
12      the saw, which was inconclusive.  It's on
13      that CD that you noticed that I said that's
14      it probably not worth copying.  It's just
15      two videos of the starting of the saw
16      lasting a couple of seconds each.  And I
17      also manipulated the saw after seeing these
18      videos to see whether I could accidentally
19      or inadvertently trigger the interlock and
20      the trigger.  I could, yes.
21  Q.  Have you now told us about all of the tests
22      that you've done in connection with your
23      work on the Watson case?
24  A.  I also handled the saw quite a bit, but --
```

Page 62

```
 1      starting and stopping it, but I can't recall
 2      any other test that I did specifically.
 3  Q.  Did you cut anything with the exemplar saw
 4      for purposes of this case?
 5  A.  Yes.
 6  Q.  What did you cut?
 7  A.  I just jammed the saw into the wood as --
 8      into a piece of wood as it was coasting to a
 9      stop a few times, just to see what would
10      result, and it wasn't -- it wasn't
11      documented to the extent that I listed what
12      the coast times were, because it was not
13      completely comparable to the accident.  I
14      just wanted to see what the effect of this
15      abrasive blade in a coastdown mode would
16      have had on a piece of wood.
17  Q.  When did you do that test?
18  A.  I did it early on before my report, and I
19      again did it after any report.
20  Q.  Did you keep notes of either of those two
21      tests?
22  A.  No.  It was just visually myself to see
23      whether the saw would stop without cutting
24      away any of the wood, and it did cut the
```

Page 63

```
 1      wood.
 2  Q.  Did you reach any conclusions from those two
 3      tests?
 4  A.  A saw blade is hazardous.
 5  Q.  Is that something you didn't know before you
 6      did the test?
 7  A.  No, I did know that, but I did want to see
 8      what it looked like and felt like.
 9  Q.  Did you learn anything new from doing the
10      test?
11  A.  No.
12  Q.  The startup time test, when did you do that?
13  A.  Within the last two or three weeks, just in
14      preparation for the deposition I was
15      thinking about it.
16  Q.  What did you do when you did the startup
17      time test?
18  A.  I videotaped the starting of the saw and
19      tried to see how long it would take before
20      it came up to speed, but my camera would not
21      -- I could not distinguish after the first
22      tenth or so of a second what speed the saw
23      had reached, and it just indicated to me
24      that the saw came up to speed very quickly
```

Page 64

```
 1      and in all likelihood it reached its final
 2      speed in probably less than three tenths of
 3      a second or something like that.
 4  Q.  Why did you do that test?
 5  A.  Because I anticipated being questioned about
 6      some lurch or jerkiness if a blade brake was
 7      installed on the saw, and I wanted to make
 8      sure that the saw didn't take -- although I
 9      knew it didn't, I just wanted to reassure
10      myself that it didn't take more than two or
11      three seconds to start up and reach full
12      speed.
13  Q.  Did you reach any conclusion about how long
14      it took for the blade to reach full speed?
15  A.  Yes.  Without being sure of it, it seemed to
16      me clearly less than one second.
17  Q.  How does the startup time relate, if it does
18      relate, to the issue of a blade brake?
19  A.  Well, the startup is apparently acceptable
20      in terms of operators being able to handle
21      the saw and not having it lurch
22      uncontrollably when they start, and
23      therefore, if the blade were to be braked in
24      the same or longer time period, then that
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 69

```
 1  A.  I don't know.
 2  Q.  And Dewalt I think you point out has a
 3      portable circular saw with a blade brake?
 4  A.  Yes.
 5  Q.  Do you know whether Dewalt advertises its
 6      blade brake as a safety device?
 7  A.  I have not exhaustively looked into the
 8      advertising to see whether or not they
 9      advertise it, but it's common in the
10      industry and you can see it in many of the
11      groups on the web, where users will say I
12      will not operate or buy a saw without a
13      blade brake for safety reasons.
14          I will add to that statement that
15      although I don't know about the advertising,
16      I do know that in some of the operator's
17      manuals on these saws it's clearly indicated
18      that if the brake is not functional that the
19      saw should be repaired, because it can be
20      hazardous.
21  Q.  Have you ever performed any tests to
22      determine how fast the abrasive blade that
23      was on Mr. Watson's saw would need to be
24      traveling in order to produce the injury
```

Page 70

```
 1      that he sustained?
 2  A.  I don't know that that could be done,
 3      because it would be a function of both how
 4      fast it's traveling and how much force it
 5      impacts the body with.
 6  Q.  Is the answer to my question no, that you
 7      haven't performed such tests?
 8  A.  I have not performed those tests, to answer
 9      the specific question you asked.
10  Q.  Do you know, speaking of force, whether
11      there was any force applied to the saw just
12      before it contacted, just before the blade
13      contacted Mr. Watson's leg?
14  A.  Other than inertia loading of the ---
15          MR. TOBIN: Just note my objection.
16      You can answer if you understand the
17      question.  Force of blade of the saw.
18  Q.  For example -- let me clarify my question --
19      did the saw swing into Mr. Watson's leg?
20      Was the saw with the spinning blade dropped
21      onto his leg, in which case the force I
22      think would be gravity that would be applied
23      to the saw.  Did somebody shove the saw into
24      his leg?  That's what I mean.
