UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL WATSON,                      )
INDIVIDUALLY, AND AS FATHER          )
AND NEXT FRIEND OF JOHN              )
WATSON, PPA,                         )
    Plaintiff,                   )
                                    )   CIVIL ACTION NO.
        v.                   )   04-11782-DPW
                                      )
ELECTROLUX PROFESSIONAL             )
OUTDOOR PRODUCTS, INC.,             )
    Defendant.                   )

MEMORANDUM AND ORDER
August 4, 2006

    Plaintiff Michael Watson ("Watson") alleges in this product liability action that he was injured while using a defective work tool--a power cutter designed and manufactured by Partner Industrial Products ("Partner"), a division of the defendant, Electrolux Professional Outdoor Products, Inc. ("Electrolux").

    Electrolux seeks to preclude testimony by Watson's expert witness on grounds that:  (1) plaintiff has failed to demonstrate that his expert, Leslie N. Wilder, P.E. ("Wilder") is qualified to render admissible opinions as to the design of the power cutter; and (2) Wilder's opinion that the power cutter is unreasonably dangerous is unreliable because it is not supported by sound reasoning or sufficient facts.  In short, defendant contends that Wilder's opinions are "sheer *ipse dixit*" and should therefore be precluded.  See generally Cipollone v. Yale Indus. Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000).

Contingent upon the outcome of the motion to preclude, Electrolux has also moved for summary judgment, claiming that expert testimony is essential to Watson's case, without which Watson will be unable to prove the saw was defective.

Finding that Watson's expert witness is qualified and that he proffers an admissible explanation for the cause of the injury, I will deny the defendant's Motion to Preclude his testimony regarding the "Blade Brake" theory.  As to the merits, I find that a genuine issue of material fact exists regarding whether the lack of a blade brake (1) constitutes a design defect; and (2) caused plaintiff's injury.  Accordingly, I will also deny Electrolux's Motion for Summary Judgment as to the Blade Brake theory.  However, I will preclude expert testimony as to the "Trigger Lock" theory and grant summary judgment as to that claim (and the inadequately argued "warning" theory) because I find the expert's methodology as to an alternative theory inadequate and that without such expert testimony Watson will be unable to prevail on an alternative theory.

## I.  BACKGROUND

### A.  Facts

On May 5, 2001, Michael Watson was working as a highway construction laborer on the Central Artery Project or "Big Dig". The environment was noisy and lighted by portable lighting units. Watson was using an electric power saw which he identifies as a

model K2300,[1] manufactured by Partner, a division of the

defendant, Electrolux, to cut rebar located approximately 10 feet

above the floor of the tunnel.  Plaintiff had frequently used the

saw[2] to cut rebar in the tunnel, and in the week prior to his

accident, that was plaintiff's exclusive job.

Watson would cut rebar protruding from the wall.  The rebar

were spaced about three feet apart, and ran from the floor of the

tunnel to the ceiling -- a distance of between fifteen and twenty

feet.  After cutting rebar in a particular section, Watson would

climb down a ten to twelve foot high aluminum ladder holding the

saw before moving the ladder to a different location.

At the time of his accident, Watson had climbed up to the

fifth or sixth rung of a ladder.  From there, he grasped the saw

by holding the rear handle with his right hand and the front

handle with his left hand.  He activated the saw and cut the

rebar.  After finishing the cut, he took his right hand off of

the rear handle and deactivated the saw as he released the

trigger.  Watson then readjusted his left hand on the front

---

[1]The K2300 consists of an electric motor mounted in a
housing.  The motor drives a set of gears that, in turn, cause a
blade mounted on front of the saw to spin rapidly.  There is a
front handle and a rear handle on the saw.  It is equipped with a
blade guard and an interlock mechanism.  The interlock mechanism
requires that the button, or "trigger lock," which is mounted
just below the trigger and on the inside of the rear handle of
the saw, be pushed before the trigger can be pulled.

