## Page 1

Volume: I
Pages: 1 - 184
Exhibits: 1 - 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
MICHAEL WATSON, INDIVIDUALLY,
AND AS FATHER AND NEXT FRIEND
OF JOHN WATSON, PPA,
    Plaintiff,

vs.    CIVIL ACTION NO.
       04-11782DPW

ELECTROLUX PROFESSIONAL
OUTDOOR PRODUCTS, INC.,
    Defendant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION of LESLIE N. WILDER, taken on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure before Eileen Baker, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac Street, Boston, Massachusetts, on Monday, March 27, 2006, commencing at 10:26 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 2

APPEARANCES:

FINNERAN, BYRNE & DRECHSLER, LLP
(By Jonathan E. Tobin, Esq.)
50 Redfield Street
Boston, Massachusetts 02122
    On behalf of the Plaintiff

SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
(By David A. Barry, Esq.
and Suleyken D. Walker, Esq.)
101 Merrimac Street
Boston, Massachusetts 02114
    On behalf of the Defendant

Also Present
Lennart Gustafsson
George P. Libbares, Videographer

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 3

I N D E X

| WITNESS: | DIRECT/REDIRECT | CROSS/RECROSS |
|---|---|---|
| LESLIE N. WILDER | | |
| By Mr. Barry | 4 | |
| By Mr. Tobin | | 177 |

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 1 | Report 9/29/05 | 5 |
| 2 | Profile | 5 |
| 3 | CV | 5 |
| 4 | Letter 3/24/06 | 75 |
| 5 | Handwritten Notes | 112 |
| 6 | Handwritten Notes | 113 |
| 7 | Handwritten Notes | 113 |
| 8 | Handwritten Notes | 113 |
| 9 | Handwritten Notes | 113 |
| 10 | Handwritten Notes | 113 |
| 11 | Letter 11/21/05 | 134 |
| 12 | Letter 3/16/06 | 134 |
| 13 | ANSI B7.5-1983 | 143 |

VIDEO TESTIMONY PAGES 83-84

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 4

P-R-O-C-E-E-D-I-N-G-S

At the offices of Sugarman, Rogers, Barshak & Cohen, P.C., 101 Merrimac Street, Boston, Massachusetts, on Monday, March 27, 2006, commencing at 10:26 a.m.

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the reading and signing will not be waived. The sealing and filing are waived.

It is further stipulated and agreed that all objections, except objections to the form of the questions, and motions to strike will be reserved until the time of trial.

LESLIE N. WILDER, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BARRY:

Q. Would you tell us your name, please, sir?
A. I'm Leslie Wilder, L-E-S-L-I-E, W-I-L-D-E-R.
Q. Where do you live, Mr. Wilder?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 85**

1  12:45. We're off the video record.
2  (Discussion off the record.)
3  (Luncheon recess.)
4  MR. BARRY: We did receive on
5  Friday early afternoon I think it was what
6  has been marked as Exhibit 4, which is
7  Mr. Wilder's March 24th, 2006 letter to you
8  addressing a different possible accident
9  scenario and also a different potential
10 alleged defect having to do with the
11 interlock.
12  I take the position and will take
13 the position with the court that that
14 disclosure did not comply with the relevant
15 rules. We don't have to argue about that
16 now. That's a legal matter, but I just want
17 it clear on the record that the fact that I
18 am now put in a position where I have to ask
19 Mr. Wilder about this, and have done so and
20 will continue to do so, doesn't mean that
21 the defendant is waiving its right to object
22 obviously to the late disclosure of this new
23 opinion. That's my speech on the record and
24 we'll obviously address that with the court.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 86**

1  (Reporter read back.)
2  Q. When you demonstrated just before the break,
3     Mr. Wilder, how it might be possible to
4     inadvertently activate the saw, can you tell
5     me in words what you were doing? I
6     understand it was videoed, but how did you
7     accomplish that demonstration, if you could
8     describe that now in words?
9  A. Well, basically -- let me preface it by
10    saying it's not the only way in which I
11    think the interlock could be inadvertently
12    depressed, but it is -- what I did is
13    transfer the saw from the weight being
14    carried by my left hand as the plaintiff was
15    presumably going down the ladder and
16    momentarily took the weight off the left
17    hand by using my right hand on the forward
18    handle, and then grabbing the saw with my
19    left hand at the handle, at the rear handle
20    while letting go with my right hand.
21    And in doing so, what I was showing
22    is that it was possible for the weight as it
23    went from my right hand to my left hand to
24    be supported partially by the side of my

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 87**

1  forefinger up against the interlock. And
2  you asked me whether I deliberately did it
3  or -- well, obviously the demonstration was
4  to show that it could be done, and so I
5  showed that it could be done.
6     I saw on the video that the Swedish
7  gentleman, he had the saw -- he did
8  something similar, except he kind of tossed
9  the saw from his right hand to his left hand
10 and kind of caught it, so that the weight of
11 the saw was then applied in a downward
12 position to his left hand showing that it
13 could be inadvertently actuated that way.
14    And he also triggered it several
15 times with the saw held down at his side
16 with just one hand, which is another way
17 which it could be inadvertently triggered,
18 and I'm just saying it is possible to
19 inadvertently trigger the interlock.
20    And because of the weight of the
21 saw you have quite a firm grip on that
22 handle and with the grip and especially if
23 you're wearing gloves, because I did try it
24 with heavy gloves as well -- not here -- it