```

Page 71

```
 1          Do you know or do you have an
 2      opinion as to whether any force from any
 3      source was applied to the saw immediately
 4      before it contacted his leg?
 5  A.  I don't know that.
 6  Q.  And you certainly don't know the degree of
 7      force, if any, that was on the saw when the
 8      blade contacted his leg, correct?
 9  A.  That's correct.
10  Q.  You didn't conduct any tests to determine
11      that?
12  A.  No.
13  Q.  And you didn't do any test to determine how
14      much energy had to be in an abrasive blade
15      at the time of Mr. Watson's injury in order
16      to produce the injury, correct?
17  A.  The reason I didn't do those tests -- and I
18      did not do those tests -- is because the
19      variables are too great.  Exactly where it
20      struck his leg, exactly what the contraction
21      of his muscles might or might not have been
22      would have affected how deeply the saw could
23      penetrate.  I don't know whether it struck
24      some bone in his leg and then veered off or
```

Page 72

```
 1      whether it hit a particularly vulnerable
 2      spot behind the knee.
 3          And everyone's body is going to be
 4      different, and the degree of muscle tension
 5      would be different.  The angle at which the
 6      saw would have hit the body could be
 7      different.
 8          The variables are just so great
 9      that I don't think it would be possible to
10      do that kind of a test, but I was convinced
11      that in the coastdown process this saw, if
12      it impacted his body with any degree of
13      force, could certainly have done the damage
14      it did, and the result is the saw did do the
15      damage.
16  Q.  Did you reach an opinion that there was a
17      coastdown time that would be too long to
18      cause his injury?  Do you understand my
19      question?
20  A.  I do understand your question and -- I think
21      I understand it.
22  Q.  Well, I'm going to give you an example.  If
23      you say the coast downtime is approximately
24      12 seconds, in other words, the time between
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 81

Q. That was not something that you had thought about before your September 2005 report?
A. That's correct, or if I thought about it, it is unconscious, because there was an interlock there and I played with it and it just looked to me as if it was a reasonable interlock, but --
Q. Go ahead.
A. -- I didn't anticipate that it could be inadvertently actuated.
Q. You have an exemplar saw here, correct?
A. Yes.
Q. And the interlock is functional on this saw?
A. Yes.
Q. Can you demonstrate using the exemplar saw how Mr. Watson possibly inadvertently turned it on?
A. I can try.
    MR. BARRY: This is where the video operator has a role here. Can we take a short break?
    (Brief recess.)
Q. I think you indicated, Mr. Wilder, before the break that you said it was possible that

Page 82

the saw was under power shortly before the accident, correct?
A. Well, you asked me whether or not I knew to a reasonable degree of engineering certainty whether the saw was powered or whether it was coasting down, and in each case I answered I can't, but I can say with a reasonable degree of engineering certainty that it was some combination of the above. It could have been coasting. It could have been powered or it could have been coasting down and powered while coasting down or after it had completed coasting down.
    I can tell you that that happened, because the accident occurred, but I can't tell you which or in what proportion these possibilities exist.
Q. And one of the possibilities is that the saw was fully under power at the time of the accident?
A. Yes.
Q. I think you also said that when you first wrote your report that you were aware that there's a trigger lock on the saw, correct?

Page 83

A. I was aware of the trigger lock.
Q. And it seemed to be working fine on your exemplar saw?
A. It simply didn't occur to me that it could be inadvertently actuated.
Q. So, would you now demonstrate how you believe, if you do believe, that the saw can be inadvertently activated?
A. I can certainly try.
    THE VIDEOGRAPHER: Well, if you could put your mike up, please, just in case.
    THE WITNESS: Say that again, please.
    THE VIDEOGRAPHER: You have the mike here.
    THE WITNESS: Right, right, right.
    MR. TOBIN: Let's go off the record for a second.
    (Discussion off the record.)
    THE VIDEOGRAPHER: The time is 12:44 p.m. We are now on the video record.
Q. Let me ask you now to demonstrate while we are on the video record how you believe, if

Page 84

you do believe, that Mr. Watson might have inadvertently activated the saw.
    MR. TOBIN: Note my objection to the questioning. Go ahead.
    THE WITNESS: Are we ready?
    THE VIDEOGRAPHER: Yes.
A. (Witness demonstrated.)
Q. Now, what are you using as you do that to depress the trigger lock, Mr. Wilder?
A. My forefinger.
Q. Your forefinger of your left hand, just so the record is clear?
A. Yes.
Q. Could you demonstrate it again, please?
A. (Witness demonstrated.)
Q. Go ahead.
A. (Witness demonstrated.)
Q. Are you making an effort to push in on the trigger lock when you do that or is that ---
A. I'm doing that for the demonstration purposes. Transfer. I'm driving it down and grabbing it and it's depressed.
Q. Okay. Thank you.
    THE VIDEOGRAPHER: The time is

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 85**

1  12:45. We're off the video record.
2  (Discussion off the record.)
3  (Luncheon recess.)
4  MR. BARRY: We did receive on
5  Friday early afternoon I think it was what
6  has been marked as Exhibit 4, which is
7  Mr. Wilder's March 24th, 2006 letter to you
8  addressing a different possible accident
9  scenario and also a different potential
10 alleged defect having to do with the
11 interlock.