[2]Defendant does not recall whether he was using a 12" or 14"
blade version saw.

handle of the saw and reached over with his right hand to make sure the cut rebar was flush with the wall.  After determining that the rebar had been cut flush with the wall, Watson again repositioned his left hand on the front handle of the saw so that he could support the saw while holding onto the ladder with his right hand and descended to the ground.  When he got to the bottom of the ladder, Watson took his right hand and gripped the saw by the front handle then removed his left hand from the front handle and gripped the saw by the rear handle with his left hand.

After lowering the saw to his side, and while gripping the rear handle of the saw with only his left hand, Watson felt the blade come into contact with his leg.  At first he didn't know what happened, but when he went to take a step he could not feel his foot and realized that he had been injured.  Watson suffered deep lacerations to the peroneal nerves in his left leg as a result of the accident.  He has permanently lost feeling and control of his left foot, resulting in a foot drop, which causes him to have difficulty with his balance and to walk with an altered gait.

Prior to the day of the accident, Watson had no difficulty with any of the mechanisms or operation of the subject saw and, on the day of the accident, the interlock was operational. Watson does not know whether the blade was still spinning as he was going down the ladder, nor does he know whether he reactivated the saw between the time he released his finger from

4

the trigger after making his last cut and when his accident occurred.  At no time did Watson deactivate the interlock on the saw.  Watson does not know what happened to the saw involved in his accident and never saw it after the accident.

## II.  DISCUSSION

### A.  Expert Testimony

Liability in this case hinges on the explanation of how the subject saw injured Watson, and whether this injury was due to a defect in product design.  Plaintiff offers expert testimony to meet his burden of causation and design defect.

1.  <u>Qualifications</u>

    i.  *Standard of Review*

Expert testimony may be presented as to "the precise nature of the alleged design defect and the causal relationship between the defect and the plaintiff's accident" where the knowledge on which evaluation rests is technical and specialized, and consequently would not be within the ordinary experience of a jury.  <u>Goffredo v. Mercedes-Benz Truck Co.</u>, 402 Mass 97, 104 (1988).

A person may be qualified as an expert based on knowledge, skill, experience, training or education.  Fed. R. Evid. 702. <u>See generally</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 153 (1999) (finding a witness with a masters degree in mechanical engineering, 10 years' work at Michelin America, Inc., and

5

testimony as a tire failure consultant in other tort cases qualified to testify in a tire failure case); Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579 (1993).

The trial judge has broad discretionary powers in determining whether the proposed expert is qualified.  Fed. R. Evid. 702; see generally United States v. Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (citing Daubert, 509 U.S. at 591). An expert's qualifications must relate to the subject matter of the proposed testimony.  Polaino v. Bayer Corp., 122 F.Supp.2d 63, 68-69 (D. Mass. 2000). Experience that has been gained solely through litigation is generally accorded little weight.  See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989).

### ii.  Analysis

Electrolux opposes consideration of the opinions offered by Watson's expert witness, Leslie N. Wilder, P.E., contending that he is unqualified to render an opinion as to the design of the power cutter in question.  In support of its argument, Electrolux argues that Wilder has no background, experience or training with power cutters--Wilder has never designed a motor brake, or tested a power cutter with a brake, nor has he designed any type of power saw or power cutter, blade brake, or trigger lock, or worked in the power saw industry.

Wilder is a licensed professional engineer in three states,

with Masters Degrees in Mechanical Engineering from Stanford University and in Electrical Engineering from New York University.  He is a board certified forensic engineer and professional ergonomist.  He has worked as an engineer for forty-two years.

In addition, Wilder has practical experience in the private sector regarding aspects of mechanical, electromechanical, and electronic product development, manufacturing and marketing.  He has worked as lead engineer with the responsibility for product development and manufacturing, including four years with the Hopp Press Inc., two years with Mechtronic Corporation, and five years as Director of Engineering at AMF Incorporated.  Wilder has been responsible for a range of product lines including lawn and garden tractors, exercise equipment, motorcycles, telephonic equipment, electronic measuring devices and electronic switches and relays.  He also holds fourteen patents which involve the design of electronic devices.  He has testified as an expert witness and has investigated 22 accidents involving a variety of power saws.