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 88**

1     becomes much easier to hit that interlock
2     because the gloves take up more space within
3     the handle.
4  Q. When you demonstrated how it was possible to
5     inadvertently start the saw here before the
6     video camera was one of your fingers
7     exerting a force in one direction on the
8     trigger lock and another finger or part of
9     your hand exerting a force in an opposite
10    direction on the trigger?
11 A. Well, the two are not in opposition. If
12    anything, I'd say one is more at right
13    angles to the other. The interlock moves
14    fore and aft and the trigger essentially
15    moves at right angles to it, even though
16    it's on an arc.
17    What really happens is that your
18    hand is now preparing to carry the weight of
19    the saw and in carrying the weight of the
20    saw there is an opening in the handle that
21    your hand comes into and supports the weight
22    of the saw. And if you were to hold the saw
23    completely horizontal and just grasp it that
24    way, then you probably would not hit the

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 89

1 interlock. If you hold it completely
2 vertical it's almost certain the interlock
3 would be depressed, and somewhere in the
4 middle then starts the dynamics of how your
5 hand reaches into the handle and when you
6 grasp it, exactly which way the force is
7 applied.
8     The trigger and the plunger are
9 very close together. So, getting one finger
10 up against both of them, if that's what I
11 did -- it's hard to say because the
12 forefinger and the next middle finger both
13 can grip the trigger. I don't believe I
14 used my middle finger to actuate it at that
15 point, but it was unconscious.
16 Q. But it was your forefinger that was
17    actuating the trigger lock?
18 A. Yes.
19 Q. And what part of your hand or what finger
20    was actuating the trigger?
21 A. I think it was my forefinger as well as my
22    middle finger, but I can't be sure how much
23    force was on each, because both of them will
24    straddle, can straddle the trigger.

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 90

1 Q. When you said if you're holding the saw
2    vertical it's almost certainly to
3    inadvertently activate the saw?
4 A. If you're holding the saw with the blade up.
5 Q. That exactly was going to be my question.
6 A. Yes. If in the transfer of the saw it winds
7    up being held vertically at one point, then
8    the weight of the saw is resting on the hand
9    that's in the rear handle and the weight
10   will cause the plunger to depress.
11 Q. But Mr. Watson wouldn't have been holding
12    the blade up, would he?
13 A. I don't know how he transferred it. He may
14    have, and again in the videos here I can't
15    remember which gentleman -- some people
16    transferred it one way. There were several
17    people transferring it. Some kind of
18    flipped it -- I think there was a young man
19    in probably one of Dr. Funk's, if I
20    recollect correctly, demonstrations, he was
21    kind of -- when he grabbed the saw in his
22    left hand, he actually kind of tossed it up
23    in the air a little bit and flipped his hand
24    around.

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 91

1    So, there is any number of ways in
2 which somebody could have transferred or
3 moved or supported the saw, and I can't be
4 sure how, except to show that with the two
5 items right in close proximity and in
6 proximity to where your hand would actually
7 grasp the saw to carry it, you can actuate
8 it. And it's designed that way, so that you
9 don't need to move too far away from where
10 you are to actuate it. That doesn't make
11 sense.
12 Q. No, no, no. It makes sense to me. Do you
13    have any information one way or another as
14    to whether the trigger lock was operative
15    and functioning as it was intended to
16    function on the day of Mr. Watson's
17    accident?
18 A. Only by presuming that if it wasn't, that
19    might have come out in some way, but I have
20    no knowledge.
21 Q. One way or another?
22 A. One way or another.
23 Q. Have you heard of a practice in the
24    construction industry of defeating the

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 92

1 trigger lock, some workers defeating the
2 trigger lock by taping it in the depressed
3 position, so that it is not necessary each
4 time one wants to activate the saw to press
5 on the trigger lock, or either taping it or
6 just defeating it, removing it? Have you
7 heard of that, such a practice?
8 A. Well, I can tell you that I've heard of that
9    sort of practice in connection with other
10   safety devices on other machines. I don't
11   know of any specific practice with respect
12   to this saw, and in looking at the saw, I'd
13   say it would be probably difficult to do.
14 Q. To tape it?
15 A. To tape it so that it will stay depressed.
16    I'm not saying -- it's not impossible. It's
17    just looking at it, one would have to wrap
18    tape around this way, and eventually I think
19    the tape would stretch or peel off and the
20    trigger lock would -- I don't know whether
21    it's done or not. I'm not aware of any
22    practice. I can say that some people in
23    some instances have been known to defeat
24    safety devices.

SHEA COURT REPORTING SERVICES
(617) 227-3097

93

1 Q. Would it be difficult to defeat the trigger
2    lock by removing it?
3 A. I did not open up this saw, so I don't know.
4    I mean it probably could have been removed
5    or bypassed or something, but again I'd have
6    to open it and see what the mechanism looked
7    like, and I haven't done that.
8 Q. If the trigger lock were defeated in some
9    way, it would be easier to inadvertently
10   start the saw than if it were functioning
11   properly, correct?
12 A. Yes.
13 Q. If that had happened -- and I understand
14   that you're not saying that it did -- and
15   Mr. Watson had inadvertently activated the
16   saw, that wouldn't be a design problem with
17   the saw, would it, if somebody had defeated
18   the interlock?
19 A. That's correct.
20 Q. Now, you didn't have an opportunity to
21   examine the saw that was involved in
22   Mr. Watson's accident?
23 A. Correct.
24 Q. The actual saw?