12 I take the position and will take
13 the position with the court that that
14 disclosure did not comply with the relevant
15 rules. We don't have to argue about that
16 now. That's a legal matter, but I just want
17 it clear on the record that the fact that I
18 am now put in a position where I have to ask
19 Mr. Wilder about this, and have done so and
20 will continue to do so, doesn't mean that
21 the defendant is waiving its right to object
22 obviously to the late disclosure of this new
23 opinion. That's my speech on the record and
24 we'll obviously address that with the court.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 86**

1  (Reporter read back.)
2  Q. When you demonstrated just before the break,
3     Mr. Wilder, how it might be possible to
4     inadvertently activate the saw, can you tell
5     me in words what you were doing? I
6     understand it was videoed, but how did you
7     accomplish that demonstration, if you could
8     describe that now in words?
9  A. Well, basically -- let me preface it by
10    saying it's not the only way in which I
11    think the interlock could be inadvertently
12    depressed, but it is -- what I did is
13    transfer the saw from the weight being
14    carried by my left hand as the plaintiff was
15    presumably going down the ladder and
16    momentarily took the weight off the left
17    hand by using my right hand on the forward
18    handle, and then grabbing the saw with my
19    left hand at the handle, at the rear handle
20    while letting go with my right hand.
21    And in doing so, what I was showing
22    is that it was possible for the weight as it
23    went from my right hand to my left hand to
24    be supported partially by the side of my

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 87**

1  forefinger up against the interlock. And
2  you asked me whether I deliberately did it
3  or -- well, obviously the demonstration was
4  to show that it could be done, and so I
5  showed that it could be done.
6  I saw on the video that the Swedish
7  gentleman, he had the saw -- he did
8  something similar, except he kind of tossed
9  the saw from his right hand to his left hand
10 and kind of caught it, so that the weight of
11 the saw was then applied in a downward
12 position to his left hand showing that it
13 could be inadvertently actuated that way.
14 And he also triggered it several
15 times with the saw held down at his side
16 with just one hand, which is another way
17 which it could be inadvertently triggered,
18 and I'm just saying it is possible to
19 inadvertently trigger the interlock.
20 And because of the weight of the
21 saw you have quite a firm grip on that
22 handle and with the grip and especially if
23 you're wearing gloves, because I did try it
24 with heavy gloves as well -- not here -- it

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 88**

1  becomes much easier to hit that interlock
2  because the gloves take up more space within
3  the handle.
4  Q. When you demonstrated how it was possible to
5     inadvertently start the saw here before the
6     video camera was one of your fingers
7     exerting a force in one direction on the
8     trigger lock and another finger or part of
9     your hand exerting a force in an opposite
10    direction on the trigger?
11 A. Well, the two are not in opposition. If
12    anything, I'd say one is more at right
13    angles to the other. The interlock moves
14    fore and aft and the trigger essentially
15    moves at right angles to it, even though
16    it's on an arc.
17    What really happens is that your
18    hand is now preparing to carry the weight of
19    the saw and in carrying the weight of the
20    saw there is an opening in the handle that
21    your hand comes into and supports the weight
22    of the saw. And if you were to hold the saw
23    completely horizontal and just grasp it that
24    way, then you probably would not hit the

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 89

1  interlock. If you hold it completely
2  vertical it's almost certain the interlock
3  would be depressed, and somewhere in the
4  middle then starts the dynamics of how your
5  hand reaches into the handle and when you
6  grasp it, exactly which way the force is
7  applied.
8      The trigger and the plunger are
9  very close together. So, getting one finger
10 up against both of them, if that's what I
11 did -- it's hard to say because the
12 forefinger and the next middle finger both
13 can grip the trigger. I don't believe I
14 used my middle finger to actuate it at that
15 point, but it was unconscious.
16 Q. But it was your forefinger that was
17    actuating the trigger lock?
18 A. Yes.
19 Q. And what part of your hand or what finger
20    was actuating the trigger?
21 A. I think it was my forefinger as well as my
22    middle finger, but I can't be sure how much
23    force was on each, because both of them will
24    straddle, can straddle the trigger.

Page 90

1 Q. When you said if you're holding the saw
2    vertical it's almost certainly to
3    inadvertently activate the saw?
4 A. If you're holding the saw with the blade up.
5 Q. That exactly was going to be my question.
6 A. Yes. If in the transfer of the saw it winds
7    up being held vertically at one point, then
8    the weight of the saw is resting on the hand
9    that's in the rear handle and the weight
10   will cause the plunger to depress.
11 Q. But Mr. Watson wouldn't have been holding
12    the blade up, would he?
13 A. I don't know how he transferred it. He may
14    have, and again in the videos here I can't
15    remember which gentleman -- some people
16    transferred it one way. There were several
17    people transferring it. Some kind of
18    flipped it -- I think there was a young man
19    in probably one of Dr. Funk's, if I
20    recollect correctly, demonstrations, he was
21    kind of -- when he grabbed the saw in his
22    left hand, he actually kind of tossed it up
23    in the air a little bit and flipped his hand
24    around.

Page 91

1      So, there is any number of ways in
2  which somebody could have transferred or
3  moved or supported the saw, and I can't be
4  sure how, except to show that with the two
5  items right in close proximity and in
6  proximity to where your hand would actually
7  grasp the saw to carry it, you can actuate
8  it. And it's designed that way, so that you
9  don't need to move too far away from where
10 you are to actuate it. That doesn't make
11 sense.