Although defendant argues that Wilder's experience dealing with saws has derived from his work in litigation, this is not in and of itself a reason to preclude his testimony.  Wilder's past history of testifying as expert engineer in jurisdictions including United States District Courts in New York, New Jersey

and Connecticut -- including cases involving power saws --may not add great weight to his qualifications, but it is certainly no basis for precluding his testimony.  While the 2000 Advisory Committee Notes for Fed. R. Evid. 702 list whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" as a factor courts have found relevant in determining whether the testimony is sufficiently reliable, I find such considerations more appropriately addressed here as a question of credibility for the factfinder, because the factor on balance supports the admissibility of his testimony in this case.

I find that Wilder's education, training and practical experience working as a professional engineer, and in designing, manufacturing and marketing electromechanical devices are sufficient to permit his expert testimony for such assistance as the jury chooses to credit in understanding the technical and scientific evidence regarding the saw -- an electromechanical device--in this case.  Fed. R. Evid. 702.

    2.  <u>Testimony</u>

        *i.  Standard of Review*

Under Fed. R. Evid. 702, a witness may testify as an expert if:  "(1) the testimony is based upon sufficient facts or data,

(2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The rule thus imposes a gate-keeping role on the trial court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. See generally Daubert, 509 U.S. at 600; Kumho, 526 U.S. at 149, 156.

Daubert lists five factors that may be taken into consideration in determining whether expert testimony is admissible: (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publications; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. 509 U.S. at 592-94. These factors may also be applicable in assessing the reliability of non-scientific expert testimony. Kumho, 526 U.S. at 147-49 (applying Daubert to the "expert" testimony of an engineer in tire failure analysis"). Kumho also holds that the list is not meant to be a definitive checklist or test. Whether any or all of these factors are considered is tied to the facts

9

of a particular case.  Id. at 150.  Thus, the inquiry is a
flexible one, and gives the trial judge broad latitude to
determine whether the expert employs the "same level of
intellectual rigor that characterizes the practice of an expert
in the relevant field."  Id. at 152.  The ultimate purpose of the
Daubert inquiry is to determine whether the expert's testimony
would be helpful to the jury in resolving a fact in issue.  Id.
at 147; Cipollone, 202 F.3d at 380.

    Where the facts in issue necessitate expert testimony but do
not clearly point to a determinative cause of the accident, an
expert may infer a "plausibl[e]" explanation from the evidence.
Pace v. Ins. Co. of N. Am., 838 F.2d 572, 578 (1st Cir. 1988).
However, "the inferences must be reasonable and must be based on
probabilities rather than possibilities and may not be the result
of mere speculation and conjecture."  Goffredo, 402 Mass. at 101.
Speculative testimony will not satisfy a plaintiff's burden of
establishing by a preponderance of the evidence that a design
defect was the proximate cause of his injuries.  Fidalgo v.
Columbus McKinnon Corp., 56 Mass.App.Ct. 176, 183 (2002).

    Once the trial court determines the reliability of the
expert's methodology and the validity of his reasoning, the
expert should be permitted to testify as to inferences and
conclusions he draws.  Any flaws in his opinion may be exposed
through cross-examination or competing expert testimony.  U.S. v.
Mooney, 315 F.3d 54, 63 (1st Cir. 2002).

*ii.  Analysis*

Here, Wilder opines that the presence of the deep laceration in Watson's left leg indicates that the blade was rotating at the time it came in contact with his leg.  Wilder has proffered two reasons for why the blade was rotating when it contacted Watson's leg:  (a) the saw did not have a blade brake to reduce the coasting of the blade quickly after deactivation (the "Blade Brake theory"); and/or (b) the location of the interlock on the saw permitted Watson to activate the saw inadvertently (the "Trigger Lock theory").  A third "warning" theory is suggested in the papers of the case, but not argued.

a.  "Blade Brake" Theory

Defendant opposes Wilder's Blade Brake theory because Wilder never designed or tested his proposed blade brake in a power cutter, the product at issue in this case.  For this reason, defendant argues that Wilder's opinion is not supported by a reliable engineering methodology or sufficient facts or data, as required by Federal Rule of Evidence 702.