SHEA COURT REPORTING SERVICES
(617) 227-3097

94

1 A. I want to think about that last answer just
2    a little more for a second, and I haven't
3    given it any consideration at this point
4    because the interlock did exist, but there
5    are ways to design triggers to make them
6    less susceptible to inadvertent operation,
7    and that would be some sort of a barrier
8    nearer the trigger, so that you can't bump
9    it accidentally.
10        And given what you've said, if we
11   take this particular saw, as it is designed
12   and remove the interlock, I would say yes,
13   the trigger would be more easily actuated,
14   but it's not, it should not be meant to be
15   construed as in general that removing an
16   interlock always makes it much more -- let
17   me change that.
18        I'm saying in general triggers
19   could be designed so that they're configured
20   with respect to the handle, so that they are
21   less susceptible to being actuated. This
22   one is not.
23 Q. I'm not sure I understand that answer.
24 A. Okay.

SHEA COURT REPORTING SERVICES
(617) 227-3097

95

1 Q. You agree with me that if the trigger lock
2    had been defeated, it would be easier then
3    if the trigger lock were functioning
4    properly to inadvertently activate the saw?
5 A. On this particular saw, yes.
6 Q. On this particular saw?
7 A. Yes.
8 Q. And if that had happened ---
9        MR. TOBIN: That?
10 Q. Somebody had -- if, in fact, the trigger
11   lock had been defeated before Mr. Watson's
12   accident and, in fact, he had inadvertently
13   activated the saw, the cause of the
14   inadvertent activation wouldn't be a design
15   problem with the trigger lock. It would be
16   the fact that somebody had defeated it,
17   correct?
18 A. I don't know that I can answer that question
19   yes or no, because I then have to consider
20   whether or not the whole handle could have
21   been configured such that even if the
22   trigger lock were removed that the trigger
23   would be less susceptible to actuation.
24        But I would have to agree with you

SHEA COURT REPORTING SERVICES
(617) 227-3097

96

1    that once the trigger lock is removed
2    regardless of what kind of design there was,
3    it only stands to reason that it could be
4    more easily inadvertently actuated, but as I
5    said, this one does not have any other
6    protective design about that handle and the
7    trigger, and this trigger is completely
8    exposed.
9        So, if the interlock was not there,
10   the trigger would be more susceptible to be
11   inadvertently triggered. That's a long way
12   of saying it.
13 Q. I was asking you about the fact that you
14   never had an opportunity to examine the
15   actual saw; am I correct about that?
16 A. That's correct.
17 Q. As an engineer would you like to have had
18   the opportunity to inspect the actual saw
19   involved in Mr. Watson's accident?
20 A. Yes. It's always good to see the subject
21   piece of equipment, yes.
22 Q. Why would you have wanted to see the
23   equipment itself?
24 A. Well, my tests were done on an exemplar. I

SHEA COURT REPORTING SERVICES
(617) 227-3097

97

1  don't know how well used the saw was that he
2  was using. It may very well have been that
3  the bearings had worn in very well. The saw
4  was loose and a coastdown time might have
5  exceeded 20 seconds instead of 15 seconds if
6  the saw was very free and easy.
7      I would certainly want to see
8  whether the interlock was functioning,
9  whether the trigger functioned or whether
10 there was anything else unusual that I don't
11 see from the exemplar.
12 Q. An opportunity to inspect the saw might have
13    permitted you to come to a more informed
14    opinion as to how Mr. Watson's accident
15    occurred?
16 A. I don't know that it would have, because I
17    think some of the circumstances of the
18    accident are just unknown.
19 Q. Do you agree, Mr. Wilder, that if
20    Mr. Watson's accident had happened while the
21    blade was still coasting after he had
22    initially turned it off following completion
23    of his cut and without his inadvertently
24    activating the saw, then under that

SHEA COURT REPORTING SERVICES
(617) 227-3097

98

1  circumstance the design of the trigger lock
2  would not have played any causal role in his
3  accident?
4  A. If it had just been coasting down?
5  Q. Correct.
6  A. Yes.
7  Q. You agree with me?
8  A. Yes.
9  Q. And conversely, if his accident had happened
10    after he did inadvertently activate the saw
11    and while the saw was under full power, then
12    the lack of an electric brake or blade brake
13    would not have played any causal role in the
14    accident, correct?
15 A. Yes.
16 Q. I think you told me earlier that you can't
17    say to a reasonable degree of engineering
18    certainty which of these two accident
19    scenarios was the one that he actually had,
20    correct?
21 A. Or some combination.
22 Q. Or some combination or some other one,
23    correct?
24 A. Yes, I agree.