12 Q. No, no, no. It makes sense to me. Do you
13    have any information one way or another as
14    to whether the trigger lock was operative
15    and functioning as it was intended to
16    function on the day of Mr. Watson's
17    accident?
18 A. Only by presuming that if it wasn't, that
19    might have come out in some way, but I have
20    no knowledge.
21 Q. One way or another?
22 A. One way or another.
23 Q. Have you heard of a practice in the
24    construction industry of defeating the

Page 92

1  trigger lock, some workers defeating the
2  trigger lock by taping it in the depressed
3  position, so that it is not necessary each
4  time one wants to activate the saw to press
5  on the trigger lock, or either taping it or
6  just defeating it, removing it? Have you
7  heard of that, such a practice?
8 A. Well, I can tell you that I've heard of that
9    sort of practice in connection with other
10   safety devices on other machines. I don't
11   know of any specific practice with respect
12   to this saw, and in looking at the saw, I'd
13   say it would be probably difficult to do.
14 Q. To tape it?
15 A. To tape it so that it will stay depressed.
16   I'm not saying -- it's not impossible. It's
17   just looking at it, one would have to wrap
18   tape around this way, and eventually I think
19   the tape would stretch or peel off and the
20   trigger lock would -- I don't know whether
21   it's done or not. I'm not aware of any
22   practice. I can say that some people in
23   some instances have been known to defeat
24   safety devices.

### Page 109

1  MR. TOBIN: Note my objection. You
2  can answer if you understand the question.
3  A.  I'm not sure I can understand the question.
4     I can try to answer it without perhaps fully
5     understanding it, but ---
6  Q.  I don't want you to do that.
7     MR. TOBIN: I don't want you to do
8     that. Let's just go off the record for a
9     second.
10     (Discussion off the record.)
11 Q.  You'd never designed a power cutter at all,
12     correct?
13 A.  That's right.
14 Q.  And you certainly haven't designed a blade
15     brake for a power cutter, correct?
16 A.  That's correct.
17 Q.  You never prepared any design drawings or
18     prepared a prototype model of a power cutter
19     with a blade brake, true?
20 A.  That's correct.
21 Q.  And you never tested a power cutter with a
22     blade brake either, correct?
23 A.  That's correct.
24 Q.  You never had any formal training with

### Page 110

1     respect to designing or manufacturing blade
2     brakes for power cutters, true?
3  A.  I have had formal training in engineering
4     which would be applied to such a design. I
5     have that training, yes.
6  Q.  If this power cutter had had a blade brake
7     on it, do you have any basis for knowing how
8     long the blade brake would have taken to
9     stop the blade?
10 A.  I have some basis for that, yes.
11 Q.  What basis do you have for that?
12 A.  Well, first of all, I preface it by saying
13     without the design in place and without
14     knowing what the design goals were, I think
15     the design goals could be met to whatever
16     degree desired.
17        What I'm saying is if someone said
18     to me this blade brake must have stopped the
19     saw within one second or two seconds or six
20     seconds, I have the feeling that it
21     certainly could be implemented, but in
22     general, yes, what I did was is I went out
23     and looked at other saws of similar power,
24     did some rough, I won't say back of the

### Page 111

1     envelope calculations, but I have done some
2     calculations, and I came to the conclusion
3     that if they had blade brakes similar to
4     what's on the market now that the blade
5     could have stopped in approximately two
6     seconds.
7        Now, I have no doubt that it could
8     have been improved or degraded depending
9     upon what the goals were.
10 Q.  And you're basing that, just so I
11     understand, on the stopping power of blade
12     brakes that are on other types of saws,
13     including portable circular saws and mitre
14     saws?
15 A.  Primarily the mitre saw, because I think the
16     wattage of the motor was similar and the
17     blade size was similar, and all I did was
18     took effectively the stopping ability of, I
19     think it was the Dewalt specifically, and
20     applied that with some modifications and
21     adjustments for the weight of the abrasive
22     blades, and in my report I said something
23     about the Partner's abrasive blade.
24        I don't know precisely what brand

### Page 112

1     was used, but I did look up the weight of
2     the 12- to 14-inch abrasive blade based on
3     the exemplar that I have, did those
4     calculations and came up with the numbers
5     that indicated that seemed to me perfectly
6     reasonable to stop the blade within two
7     seconds.
8  Q.  Again, that is based on the stopping time of
9     you said the Dewalt mitre saw?
10 A.  The Dewalt and I think Ridgid was in the
11     same ballpark. Ridgid is another
12     manufacturer.
13 Q.  You said you did some calculations there?
14 A.  Yes.
15 Q.  Are they in your notes?
16 A.  Yes. It would have been in handwriting.
17 Q.  Are these the notes? (Indicating)
18 A.  No.
19 Q.  Maybe you can pull them out.
20     (Brief recess.)
21     (Documents handed to counsel.)
22     MR. BARRY: If we could have the
23     court reporter mark these separately.
24     (Exhibit No. 5 Handwritten Notes

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 113

1 marked for identification.)
2         (Exhibit No. 6 Handwritten Notes
3 marked for identification.)
4         (Exhibit No. 7 Handwritten Notes
5 marked for identification.)
6         (Exhibit No. 8 Handwritten Notes
7 marked for identification.)