However, Wilder did conduct a number of tests with an exemplar K2300 including:  simulation of the accident sequence, timing of the coasting blade, fast action photography to determine spin up time of the blade, cuts with the saw, manipulations to determine if the saw could be activated inadvertently, and general handling of the saw to understand its

11

operational characteristics.  Wilder repeatedly simulated
Watson's accident to determine how long it would take to descend
the ladder, and change the saw from one hand to the other.  This
averaged out at nine seconds.  He performed coast down tests on
an exemplar 12" saw, in which he again and again timed how long
it took the blade to stop after release of the trigger.  This
averaged 12.7 seconds.

Wilder examined other electric saws, similar to the K2300,
equipped with blade braking mechanisms.  He found that blade-
braking mechanisms on electric saws with rotating blades are
commonly used, that the technology to employ such a mechanism has
been readily available since the 1960's, and that it could have
been installed at a minimal cost to the manufacturer.[3]

Based on his testing, Wilder concluded that approximately
nine seconds would have elapsed from when Watson powered down his
saw to the point of injury and that an abrasive blade on the saw
measuring twelve or fourteen inches could have been made to stop
in approximately two seconds with such a brake.  Without a blade
brake the blade will continue to spin for 10-15 seconds after
deactivation.

I find that Wilder's testing of the saw's coast down times

_____

[3]For the Makita 5007NB, the addition of an electric brake
feature-the cost difference between the two saws was $10.  For
the DeWalt circular saw, model DW369CSK and DW368 model, which
differ only in that the former includes an electric brake, the
cost difference between the two was between $5 and $7.

is based on generally accepted engineering principles, and can give rise to admissible testimony on the issue of causation. His opinion satisfies Fed. R. Evid. 702 in that it is based upon sufficient facts or data (repeated testing), is the product of reliable principles and methods (repeated timing with a stop watch), and employs methods that have been applied reliably to the facts of the case (accident simulations).

Wilder also determined that a blade brake would have prevented Watson's injury because it would have stopped the subject saw within two seconds, and the time between Watson's turning off the saw and the injury was approximately nine seconds.[4] Although Wilder's blade brake calculations are more speculative because he did not use the K2300 in these tests, I find that his methods are acceptable under Fed. R. Evid. 702.

Wilder could not have used a K2300 to perform these tests because no K2300s are manufactured with blade brakes. Defendant suggests that Wilder should have somehow installed a blade brake on the K2300. That step, while no doubt instructive, is not necessary. Wilder's repeated testing of similar saws, one of

---

[4]Wilder tested the DeWalt DW 369CSK by mounting two 10-inch steel blades on the saw. These blades had greater combined polar moment of inertia than the K2300 14-inch abrasive blade. The DeWalt stopped in two seconds. Wilder also tested Delta and Ridgid miter saws of similar power, functionality, size and price as the subject saw. Wilder found stopping times of 2.6 seconds and 2 seconds respectively. However, the Ridgid model had a free coast down of only 5.5 seconds, while the coast down of the K2300 was 10-15 seconds.

which was heavier than the K2300, is sufficient to establish that coast down times would have been shorter had the K2300 been equipped with a brake.

b.  Trigger Lock Theory

Defendant opposes Wilder's Trigger Lock theory contending it was not presented in a timely fashion (Wilder communicated his theory to defendant in a letter dated March 24, 2006, just three days before his deposition, and long after the September 30, 2005 deadline set by this court); it is unreliable because it is based on a factually mistaken interpretation of a videotape produced by the defendants; experimentation with an exemplar cutter was limited; the underlying hypothesis as to what might become "instinctive" or "second nature" is speculative; and the proposed alternative design represents a mere "concept" that he never designed or tested; there is insufficient basis to show that the location of the trigger lock caused Watson's injury.