SHEA COURT REPORTING SERVICES
(617) 227-3097

99

1  Q. If Mr. Watson had inadvertently activated
2     the saw and then released the trigger so
3     that it turned off at some point, would you
4     expect him to recall that?
5         MR. TOBIN: Objection.
6  A. Actually, I don't know how I can answer what
7     would have happened in his mind, but he did
8     indicate that he was wearing earplugs and
9     that it was a noisy environment and that I
10    suspect he would not have been aware at some
11    point as to whether the saw was actually
12    running or not running or coasting or not
13    coasting.
14 Q. If he inadvertently activated the saw and
15    then released his trigger, the trigger on
16    the saw, you have no idea how long the blade
17    was coasting before it struck and injured
18    him, do you?
19 A. I don't think there is any way for anybody
20    to make that assessment.
21 Q. And that's not something you know?
22 A. Certainly, I couldn't.
23 Q. Let's talk about the design of the saw with
24    respect to the fact that it doesn't have a

SHEA COURT REPORTING SERVICES
(617) 227-3097

100

1  blade brake on it. In your report marked
2  Exhibit 1 you only discuss blade brakes on
3  other types of power saws, that is other
4  than power cutters. For example, you
5  mentioned circular saws and mitre saws; is
6  that correct?
7  A. Yes.
8  Q. Why is that? Why did you discuss other
9     types of saws and not power cutters when you
10    were discussing saws with blade brakes?
11        MR. TOBIN: Note my objection to
12    the question. The report is about putting a
13    blade brake on a power cutter. What do you
14    mean by your question?
15        MR. BARRY: Let me shortcut it.
16 Q. Is it because you couldn't find any power
17    cutters as opposed to circular saws or mitre
18    saws that had blade brakes?
19 A. No.
20 Q. That's not why?
21 A. That's not why.
22 Q. If there are power cutters saws that are
23    similar to the saw Mr. Watson was using that
24    had or have blade brakes, wouldn't it have

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 101

1 been a more meaningful comparison to talk
2 about power cutters with blade brakes than
3 to talk about circular or mitre saws with
4 blade brakes?
5 A. I'm not sure it would be more meaningful.
6 The comment element is that these saws all
7 use electrically operated motors that are
8 susceptible to being braked electrically.
9 I'm sure they probably all use a series or a
10 universal motor and it really doesn't matter
11 whether it's a polishing wheel or an
12 electric saw that's a hand-held circular
13 saw, or as the Makita saw has a timber saw,
14 a very large circular saw.
15 They all have the common element of
16 an electric motor and a cutting implement
17 that spins, and the issue was whether or not
18 they could technologically and economically
19 and feasibly be braked, and I was just
20 looking for examples that were for sale to
21 illustrate that blade braking is technically
22 and economically feasible, and I don't see
23 that there is any distinction to be made
24 between a power cutter and the saws that I

Page 102

1 referred to.
2 Q. Does the environment in which the different
3 types of saws are used have any affect on
4 whether in your opinion they should have
5 blade brakes or not?
6 A. Yes, to a degree.
7 Q. To what degree?
8 A. Well, the other saws that we talked about or
9 I talked about in my report typically had
10 lower guards, so that when you were done
11 with your cut the blade was protected by a
12 spring-loaded guard. Power cutters, because
13 of the way they're used, tend not to be
14 susceptible to having a retractable guard.
15 I would think a power cutter needs a blade
16 brake even more than these other saws.
17 Q. While we're on the guarding issue, you're
18 not saying that the power cutter was
19 defectively designed because it didn't have
20 a different type of blade guard, are you?
21 A. If I thought about it long enough and could
22 come up with a design that I thought was
23 feasible, then I might say yes, it needed a
24 retractable guard, but I didn't spend a lot

Page 103

1 of time on that, because it looked, at least
2 on the face of it, as if it would have been
3 difficult or impossible to implement. So, I
4 didn't go any further in that direction.
5 Q. And you're not purporting to offer such an
6 opinion at the trial of this case that it
7 was defective, because it didn't have a
8 lower retractable blade guard, are you?
9 A. No.
10 Q. Are power cutters such as the one Mr. Watson
11 was using generally used by the same
12 category of users as are portable circular
13 saws and mitre saws?
14 A. That's a tough question to answer, because
15 the user is really defined by what the
16 project is, and most circular saws that I'm
17 familiar with would span the population from
18 home owner, do-it-yourselfers, to
19 professional tradesmen, where I think power
20 cutters I think are probably almost always
21 used by professional -- not professional,
22 but people that are dedicated to commercial
23 use.
24 Q. Maybe that's another way of saying it. The

Page 104

1 type of power cutter that Mr. Watson was
2 using is designed to be used by the
3 professional user, not the home owner,
4 do-it-yourselfer, correct?
5 A. I don't think it's specifically designed to
6 be used by a professional user. I think it
7 is what it is, and it tends to be used by
8 professional users, just because that's the
9 nature of what they're used for.
10 Q. Would that have any affect on whether you
11 think there is a type of person who
12 generally uses power cutters? Would that
13 have any bearing on whether you think power
14 cutters should come with blade brakes or
15 not?
16 A. I haven't really considered that except to
17 the degree that I'd say offhand right now
18 without much more thinking I see a lot of
19 accidents with all sorts of saws and very
20 often it's the professional tradesmen,
21 because of their familiarity or long-time
22 exposure to these saws that make them more
23 at risk than the average do-it-yourselfer.
24 Q. When did you first reach an opinion that

Page 105

```
 1      power cutters without blade brakes are
 2      defectively designed?
 3  A.  Well, shortly after I looked at the saw and
 4      realized what it was and how it was used,
 5      the thought -- I was very familiar with the
 6      use of blade brakes on other saws, and
 7      almost as soon as I realized what the
 8      circumstances of the accident were I came to
 9      a conclusion that it's very likely that a
10      blade brake would have mitigated or
11      eliminated the possibility of the accident.
12  Q.  So, the first time you came to that
13      conclusion was in connection with your work
14      on this case?
15  A.  Well, I have come to the conclusion that
16      blade brakes are an important safety device
17      well before this case.
18  Q.  With respect to power cutters, is it fair to
19      say that the first time that you came to a
20      conclusion that all power cutters, if they
21      don't have blade brakes, are defectively
22      designed is in connection with your work on
23      this case?
24  A.  I had not considered power cutters as a
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 106