8         (Exhibit No. 9 Handwritten Notes
9 marked for identification.)
10        (Exhibit No. 10 Handwritten Notes
11 marked for identification.)
12 Q. Would you identify the two pages of notes
13    that we've marked Exhibit 5 which we have
14    copied from your original file?
15        (Document handed to witness.)
16 A. Yes.
17 Q. What are they?
18 A. One of them is, has a line at the top that
19    says 9/26 Tobin Watson, the other page of
20    which is associated with it, has kind of a
21    picture of a rectangle with a small M in the
22    middle of it at the top of the page.
23 Q. When did you prepare those notes?
24 A. Approximately 9/26, September 26th, 2005.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 114

1 Q. Just before your report, your September 29th
2    report?
3 A. Yes. It may have been at the time that I
4    was writing the report. I'm not sure.
5 Q. I guess on the photocopy the date ---
6 A. There is no date on the one that has the
7    rectangle.
8 Q. But the 9/26 got cut off.
9 A. You're seeing the balance of it. You see
10   the 26th. It was September 26th.
11 Q. So, it's September 26th up in the upper
12   left-hand corner on the first page of
13   Exhibit 5?
14 A. Yes.
15 Q. What do those calculations represent?
16 A. They were just an attempt to estimate
17   whether or not the Partner or if a 12- or
18   14-inch blade on a Partner saw could have
19   been stopped in about the same time as the
20   Dewalt blade. Not the Dewalt blade, but the
21   Dewalt test that I did with two steel blades
22   stopped, which was just a little under two
23   seconds, and it was just a rough
24   confirmation that had the motor had the same

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 115

1    kind of braking effect that the Dewalt motor
2    had, either a 12- or 14-inch blade would
3    have stopped in approximately two seconds or
4    could have been made to stop in about two
5    seconds also.
6 Q. Did you discuss your work to determine the
7    stopping time of a blade with a blade brake
8    on a Partner saw with any other engineer?
9 A. No.
10 Q. Maybe you can just tell me how you went
11    about figuring out based on the stopping
12    time of the blade in a mitre saw how you
13    felt, how quickly you felt the blade brake
14    in a power cutter would have stopped the
15    blade?
16 A. Yes. Let me try to do it by way giving an
17    analogy if I can. It may be easier to
18    describe. Picture a car that has a set of
19    wheels on it and a set of brakes on the
20    wheels and you step on the brakes and the
21    car will stop in 50 feet or 10 seconds or
22    whatever it is. And now, if you would like
23    to know given the same sort of technology
24    for brakes how long would a heavier car or a

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 116

1    lighter car going at either somewhat faster
2    or slower speeds could be made to stop.
3        And that's essentially what I did.
4    Instead of it being a linear speed where a
5    body is moving in a straight line and you're
6    dragging it to a stop, this is a product
7    that is spinning, and that's an analogy.
8        What I did is I looked at the
9    Dewalt saw that had I believe a 12-inch
10   steel blade on it and I replaced the steel
11   blade with two -- I don't have my numbers
12   here, but I think with two 10-inch steel
13   blades. I bolted them on to the Dewalt saw
14   instead of the saw blade that was on there
15   originally, and I saw how fast it came to a
16   stop, and it was just under two seconds.
17 Q. That was slower than it would have stopped
18   with the single blade?
19 A. I think so, yes. Basically, I then said
20   that represents, given the Dewalt saw's
21   speed, that represents the braking power of
22   the motor. Now, let's apply that braking
23   power of the motor to a 12- or 14-inch
24   abrasive blade, instead of the two 10-inch

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 117**

blades.

So, at one point it's as if we measured the car that stopped, the car that weighed a thousand pounds and stopped in 50 feet. And now what we did is we changed the car to a 2,000 pound car or a 1,500 pound car going at a slightly different speed, assuming that the brakes were as effective or as ineffective as the first one was, and I just ran the numbers and these are rough. That's just to see whether it came out in the same ballpark.

And what it turned out to be is that if we put a 12- or 14-inch blade on that Dewalt, which wasn't possible to do, because physically it just didn't fit right, and again the Dewalt saw also ran a different speed, with a 14-inch blade it would take 1.06 times, six percent longer time to stop than what I tested the two 10-inch blades to be stopped at, which would have meant two and a quarter seconds, something like that.

And the same thing -- that was the

**Page 118**

14-inch blade and with the 12-inch blade it would have stopped in about 1.1 seconds, something like that. And the whole purpose was not to do an exhaustive mathematical analysis.

A lot of it was ballparking based on some numbers that I got for weights of the 14-inch abrasive saw, to show that given the state of technology now, that the Dewalt motor, which is about the same size, same 15 amperes, 120 volt motor, it could bring these blades to a stop in approximately two seconds. That's the whole purpose of it.

Q. As an engineer have you ever attempted to answer the question why, if it's the case, no manufacturer of power cutters uses a blade brake on its saws?

A. I could make some, I won't say guesses, but I can come up with some possible explanations.

Q. What possible explanations do you think there are?

A. One would be inertia in the industry. It hasn't been done. Nobody is clamoring for

**Page 119**

it. It would cost money to redesign. It would cost money to tool up for a new design in all likelihood. In my view that's the reason.

I have noticed with respect to circular saws a few years back there were very few that had brakes. Now it seems to me nearly all of them have brakes, and my guess would be if we were sitting here five years from now that the power cutters will all have brakes as well.