In March 2006, Wilder viewed a videotape showing an operator using the same hand to activate the locking button and the power trigger of the K2300, while holding the cutter by the rear handle in one hand.  Because Watson was holding the subject saw in just this position at the time of his accident, Wilder was prompted to consider a second potential cause of Watson's accident -- that Watson could have inadvertently activated the saw because of the defective placement of the trigger lock.  Unbeknownst to Wilder, who viewed the video in Swedish and without a translation, the

trigger lock had been deliberately disabled by the defendant's engineers so that the user in the video was activating the power cutter with only the power trigger.

Be that as it may, Wilder reenacted the accident sequence to see if the interlock on the subject saw actually prevented inadvertent activation of the saw, and found that in two separate scenarios, the interlock on the subject saw failed to prevent inadvertent activation.  In the first case, it was possible while wearing work gloves[5], even with the saw hanging at the user's side, to depress the trigger lock and squeeze the trigger because the trigger lock is located close to the trigger on the inside of the rear handle.  The second scenario in which the interlock on the subject saw did not prevent inadvertent activation was when the user reached across his body with his hand and gripped the front handle of the saw while using his other hand to grip the rear handle.  The saw was forced back toward the user, driving his index finger into the "trigger lock" by a combination of the weight of the saw and the weight of the user's arm.

Wilder opines that recessing the trigger lock, placing a barrier over the trigger lock, or relocating the trigger lock to an area on the product that was out of reach of the operator's normal operating grip as alternative safer designs.  In

---

[5]Although defendant suggests that there was no evidence that Watson was wearing work gloves, plaintiff will apparently testify at trial that he was.

developing his hypothesis, Wilder looked at different models of defendant's saws and suggests that Electrolux's relocation of the trigger lock on a later model power cutter, the K3000, supports his position that the trigger lock is less likely to be inadvertently pressed in this alternative location.

Although this additional opinion was made in a letter dated March 24, 2006, well after the deadline set by this court of September 30, 2005, and only three days before his deposition of March 27, 2006, I do not find the delay disabling here.  To be sure, Fed. R. Civ. P. 37(c)(1) provides when "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence ... any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1). Although Rule 37(c)(1) is traditionally invoked to preclude expert testimony at trial, it can also be applied to motions for summary judgment.  See Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (citing Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1007-09 (8th Cir. 1998) (finding that a products liability defendant, whose summary judgment motion relied partially on the plaintiff's lack of expert testimony, would have been significantly prejudiced by plaintiff's untimely expert disclosure).  However, Rule 37(c)(1) "allows the court to admit belatedly proffered expert evidence if the proponent's failure to reveal it was either substantially justified or

harmless." Lohnes, 272 F.3d at 60. Here, Wilder only received the video which inspired his theory on March 17. Thus, his delay until March 24, 2006, in proffering his second theory is sufficiently justified. Further, defendant, which itself sought a relaxation of the Schedule to bring the instant motions, was able to depose Wilder on his theory, and has not alleged that it has been in any way prejudiced by the late disclosure.

That Wilder was spurred to consider this alternative by a mistaken interpretation of the video does not preclude his testimony on this point. Although the trigger lock had been disabled in the video, this does not mean that one-handed activation was impossible. Indeed, Wilder was able to actuate the saw with one hand in two separate fashions, one of which was videotaped at his deposition. Thus, his Trigger Lock theory should not be precluded merely because it was stimulated by a misunderstanding.

Nonetheless, I agree with defendant that Wilder's opinion on this point is speculative. Wilder merely states in a conclusory fashion that inadvertent activation would have been prevented had the trigger lock been located elsewhere, or a barrier placed over it. However, he has done no reliable testing which would corroborate these bare assertions. Nor is there any factual basis for inferring that Watson actually caused inadvertent activation.

Wilder attempts to support his theory in a redesigned model

17

of the subject saw, the K3000.  The interlock on the K3000 is
located on the side rather than on the rear handle.  Wilder
suggests that this was a safety innovation.  However, according
to defendant, the interlock was moved, not for safety purposes,
but because many people had trouble locating the interlock on the
K2300.  Defendant contends that trigger activation would if
anything be *more* difficult, under the subject design than under
this alternative design.  Wilder has presented no evidence that
the trigger lock was moved for safety reasons, or that its
location on the K3000 renders it less prone to inadvertent
activation, and his suggestions remain mere hypothetical
concepts.