```
 1      separate entity before this case.
 2  Q.  So, the first time you came to that
 3      conclusion with regard to power cutters is
 4      in connection with your work on this case?
 5  A.  Well, I don't see the power cutter as much
 6      different than an ordinary hand-held saw,
 7      except to the extent that it doesn't have
 8      this additional -- it's heavier, beefier,
 9      maybe a little harder to handle, but it
10      doesn't have the retractable guard, and
11      that's the only distinction.  I did not say
12      power cutters are a different animal.
13          When I got this particular
14      investigation and thinking about it, the
15      more I thought about it the more I realized
16      blade brakes certainly could have been and I
17      suspect in the future will be applied to
18      this class of tool.
19  Q.  Your opinion that you express in Exhibit 1
20      that the power cutter that Mr. Watson was
21      using was defective because it lacked a
22      blade brake, that was an opinion that you
23      arrived at in connection with and for the
24      purposes of this litigation, correct?
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 107

```
 1  A.  Yes.
 2  Q.  You had previously come to opinions that
 3      other types of power saws are defective
 4      because they lack blade brakes?
 5  A.  Yes.
 6  Q.  When did you first come to that opinion with
 7      regard to any power saw?
 8  A.  I simply don't remember.
 9  Q.  Have you ever advised any government or
10      industry group of your opinion that power
11      saws without blade brakes are defective and
12      dangerous?
13  A.  No.
14  Q.  Have you done any research to determine the
15      frequency of coasting blade accidents with
16      power cutters like the one Mr. Watson was
17      using?
18  A.  No.
19  Q.  Are you aware of any empirical data that
20      shows the extent to which, if any, that the
21      coasting blade represents a hazard to an
22      experienced user of a power cutter?
23  A.  Other than Dr. Funk's testing, I think it's
24      obvious on the face of it that there is a
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 108

```
 1      hazard.
 2  Q.  What I'm trying to distinguish is the hazard
 3      that's presented by a coasting blade of a
 4      power cutter.  Are you aware of any data or
 5      statistics or empirical evidence that
 6      indicates the extent to which coasting
 7      blades on power cutters have hurt people?
 8  A.  I'm not aware of any statistics or of any
 9      studies that have put that kind of data
10      together.
11  Q.  Did you consider it important to know the
12      degree to which, if any, a power cutter is
13      dangerous to an operator without a blade
14      brake before coming to the conclusion that
15      it requires a blade brake?
16          MR. TOBIN:  I'm not sure I
17      understand.
18  A.  Would you say that again, please?
19  Q.  It was an awkward question.  Did you
20      consider it important to know the extent to
21      which, if any, a coasting blade on a power
22      cutter represents a danger to the operator
23      before you came to the opinion that power
24      cutters need to have blade brakes?
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 113

1  marked for identification.)
2  (Exhibit No. 6 Handwritten Notes
3  marked for identification.)
4  (Exhibit No. 7 Handwritten Notes
5  marked for identification.)
6  (Exhibit No. 8 Handwritten Notes
7  marked for identification.)
8  (Exhibit No. 9 Handwritten Notes
9  marked for identification.)
10  (Exhibit No. 10 Handwritten Notes
11  marked for identification.)
12  Q.  Would you identify the two pages of notes
13      that we've marked Exhibit 5 which we have
14      copied from your original file?
15      (Document handed to witness.)
16  A.  Yes.
17  Q.  What are they?
18  A.  One of them is, has a line at the top that
19      says 9/26 Tobin Watson, the other page of
20      which is associated with it, has kind of a
21      picture of a rectangle with a small M in the
22      middle of it at the top of the page.
23  Q.  When did you prepare those notes?
24  A.  Approximately 9/26, September 26th, 2005.

Page 114

1  Q.  Just before your report, your September 29th
2      report?
3  A.  Yes. It may have been at the time that I
4      was writing the report. I'm not sure.
5  Q.  I guess on the photocopy the date ---
6  A.  There is no date on the one that has the
7      rectangle.
8  Q.  But the 9/26 got cut off.
9  A.  You're seeing the balance of it. You see
10     the 26th. It was September 26th.
11 Q.  So, it's September 26th up in the upper
12     left-hand corner on the first page of
13     Exhibit 5?
14 A.  Yes.
15 Q.  What do those calculations represent?
16 A.  They were just an attempt to estimate
17     whether or not the Partner or if a 12- or
18     14-inch blade on a Partner saw could have
19     been stopped in about the same time as the
20     Dewalt blade. Not the Dewalt blade, but the
21     Dewalt test that I did with two steel blades
22     stopped, which was just a little under two
23     seconds, and it was just a rough
24     confirmation that had the motor had the same