Q. Any other reasons that you can come up with?
A. No. They're going to cost a few dollars more, but not significantly.
Q. Can you identify the document we've just marked Exhibit 6?
   (Document handed to witness.)
A. Yes.
Q. What's that?
A. Those are some notes I made primarily to myself to talk about issues and questions that I would have about Dr. Funk's testing.
Q. So, obviously these were done before you were provided with Dr. Funk's report?

**Page 120**

A. No. They were done after.
Q. Excuse me, I misspoke. I'm thinking the right thing.
A. Otherwise I would be very proud of myself.
Q. They were done after you were given his report?
A. Yes.
Q. Were they done after you saw the videos?
A. No. I believe part of it might have been after, part of it before. I think after the videos would be.
Q. So, within the last two weeks?
A. Yes, but some of the thoughts that I have down here were thoughts that I had had well before I saw this report.
Q. Maybe you can just go through and read what Exhibit 6 says and explain what you meant by what you wrote there?
A. No. 1 says, "Used/rounded blade V for versus square edge. New versus angle edge." I don't know what the condition of the abrasive blade was that Dr. Funk used, nor do I know what the condition of the edge was on the blade that Mr. Watson used, but it's

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 137

1  Q. So, you got the videos sometime on or after
2     March 17th of 2006?
3  A. Yes.
4  Q. For the first time. And it wasn't until you
5     got them that you realized that you had some
6     supplemental or rebuttal report to provide?
7     MR. TOBIN: Note my objection.
8  A. Well, as I said in my note, I realized at
9     that point that there might have been an
10    inadvertent actuation of the interlock, and
11    I wanted to make sure that that was also
12    covered, because I don't know what happened.
13 Q. Now, in your original report marked
14    Exhibit 1 in your discussion of blade brakes
15    you talk about the cost of equipping the
16    Partner power cutter with a blade brake.
17       Did you reach any opinion, and if
18    so, I would like you to tell me the basis
19    for that opinion, as to how much more it
20    would cost to make the K2300 power cutter
21    with a blade brake?
22 A. I don't know that I can add to what I had in
23    my report, except to say that in previous
24    looks at this subject I came up with the

Page 138

1     conclusion that it would cost, at least for
2     the Makita, the retail cost difference
3     between the components -- Makita had a saw
4     that was available both with and without
5     blade brake, and so it was relatively
6     straight forward to look at their component
7     list and see what the differences were. And
8     on a retail basis I could have spent $10
9     more to get the components that included the
10    braking in that saw and that was done a few
11    years ago.
12       Today I found that there are two
13    different Makita models, again with and
14    without blade brakes, and they retailed for
15    a difference of $105 and $127. So, the
16    retail difference is about $22, and roughly
17    if you say three or four times or one-fourth
18    or one-third of that cost as being
19    manufacturing costs -- I don't know what
20    Partner's overheads are -- I would say we're
21    talking about again 6, 8, $9 difference in
22    manufacturing cost at most.
23       Similarly, there is Dewalt that had
24    two saws that retailed between -- the

Page 139

1     difference between the two with and without
2     brakes, otherwise identical saws, was $20 in
3     a saw that runs for $110 to $130. So, the
4     manufacturing cost would have certainly been
5     assumed to be less than $20 divided by three
6     or four. Roughly $7 or so.
7        But again, that has to do with
8     amortization of tooling, and how a company
9     costs their R & D efforts, whatever, but
10    what I'm pointing out here is I would
11    imagine that Partner could put a blade brake
12    on their saw for no more than 10 to $20 more
13    than it cost them to make it now, and that's
14    just -- I'd say it's a rough, rough
15    estimate.
16       I don't know how they allocate
17    their overheads. I don't know what the
18    tooling costs are. I don't know how many
19    saws a year they produce and how much it
20    would have to be amortized over, but it's
21    certainly not a huge difference in my view,
22    would not be a huge difference.
23 Q. Can you tell me what Exhibit 7 is and maybe
24    you can find it in your own notes?

Page 140

1     (Document handed to witness.)
2  A. Those were some notes that I made based on
3     it looks like a reading of the Partner
4     manual and a reading of the accident report
5     just to get some information in a more
6     concise way for me to use in my
7     consideration and in my report. I just
8     plucked out some bits of information that I
9     thought I would probably want to have in
10    mind or would have in mind as I wrote my
11    report.
12 Q. When was Exhibit 7 prepared?
13 A. I don't know when it was prepared, but it
14    would have been before my report was.
15 Q. Early?
16 A. Yes.
17 Q. Exhibit No. 8?
18    (Document handed to witness.)
19 A. That had to do with the various tests that I
20    ran in stopping times, some of them on
21    little scraps of paper and what I did was
22    organized them and put them on this piece of
23    paper.
24    6/21/05 talks about the K2300 and

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 141

```
 1      my testing of the coast time down, that was
 2      done on 6/21/05 when I measure the coastdown
 3      time.  Then I have three other dates, 9/13,
 4      9/25 and 9/22 of 2005 when I had
 5      opportunities to examine some other saws and
 6      I wrote down the coasting down times with
 7      and without braking on those saws.
 8   Q. In your examination of other saws in
 9      connection with this case did you ever look
10      at any portable power cutters comparable to
11      the one that Mr. Watson was using?