The methodology that Wilder employed is speculative and
inadmissible under Federal Rule of Evidence 702.  In an effort to
determine how the saw could be inadvertently activated, Wilder
made repeated tests with gloves on and off to see how he could
activate the saw with one hand.  Although Wilder was eventually
able to find two different scenarios in which he could accomplish
this, there is no evidence that the so-called test that he used
was anything that even remotely resembled a rigorous or
systematic technique.

Wilder states that a worker might become used to activating
the saw with one hand, such that it becomes "instinctive" to do
so.  However, Wilder presents no evidence that Watson ever
activated his saw in this manner, such that it might become

18

"instinctive".  Thus, Wilder's hypothesis is wholly speculative.
Although Wilder was able to demonstrate at his deposition that
the saw could be activated with one hand, he had to admit that
his own activation of the saw was not inadvertent.

Wilder provides no evidence from which a factfinder might
conclude that it is more probable than not that Watson
inadvertently activated the saw.  Thus, because Wilder's Trigger
Lock theory is not based on a reliable methodology and requires
speculation, it is insufficient to establish either a product
defect or causation.  I find that Wilder's testimony as to this
theory must be precluded.

c.  Warning

Defendant also opposes Wilder's suggestion of an information
defect.  In Wilder's report, he writes that if it is not possible
to make a product nonhazardous without compromising its utility,
then warnings and/ or training should be used to reduce the risk.
Although plaintiff does not discuss an information defect in his
opposition memorandum, defendant opposes allegations of any such
purported defect at length.

Defendant notes that an expert's proposed opinion concerning
proper warning "design" is subject to the same requirements of
reliability as his opinions concerning other alleged design
defects.  See generally Dhillon v. Crown Controls Corp., 269 F.3d
865, 870 (7th Cir. 2000); Milancowicz v. The Raymond Corp., 148
F. Supp.2d 525, 541 (D.N.J. 2001).  In order to establish the

required causal connection between any failure to warn and his accident, plaintiff must prove that additional warnings on both of the suggested subjects were necessary to render the cutter reasonably safe.

Because plaintiff admits that he understood that the wheel would continue to coast for "a number of seconds" after the power trigger was released, that if he contacted the wheel he could be injured, and that he therefore had to be careful to keep the cutter away from his body even when it was not under power, it is difficult to envision what type of warning would have prevented injury caused by a blade coasting down. See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29 (1st Cir. 2004); Slate v. Bethlehem Steel Corp., 400 Mass. 378, 384 (1987).

The defendant's conclusory argument that the K2300 EL did not incorporate "adequate operator safety warnings" is not supported by sufficient facts or data, nor is it the product of reliable principles and methods.  Indeed, it does not appear that plaintiff attempted to advance this theory at all in opposition to the motions.  Nonetheless, in the interest of completeness, I conclude that the Warning theory has not been made out in the record and consequently will exclude it.

**B.  Summary Judgment**

I now turn to the substance of the summary judgment motion and Electrolux's claim that Watson will be unable to support through reliable testimony of a qualified expert witness, that

the subject power cutter was defective at the time it was sold, and that the defects alleged caused his accident and resulting injuries.

1.  Summary Judgment Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks and citation omitted.)  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when a factfinder could reasonably return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is upon the party seeking summary judgment to make a preliminary showing that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995). Once the moving party has satisfied its burden, the burden shifts to the non-moving party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. Id.  The Court must view the record, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Chapman v.

Bernard's Inc., 167 F.Supp.2d 406, 411 (D.Mass. 2001) (citing

O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)).

    2.  Substantive Standards

    Because this case is before me as a result of diversity

jurisdiction, and all events took place in Massachusetts,

Massachusetts products liability law applies.  See Ticketmaster-

New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994) ("[A]

federal court exercising diversity jurisdiction is the functional

equivalent of a state court sitting in the forum state.")