Page 115

1  kind of braking effect that the Dewalt motor
2  had, either a 12- or 14-inch blade would
3  have stopped in approximately two seconds or
4  could have been made to stop in about two
5  seconds also.
6  Q.  Did you discuss your work to determine the
7      stopping time of a blade with a blade brake
8      on a Partner saw with any other engineer?
9  A.  No.
10 Q.  Maybe you can just tell me how you went
11     about figuring out based on the stopping
12     time of the blade in a mitre saw how you
13     felt, how quickly you felt the blade brake
14     in a power cutter would have stopped the
15     blade?
16 A.  Yes. Let me try to do it by way giving an
17     analogy if I can. It may be easier to
18     describe. Picture a car that has a set of
19     wheels on it and a set of brakes on the
20     wheels and you step on the brakes and the
21     car will stop in 50 feet or 10 seconds or
22     whatever it is. And now, if you would like
23     to know given the same sort of technology
24     for brakes how long would a heavier car or a

Page 116

1  lighter car going at either somewhat faster
2  or slower speeds could be made to stop.
3      And that's essentially what I did.
4  Instead of it being a linear speed where a
5  body is moving in a straight line and you're
6  dragging it to a stop, this is a product
7  that is spinning, and that's an analogy.
8      What I did is I looked at the
9  Dewalt saw that had I believe a 12-inch
10 steel blade on it and I replaced the steel
11 blade with two -- I don't have my numbers
12 here, but I think with two 10-inch steel
13 blades. I bolted them on to the Dewalt saw
14 instead of the saw blade that was on there
15 originally, and I saw how fast it came to a
16 stop, and it was just under two seconds.
17 Q.  That was slower than it would have stopped
18     with the single blade?
19 A.  I think so, yes. Basically, I then said
20     that represents, given the Dewalt saw's
21     speed, that represents the braking power of
22     the motor. Now, let's apply that braking
23     power of the motor to a 12- or 14-inch
24     abrasive blade, instead of the two 10-inch

SHEA COURT REPORTING SERVICES
(617) 227-3097

141

1  my testing of the coast time down, that was
2  done on 6/21/05 when I measure the coastdown
3  time. Then I have three other dates, 9/13,
4  9/25 and 9/22 of 2005 when I had
5  opportunities to examine some other saws and
6  I wrote down the coasting down times with
7  and without braking on those saws.
8  Q. In your examination of other saws in
9  connection with this case did you ever look
10 at any portable power cutters comparable to
11 the one that Mr. Watson was using?
12 A. As I said before, I think every one of these
13 is comparable, in that it uses a universal
14 motor and it drives a blade. I don't see
15 that the fact that it has or hasn't got a
16 lower guard or that it's held one way or
17 another way or it uses an abrasive blade
18 versus a steel blade as being of any
19 significance in looking at the braking.
20 Q. Let me see if I can get a yes or no answer
21 to my question. Did you look at -- you
22 understand what a power cutter is?
23 A. I think what I understand a power cutter to
24 be is a saw similar to this one that does

SHEA COURT REPORTING SERVICES
(617) 227-3097

142

1  not have a retractable lower guard that is
2  used in abrasive cutting rather than cutting
3  wood.
4  Q. Taking that definition of a power cutter,
5  did you look at any other power cutters in
6  connection with your work on this case?
7  A. No.
8  Q. Would you identify Exhibit 9, please?
9     (Document handed to witness.)
10 A. That was done, if I could find my note.
11 Q. I'm going to ask you the date.
12 A. I don't know what the date is. It says up
13 there. It was my notes to myself based on
14 my own climbing up and down a ladder and
15 checking the time it took me to go through
16 the motions that Mr. Watson had described,
17 and I'll look for that.
18 Q. Can you pull out the original?
19 A. I can certainly try.
20    (Discussion off the record.)
21 A. It was 9/23/05.
22 Q. The date of Exhibit 9, right?
23 A. Yes.
24 Q. So, you did that -- this is the accident

SHEA COURT REPORTING SERVICES
(617) 227-3097

143

1  reconstruction climb down test where you
2  were timing how long it took to climb down
3  the ladder from the fifth or sixth rung
4  where Mr. Watson said he was?
5  A. Yes.
6  Q. As you testified earlier, you got about nine
7  seconds?
8  A. Yes.
9  Q. That was done before your report obviously?
10 A. Yes. That's Exhibit 9?
11 Q. Yes.
12    MR. BARRY: Mark that.
13    (Exhibit No. 13 ANSI B7.5-1983
14 marked for identification.)
15    (Document handed to witness.)
16 Q. This is Exhibit 13. Was that sent to you by
17 Mr. Tobin?
18 A. Yes.
19 Q. And did you find that of any relevance to
20 any of your opinions in this case?
21 A. No.
22 Q. That takes care of that. That makes it
23 easy. Do I understand correctly that the
24 first time you reached an opinion that there

SHEA COURT REPORTING SERVICES
(617) 227-3097

144

1  might have been a problem with the interlock
2  on the saw that Mr. Watson was using was
3  after you received the videos about two
4  weeks ago, and particularly the Swedish
5  video?
6  A. Yes.
7  Q. Did you think at all one way or the other
8  about the design of the interlock before
9  that point in time?
10 A. Before that period of time I operated the
11 interlock and it looked to me at the time
12 that it would have been difficult to
13 impossible to accidentally actuate the
14 trigger, and especially in the way
15 Mr. Watson had described what happened, I
16 had envisioned the saw hanging down and as
17 it hangs down why it pulls away from your
18 hand. You come away from the interlock.
19    And frankly, the learning process
20 and things gel slowly and when I saw the
21 video and this gentleman who first he was
22 tossing the saw, passing it from one hand to
23 the other actuating it and then he held it
24 hanging down and actuated it, and I said oh,

SHEA COURT REPORTING SERVICES
(617) 227-3097

145

1 my goodness, that's possible. I didn't
2 think it was possible.
3     I tried it. I found it very
4 difficult to do, almost impossible with my
5 bare hand, and I put a work glove on and I
6 found then it became possible to do it with
7 a saw hanging down. And then I had realized
8 with someone that handled this saw all the
9 time, he probably, it probably became second
10 nature to him to actuate it, and it may have
11 been instinctively in grasping the saw that
12 he did it or then in passing it from one
13 hand to the other the weight of the saw
14 caused the interlock button to be depressed.
15 And at that point I realized that this
16 interlock button is not in the right place
17 for safety.
18 Q. So, it wasn't that you didn't think about
19    the issue before?
20 A. It's hard to say. I can't say that I sat
21    down and wrote everything out and said what
22    do I think about and what don't I think
23    about. I looked at it. I saw it. I
24    recognized it was an interlock. It didn't

SHEA COURT REPORTING SERVICES
(617) 227-3097

146

1 -- it simply didn't occur to me that it
2 could be inadvertently actuated.
3 Q. Have you ever designed an interlock or
4    trigger lock for a power saw?
5 A. No.
6 Q. You've never done a design drawing or
7    developed a prototype for a trigger lock for
8    a power saw, have you?
9 A. No.
10 Q. And therefore, you haven't tested any
11    alternate design trigger lock or interlock
12    for a power saw, have you?
13 A. Other than for the purposes of this
14    deposition, I've done some mental design, of
15    course, saying what would I do, what do I
16    think would be a better interlock, a safer
17    interlock, and I don't need to actually put
18    pen to paper to do that. And I think there
19    are alternative ways of doing it that would
20    have prevented inadvertent operation.
21 Q. What alternative ways are there of doing it
22    that would have prevented an inadvertent
23    operation?
24 A. I am going to have to preface this by saying

SHEA COURT REPORTING SERVICES
(617) 227-3097

147

1 I haven't been hired to redisign the saw,
2 and in engineering designs you try an
3 approach. You experiment with it and you
4 test it on people. You see whether it works
5 or not. Then you redesign it and you refine
6 it, and what we're doing here is artificial
7 in the sense that all I'm going to be able
8 to give you is some two or three approaches
9 to what I would take, and then after working
10 with them, trying some prototypes, testing
11 them on people, they would either be
12 modified or discarded or what.
13     But number one, this is a heavy saw
14 and when you grasp it and hold it you need
15 to apply some force to the handle to be able
16 to control this weight. Therefore that
17 handle is not only to guide it when cutting.
18 It's also a handle that one uses to move the
19 saw around from one hand to the other and
20 carry it.
21     I wouldn't put the interlock
22 unprotected as it is in that handle, because
23 in holding the weight of the saw, depending
24 upon how one holds it, if you tip the saw

SHEA COURT REPORTING SERVICES
(617) 227-3097

148

1 like this and the weight is on the
2 interlock. So, I number one, would move the
3 interlock out of the internal cavity of the
4 handle. I would probably start by putting
5 it up on top of the handle, so that it could
6 be reached by the thumb and I would have put
7 some barriers around the side of it. Maybe
8 it's a slide switch, a slide push switch, so
9 that one has to kind of awkwardly reach up
10 front to get it and then put your hand back
11 into a comfortable position for holding the
12 trigger down.
13     No. 2, I might have put a barrier
14 around, similar to the interlock that's
15 there now, except not leaving it exposed as
16 it is, but having it in kind of a barrier
17 area, so one has to use the tip of one's
18 finger to actuate it, and it would have to
19 be done in such a way that if you bumped
20 into it you would be bumping into the
21 barrier rather than just the point of the
22 trigger.
23     And the third alternative would be
24 something that required a simultaneous press

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 149

1  of two fingers in another area. Once that
2  was done and the trigger was pulled you
3  could release it. It's in a sense analogous
4  to the two-handed operation that's needed on
5  punch presses.
6  Q. I'm sorry.
7  A. Those are three approaches that I would
8  start with and what would come out
9  eventually might look just like that or it
10 might look different depending upon what the
11 results were.
12 Q. So, it would be fair to say that these are
13 concepts or approaches that you've thought
14 about, but haven't actually designed out or
15 tested?
16 A. That's correct.
17 Q. Have you discussed with any other engineers
18 these concepts about an alternate design
19 trigger lock?
20 A. No.
21 Q. You can't recall ever using yourself a power
22 cutter with such an alternate design trigger
23 lock as you sit here now, can you?
24 A. I can't recall. I don't know whether the

### Page 150

1  saw actually did use, had or didn't have
2  such an interlock or any interlock. I just
3  don't know.
4      MR. BARRY: Can we take just a few
5  minutes and then we'll move on to one other
6  topic and then we will be finished.
7      (Discussion off the record.)
8      (Brief recess.)
9  Q. Mr. Wilder, I think you may have said this
10 already, but would it be accurate to say
11 that your opinion about the trigger lock was
12 developed in connection with and for
13 purposes of this case?
14 A. The comments that I have made about this
15 particular trigger lock, but I would have
16 had the same thoughts about another device
17 having a trigger lock if that was implicated
18 in the accident.
19 Q. Right, but, I mean, you came to that opinion
20 about this trigger lock in connection with
21 your work on this case?
22 A. This trigger lock in connection with this
23 work on this case.
24 Q. Correct.

### Page 151

1  A. But I have looked into and given opinions on
2  other two-handed and other safety devices on
3  other machines. So, I've considered how one
4  can protect against inadvertent operation in
5  other matters, not just in this matter.
6  Q. Had you ever, before you came to the opinion
7  about the trigger lock on Mr. Watson's saw,
8  expressed the opinion that a trigger lock on
9  any other portable abrasive power cutter,
10 using your definition of power cutter, was
11 defective?
12 A. No.
13 Q. Now, in your report that we marked Exhibit 1
14 you ---
15 A. I'm sorry, let me clarify that a little bit,
16 because it goes way back, and it's not a
17 power cutter, but if you -- are you
18 restricting your question to a power cutter?
19 Q. It was about power cutters, yes.
20 A. Then my answer stands.
21 Q. Was there another case in which you had
22 a ---
23 A. It wasn't a power cutter.
24 Q. You expressed some opinions about warnings

### Page 152

1  in your report, correct?
2  A. I would have to look at them. I don't
3  remember exactly what I might have said.
4  Yes, I did.
5  Q. I think it's on the last page.
6  A. Last page, yes.
7  Q. You say that, "The K2300 EL incorporated
8  neither effective guarding nor adequate
9  operator safety warnings"?
10 A. Yes.
11 Q. I don't want to go back on guarding. I
12 think we've covered that. I think you told
13 me that you don't have an opinion that the
14 saw was defective for reason of inadequate
15 guarding, correct?
16 A. That's correct. We were talking about a
17 lower blade guard, and what I meant here in
18 terms of guarding also included a means --
19 at the time I believe I was also considering
20 a means to prevent inadvertent injury or
21 operation, and I can't be sure at this point
22 what I had in mind then, but I was saying
23 that the saw was not guarded. I didn't say
24 it had to be guarded for this use. I said

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 177

1  A.  Essentially all of it. I mean other than
2      investments and things like that.
3  Q.  Earned income?
4  A.  Earned income.
5         MR. BARRY: I think that's all I
6      have.
7         MR. TOBIN: I have got to ask a
8      couple.
9            CROSS-EXAMINATION
10 BY MR. TOBIN:
11 Q.  I have a few questions for you just for
12     clarification. A little bit earlier you
13     talked about different types of interlock
14     that could be incorporated into this saw.
15     Do you recall that?
16 A.  Yes.
17 Q.  The different types of interlocks you
18     described, are they used on power tools and
19     devices in the current market?
20 A.  There are many interlocks used on power
21     tools in today's market.
22 Q.  You talked about interlocks that are
23     recessed or guarded?
24 A.  Yes.

Page 178

1  Q.  Are there products on the market today that
2      use such interlocks?
3  A.  I've seen them. I can't specifically pull
4      one out right now to describe to you.
5  Q.  But it's well accepted in the industry that
6      they're used?
7         MR. BARRY: Objection to form.
8  A.  I believe so, yes.
9  Q.  Mr. Wilder, can you conclude to a reasonable
10     degree of engineering certainty that the
11     presence of a blade brake and an effective
12     interlock would have prevented Mr. Watson's
13     injury?
14 A.  Would have prevented or mitigated it if both
15     of those features were part of his saw.
16 Q.  Can you explain that, please?
17 A.  Well, I believe since we don't know or I
18     don't know precisely what happened, how much
19     of his injury was caused by coasting versus
20     how much of it might have been caused by a
21     powered on blade, since we don't know -- and
22     how much it might have been caused by a
23     coasting blade, the presence of both of
24     those safety devices, a blade brake and an

Page 179

1      interlock in my opinion would have either
2      prevented or mitigated this injury.
3  Q.  Mr. Wilder, can you conclude to a reasonable
4      degree of engineering certainty that
5      Mr. Watson's injury likely took place when
6      he was near the bottom of the ladder?
7  A.  Yes.
8  Q.  Can you explain that conclusion for me,
9      please?
10 A.  Well, yes. He climbed down the ladder
11     several steps, and if he had been injured
12     halfway up the ladder I doubt very much
13     whether he would have been able to
14     successfully negotiate the rest of the
15     ladder, and he certainly wouldn't have
16     testified that when and as he got to the
17     bottom the injury occurred. He would have
18     said as I was going down the ladder or
19     something like that, but he specifically
20     testified that his foot was either on the
21     ground or just about on the ground and
22     that's when he felt the injury, became aware
23     of the injury.
24 Q.  A little bit earlier we talked about

Page 180

1      warnings. Is there a warning on the device
2      itself regarding the danger of a coasting
3      blade?
4  A.  No.
5  Q.  Should there be a warning on the device
6      itself?
7  A.  Well, again, my opinion is that warnings
8      were a second line of defense. First line
9      of defense is to design a machine which is
10     safe in and of itself as far as it can be
11     done. A warning might or might not have
12     been helpful. I can't tell you that.
13 Q.  Is there any kind of a warning on the device
14     regarding inadvertent activation?
15 A.  Not that I saw.
16 Q.  Finally, is there a warning on the device or
17     even in the owner's manual regarding whether
18     this particular device should be used while
19     climbing a ladder?
20 A.  I would have to look through that. I don't
21     believe it says anything about that in
22     there, but I would have to look through the
23     manual again. In any event, people in the
24     real world have to use ladders to sometimes