12   A. As I said before, I think every one of these
13      is comparable, in that it uses a universal
14      motor and it drives a blade.  I don't see
15      that the fact that it has or hasn't got a
16      lower guard or that it's held one way or
17      another way or it uses an abrasive blade
18      versus a steel blade as being of any
19      significance in looking at the braking.
20   Q. Let me see if I can get a yes or no answer
21      to my question.  Did you look at -- you
22      understand what a power cutter is?
23   A. I think what I understand a power cutter to
24      be is a saw similar to this one that does
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 142

```
 1      not have a retractable lower guard that is
 2      used in abrasive cutting rather than cutting
 3      wood.
 4   Q. Taking that definition of a power cutter,
 5      did you look at any other power cutters in
 6      connection with your work on this case?
 7   A. No.
 8   Q. Would you identify Exhibit 9, please?
 9          (Document handed to witness.)
10   A. That was done, if I could find my note.
11   Q. I'm going to ask you the date.
12   A. I don't know what the date is.  It says up
13      there.  It was my notes to myself based on
14      my own climbing up and down a ladder and
15      checking the time it took me to go through
16      the motions that Mr. Watson had described,
17      and I'll look for that.
18   Q. Can you pull out the original?
19   A. I can certainly try.
20          (Discussion off the record.)
21   A. It was 9/23/05.
22   Q. The date of Exhibit 9, right?
23   A. Yes.
24   Q. So, you did that -- this is the accident
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 143

```
 1      reconstruction climb down test where you
 2      were timing how long it took to climb down
 3      the ladder from the fifth or sixth rung
 4      where Mr. Watson said he was?
 5   A. Yes.
 6   Q. As you testified earlier, you got about nine
 7      seconds?
 8   A. Yes.
 9   Q. That was done before your report obviously?
10   A. Yes.  That's Exhibit 9?
11   Q. Yes.
12          MR. BARRY:  Mark that.
13          (Exhibit No. 13 ANSI B7.5-1983
14      marked for identification.)
15          (Document handed to witness.)
16   Q. This is Exhibit 13.  Was that sent to you by
17      Mr. Tobin?
18   A. Yes.
19   Q. And did you find that of any relevance to
20      any of your opinions in this case?
21   A. No.
22   Q. That takes care of that.  That makes it
23      easy.  Do I understand correctly that the
24      first time you reached an opinion that there
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 144

```
 1      might have been a problem with the interlock
 2      on the saw that Mr. Watson was using was
 3      after you received the videos about two
 4      weeks ago, and particularly the Swedish
 5      video?
 6   A. Yes.
 7   Q. Did you think at all one way or the other
 8      about the design of the interlock before
 9      that point in time?
10   A. Before that period of time I operated the
11      interlock and it looked to me at the time
12      that it would have been difficult to
13      impossible to accidentally actuate the
14      trigger, and especially in the way
15      Mr. Watson had described what happened, I
16      had envisioned the saw hanging down and as
17      it hangs down why it pulls away from your
18      hand.  You come away from the interlock.
19          And frankly, the learning process
20      and things gel slowly and when I saw the
21      video and this gentleman who first he was
22      tossing the saw, passing it from one hand to
23      the other actuating it and then he held it
24      hanging down and actuated it, and I said oh,
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 145**

```
 1   my goodness, that's possible.  I didn't
 2   think it was possible.
 3          I tried it.  I found it very
 4   difficult to do, almost impossible with my
 5   bare hand, and I put a work glove on and I
 6   found then it became possible to do it with
 7   a saw hanging down.  And then I had realized
 8   with someone that handled this saw all the
 9   time, he probably, it probably became second
10   nature to him to actuate it, and it may have
11   been instinctively in grasping the saw that
12   he did it or then in passing it from one
13   hand to the other the weight of the saw
14   caused the interlock button to be depressed.
15   And at that point I realized that this
16   interlock button is not in the right place
17   for safety.
18 Q. So, it wasn't that you didn't think about
19   the issue before?
20 A. It's hard to say.  I can't say that I sat
21   down and wrote everything out and said what
22   do I think about and what don't I think
23   about.  I looked at it.  I saw it.  I
24   recognized it was an interlock.  It didn't
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 146**

```
 1   -- it simply didn't occur to me that it
 2   could be inadvertently actuated.
 3 Q. Have you ever designed an interlock or
 4   trigger lock for a power saw?
 5 A. No.
 6 Q. You've never done a design drawing or
 7   developed a prototype for a trigger lock for
 8   a power saw, have you?
 9 A. No.
10 Q. And therefore, you haven't tested any
11   alternate design trigger lock or interlock
12   for a power saw, have you?
13 A. Other than for the purposes of this
14   deposition, I've done some mental design, of
15   course, saying what would I do, what do I
16   think would be a better interlock, a safer
17   interlock, and I don't need to actually put
18   pen to paper to do that.  And I think there
19   are alternative ways of doing it that would
20   have prevented inadvertent operation.
21 Q. What alternative ways are there of doing it
22   that would have prevented an inadvertent
23   operation?
24 A. I am going to have to preface this by saying
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 147**

```
 1   I haven't been hired to redesign the saw,
 2   and in engineering designs you try an
 3   approach.  You experiment with it and you
 4   test it on people.  You see whether it works
 5   or not.  Then you redesign it and you refine
 6   it, and what we're doing here is artificial
 7   in the sense that all I'm going to be able
 8   to give you is some two or three approaches
 9   to what I would take, and then after working
10   with them, trying some prototypes, testing
11   them on people, they would either be
12   modified or discarded or what.
13          But number one, this is a heavy saw
14   and when you grasp it and hold it you need
15   to apply some force to the handle to be able
16   to control this weight.  Therefore that
17   handle is not only to guide it when cutting.
18   It's also a handle that one uses to move the
19   saw around from one hand to the other and
20   carry it.
21          I wouldn't put the interlock
22   unprotected as it is in that handle, because
23   in holding the weight of the saw, depending
24   upon how one holds it, if you tip the saw
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 148**

```
 1   like this and the weight is on the
 2   interlock.  So, I number one, would move the
 3   interlock out of the internal cavity of the
 4   handle.  I would probably start by putting
 5   it up on top of the handle, so that it could
 6   be reached by the thumb and I would have put
 7   some barriers around the side of it.  Maybe
 8   it's a slide switch, a slide push switch, so
 9   that one has to kind of awkwardly reach up
10   front to get it and then put your hand back
11   into a comfortable position for holding the
12   trigger down.
13          No. 2, I might have put a barrier
14   around, similar to the interlock that's
15   there now, except not leaving it exposed as
16   it is, but having it in kind of a barrier
17   area, so one has to use the tip of one's
18   finger to actuate it, and it would have to
19   be done in such a way that if you bumped
20   into it you would be bumping into the
21   barrier rather than just the point of the
22   trigger.
23          And the third alternative would be
24   something that required a simultaneous press
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

177
1 A. Essentially all of it. I mean other than
2    investments and things like that.
3 Q. Earned income?
4 A. Earned income.
5    MR. BARRY: I think that's all I
6    have.
7    MR. TOBIN: I have got to ask a
8    couple.
9    CROSS-EXAMINATION
10 BY MR. TOBIN:
11 Q. I have a few questions for you just for
12    clarification. A little bit earlier you
13    talked about different types of interlock
14    that could be incorporated into this saw.
15    Do you recall that?
16 A. Yes.
17 Q. The different types of interlocks you
18    described, are they used on power tools and
19    devices in the current market?
20 A. There are many interlocks used on power
21    tools in today's market.
22 Q. You talked about interlocks that are
23    recessed or guarded?
24 A. Yes.

SHEA COURT REPORTING SERVICES
(617) 227-3097

178
1 Q. Are there products on the market today that
2    use such interlocks?
3 A. I've seen them. I can't specifically pull
4    one out right now to describe to you.
5 Q. But it's well accepted in the industry that
6    they're used?
7    MR. BARRY: Objection to form.
8 A. I believe so, yes.
9 Q. Mr. Wilder, can you conclude to a reasonable
10    degree of engineering certainty that the
11    presence of a blade brake and an effective
12    interlock would have prevented Mr. Watson's
13    injury?
14 A. Would have prevented or mitigated it if both
15    of those features were part of his saw.
16 Q. Can you explain that, please?
17 A. Well, I believe since we don't know or I
18    don't know precisely what happened, how much
19    of his injury was caused by coasting versus
20    how much of it might have been caused by a
21    powered on blade, since we don't know -- and
22    how much it might have been caused by a
23    coasting blade, the presence of both of
24    those safety devices, a blade brake and an

SHEA COURT REPORTING SERVICES
(617) 227-3097

179
1    interlock in my opinion would have either
2    prevented or mitigated this injury.
3 Q. Mr. Wilder, can you conclude to a reasonable
4    degree of engineering certainty that
5    Mr. Watson's injury likely took place when
6    he was near the bottom of the ladder?
7 A. Yes.
8 Q. Can you explain that conclusion for me,
9    please?
10 A. Well, yes. He climbed down the ladder
11    several steps, and if he had been injured
12    halfway up the ladder I doubt very much
13    whether he would have been able to
14    successfully negotiate the rest of the
15    ladder, and he certainly wouldn't have
16    testified that when and as he got to the
17    bottom the injury occurred. He would have
18    said as I was going down the ladder or
19    something like that, but he specifically
20    testified that his foot was either on the
21    ground or just about on the ground and
22    that's when he felt the injury, became aware
23    of the injury.
24 Q. A little bit earlier we talked about

SHEA COURT REPORTING SERVICES
(617) 227-3097

180
1    warnings. Is there a warning on the device
2    itself regarding the danger of a coasting
3    blade?
4 A. No.
5 Q. Should there be a warning on the device
6    itself?
7 A. Well, again, my opinion is that warnings
8    were a second line of defense. First line
9    of defense is to design a machine which is
10    safe in and of itself as far as it can be
11    done. A warning might or might not have
12    been helpful. I can't tell you that.
13 Q. Is there any kind of a warning on the device
14    regarding inadvertent activation?
15 A. Not that I saw.
16 Q. Finally, is there a warning on the device or
17    even in the owner's manual regarding whether
18    this particular device should be used while
19    climbing a ladder?
20 A. I would have to look through that. I don't
21    believe it says anything about that in
22    there, but I would have to look through the
23    manual again. In any event, people in the
24    real world have to use ladders to sometimes

SHEA COURT REPORTING SERVICES
(617) 227-3097