    Under Massachusetts law, a plaintiff challenging a product's

design must show that the design was "defective" in that it

presented an unreasonable risk of injury to users.  Back v.

Wickes Corp., 375 Mass. 633, 642 (1978).  Plaintiff must also

prove that the defect existed at the time the product left the

defendant's control.  Enrich v. Windmere Corp., 416 Mass. 83, 89

(1993).  Whether a defect exists is partly a question of consumer

expectations, and partly one of "social acceptability," involving

consideration of factors such as the gravity of danger posed by

the challenged design, the likelihood of harm, the technological

and economic feasibility of an improved design, and adverse

consequences to the product and consumer that would result from

an alternative design.  Back, 375 Mass. at 642 citing Barker v.

Lull Eng'r Co., 20 Cal.3d 413, 429-30 (1978).  "[T]here is a case

for the jury if the plaintiff can show an available design

modification which would reduce the risk without undue cost or

interference with the performance of the machinery." <u>Uloth v. City Tank Corp.</u>, 376 Mass. 874, 881 (Mass. 1978).

If fault lies with the manufacturer for defective design or failure to warn consumers, the manufacturer is strictly liable under Massachusetts law.  Massachusetts courts "hold a manufacturer liable for defectively designed products because the manufacturer is in the best position to recognize and eliminate the design defects." <u>Colter v. Barber-Greene Co.</u>, 403 Mass. 50, 57 (1988) (citing <u>Solimene v. B. Grauel & Co., KG</u>, 399 Mass. 790, 796 (1987)).  Thus, in analyzing breach of warranty of marketability claims, the focus is on the product itself rather than the actions of the plaintiff. <u>Cipollone</u>, 202 F.3d at 379.

A plaintiff who cannot establish precisely how an accident occurred is not necessarily barred from maintaining tort or warranty claims such as those asserted by Watson here, so long as he can show a greater likelihood that the accident was due to causes for which the defendant was responsible than from any other cause. <u>Carey v. General Motors Corp.</u>, 377 Mass. 736, 740 (1979).

3.  <u>Analysis</u>

Here, parties dispute whether the lack of a blade brake and/or the location of the trigger lock render the saw defective. Wilder opines that to a reasonable degree of engineering certainty, Watson's injury could have been prevented or mitigated by the incorporation of either or both a blade brake mechanism

23

and an effective interlock into the design of the K2300.

Because Wilder may only testify as to the Blade Brake theory, Watson will have the burden of proving by the preponderance of the evidence that "there was a greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause." Carey, 377 Mass. at 740. Thus, Watson must prove by a preponderance of the evidence that the absence of a blade brake rendered the product defective and caused his injury.

I find plaintiff has satisfied his burden by showing an "available design modification [the addition of a blade brake] which would reduce the risk without undue cost or interference with the performance of the machinery." Uloth, 376 Mass. at 881. Wilder has suggested the addition of a brake that he contended would ensure that the product was safer for users. This modification would not have unduly increased its cost, and defendant has offered no evidence showing that it would impair its utility. Thus, there is a sufficient basis for a reasonable factfinder to find the existence of a product defect.

Moreover, there is sufficient evidence to show causation. Wilder can testify that the absence of a blade brake extended the coast down time sufficiently for a jury to find that but for this extended time the injury would not have occurred. The focus in a breach of warranty case is on the product itself. At this stage in the proceedings, no reasonable cause for the injury has been

advanced, other than the Blade Brake theory of product misdesign (and perhaps contributory negligence by Watson, effectively an immaterial cause in a breach of warranty context), which would lead to the injury.

### III. CONCLUSION

For the reasons set forth above, Electrolux's motion to exclude the expert's opinion is GRANTED as to the Trigger Lock

and Warning theories and DENIED as to the Blade Brake theory.  As a consequence, Electrolux's motion for Summary Judgment is GRANTED as to the Trigger Lock and Warning theories and DENIED as to the Blade Brake theory.

/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE