# ATTACHMENT A

```
                                                    Volume: I
                                                    Pages: 1 - 184
                                                    Exhibits: 1 - 13

              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

              **********************
              MICHAEL WATSON, INDIVIDUALLY,
              AND AS FATHER AND NEXT FRIEND
              OF JOHN WATSON, PPA,
                   Plaintiff,

                   vs.          CIVIL ACTION NO.
                                04-11782DPW

              ELECTROLUX PROFESSIONAL
              OUTDOOR PRODUCTS, INC.,
                   Defendant.
              **********************


                   DEPOSITION of LESLIE N. WILDER,
              taken on behalf of the Defendant, pursuant
              to the Federal Rules of Civil Procedure
              before Eileen Baker, Registered Professional
              Reporter and Notary Public within and for
              the Commonwealth of Massachusetts, at the
              offices of Sugarman, Rogers, Barshak &
              Cohen, P.C., 101 Merrimac Street, Boston,
              Massachusetts, on Monday, March 27, 2006,
              commencing at 10:26 a.m.


                   SHEA COURT REPORTING SERVICES
                          (617) 227-3097
```

```
APPEARANCES:

FINNERAN, BYRNE & DRECHSLER, LLP
(By Jonathan E. Tobin, Esq.)
50 Redfield Street
Boston, Massachusetts 02122
     On behalf of the Plaintiff

SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
(By David A. Barry, Esq.
and Suleyken D. Walker, Esq.)
101 Merrimac Street
Boston, Massachusetts 02114
     On behalf of the Defendant


Also Present
Lennart Gustafsson
George P. Libbares, Videographer




                SHEA COURT REPORTING SERVICES
                       (617) 227-3097
```

```
                          I N D E X

WITNESS:                  DIRECT/         CROSS/
                          REDIRECT        RECROSS

LESLIE N. WILDER
By Mr. Barry               4
By Mr. Tobin                               177



                       E X H I B I T S
NO.                                        PAGE
1     Report 9/29/05                          5
2     Profile                                 5
3     CV                                      5
4     Letter 3/24/06                         75
5     Handwritten Notes                     112
6     Handwritten Notes                     113
7     Handwritten Notes                     113
8     Handwritten Notes                     113
9     Handwritten Notes                     113
10    Handwritten Notes                     113
11    Letter 11/21/05                       134
12    Letter 3/16/06                        134
13    ANSI B7.5-1983                        143

VIDEO TESTIMONY PAGES 83-84


                SHEA COURT REPORTING SERVICES
                       (617) 227-3097
```

```
                    P-R-O-C-E-E-D-I-N-G-S
          At the offices of Sugarman, Rogers,
     Barshak & Cohen, P.C., 101 Merrimac Street
     Boston, Massachusetts, on Monday, March 27,
     2006, commencing at 10:26 a.m.
                         STIPULATIONS
          It is hereby stipulated and agreed
     by and between counsel for the respective
     parties that the reading and signing will
     not be waived.  The sealing and filing are
     waived.
          It is further stipulated and agreed
     that all objections, except objections to
     the form of the questions, and motions to
     strike will be reserved until the time of
     trial.
                    LESLIE N. WILDER,
     being first duly sworn, was examined and
     testified as follows:
                    DIRECT EXAMINATION
     BY MR. BARRY:
Q.   Would you tell us your name, please, sir?
A.   I'm Leslie Wilder, L-E-S-L-I-E, W-I-L-D-E-R.
Q.   Where do you live, Mr. Wilder?
                SHEA COURT REPORTING SERVICES
                       (617) 227-3097
```

Page 41

```
 1        can't say?
 2  A.    I can't say precisely, no.
 3  Q.    So, as far as you know he was either
 4        completely on the ladder, partially on the
 5        ladder or completely on the ground when his
 6        accident happened, and you can't say which
 7        of those possibilities is the case; is that
 8        right?
 9  A.    That's correct.
10  Q.    Was the blade coasting or was it under power
11        when Mr. Watson was injured?
12  A.    I don't know.
13  Q.    Is it equally probable in your mind that it
14        was coasting and under power?
15  A.    I can't answer the question.
16  Q.    Do you assign any greater probability to the
17        blade being coasting, on the one hand, or
18        under power on the other at the time he was
19        injured?
20  A.    I simply don't have enough information to
21        make that determination.
22  Q.    So, you simply don't know?
23  A.    I simply don't know.
24  Q.    As you sit here now it's equally probable in
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 42

```
 1        your mind the blade was coasting when he was
 2        injured as it is that it was under power
 3        when he was injured?
 4  A.    I didn't say that. I said I really don't
 5        know.
 6  Q.    When you wrote your September 29th, 2005
 7        report was it your understanding that the
 8        blade was coasting at the time he was
 9        injured?
10  A.    Yes.
11  Q.    What did you base that understanding on?
12  A.    I based it essentially on the assumption
13        that he had started down the ladder,
14        descended the ladder and then somehow at the
15        bottom or near the bottom the saw somehow
16        struck his leg, and the only way that I
17        could envision that happening at the time
18        was that the blade was still coasting.
19  Q.    What information, if any, have you received
20        since you wrote your September 29th report
21        that causes you to now not know whether the
22        blade was coasting or had power?
23  A.    Well, specifically I reviewed the videos,
24        and in viewing the videos I noticed that it
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 43

```
 1        was possible for the saw to be triggered in
 2        normal handling, which I hadn't anticipated
 3        before.
 4  Q.    What videos are you referring to?
 5  A.    There is one entitled Film Reconstruction
 6        Sweden: Descend ladder and cut leg.
 7  Q.    Is that the film that you have in mind when
 8        you say you now think it's possible that he
 9        inadvertently started the saw?
10  A.    Yes.
11  Q.    Did that film have some narration to it?
12  A.    It was in Swedish.
13  Q.    Do you speak Swedish?
14  A.    No.
15  Q.    Do you understand Swedish?
16  A.    No.
17  Q.    Did you have it translated?
18  A.    No.
19  Q.    Do you know what the man was saying as he
20        was demonstrating what was shown in the
21        video?
22  A.    No.
23  Q.    You understand that on this K2300 saw there
24        is an interlock device that requires that
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 44

```
 1        one depress a button before you can pull the
 2        trigger to start the saw?
 3  A.    Yes.
 4  Q.    Do you know whether that was operative and
 5        functional during the demonstration that you
 6        referred to?
 7  A.    I don't know that.
 8  Q.    What was it about reviewing the video that
 9        now leads you to question, if that's a fair
10        way of putting it, whether the blade was
11        coasting when Mr. Watson had his accident?
12  A.    Well, it wasn't so much that the blade was
13        coasting or that the video showed that the
14        blade was coasting. What I was referring to
15        in the video is that the blade could be
16        inadvertently powered.
17  Q.    Besides now thinking that the blade can be
18        inadvertently powered, is there any other
19        reason that causes you to question whether
20        the blade was coasting at the time of
21        Mr. Watson's accident?
22  A.    I'm not sure I can answer that completely.
23        I would think that primarily almost
24        exclusively the video demonstrated the
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 57

1  Q.  That is you don't know whether he was
2      climbing down from the ladder or whether he
3      was all the way down and on the ground?
4  A.  I don't know that.
5  Q.  Do you know where his hands were when he was
6      injured?
7  A.  Precisely, no.
8  Q.  Do you know what part of the saw, if any,
9      his left hand was on when he was injured?
10 A.  My understanding his left hand was on the
11     rear handle.
12 Q.  So, you believe that at the time of his
13     injury he had already made the switch by
14     putting his left hand which had been on the
15     front handle to the rear handle?
16 A.  I believe so, yes.
17 Q.  Do you know how long after he made that
18     switch from having his left hand on the
19     front handle to the rear handle he was
20     injured?
21 A.  No.
22 Q.  Have you performed any tests to determine
23     how the plaintiff's accident happened?
24 A.  Yes.

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 58

1  Q.  What tests did you perform?
2  A.  I did use a ladder and I did climb up on the
3      fifth step, I believe it was the fifth step,
4      and simulated going through the motions
5      without the saw running and timed myself
6      coming down and transferring hands, just as
7      he described it, to see how long I could get
8      that sequence of events. How long it would
9      take me to do that sequence of events.
10 Q.  And what saw did you use in those tests?
11 A.  The exemplar that I had which is a 12-inch
12     saw.
13 Q.  When did you obtain that exemplar?
14 A.  Early on. I don't remember precisely when,
15     but early on when I got involved in this
16     case.
17 Q.  So, you had it before your September 2005
18     report?
19 A.  Yes.
20 Q.  When did you perform the test that you just
21     described?
22 A.  I think I have it in my notes, but I don't
23     have them in front of me.
24 Q.  Was it before your September 2005 report?

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 59

1  A.  Yes.
2  Q.  I don't believe you mentioned it in your
3      report. Is there any reason why you don't?
4  A.  I'd have to look at my report. I think I
5      did mention it, but I'm not sure.
6  Q.  Maybe I'm mistaken. How much time elapsed
7      in your test?
8  A.  I think approximately nine seconds.
9  Q.  Was that test videotaped?
10 A.  No, it wasn't.
11 Q.  Did you repeat it several times?
12 A.  Yes.
13 Q.  Did you generally get nine seconds from the
14     time that you started to descend the ladder
15     to the time when you simulated his accident
16     happening?
17 A.  I believe in my notes I actually have the --
18     I think it was at least three tests, and I
19     actually have the times down, but it was
20     plus or minus whatever that averaged out to
21     about nine seconds, I believe.
22 Q.  Do you have your report there?
23 A.  I do.
24 Q.  Can you just point it to me because I ---

SHEA COURT REPORTING SERVICES
(617) 227-3097

## Page 60

1  A.  I am looking for it and I don't see it
2      myself.
3  Q.  Do you think you might have done that test
4      or those tests that you just described in
5      response to getting the defendant's expert
6      reports?
7  A.  No.
8  Q.  After they did those tests and those tests
9      were shared with you?
10 A.  No. I did it before that and I'm fairly
11     certain that in my notes will have the date
12     that I actually did it.
13 Q.  Okay.
14 A.  No, I don't see it in my report which
15     surprises me, but I don't see it.
16 Q.  Did you perform any other tests in
17     connection with your work on this case?
18 A.  I performed the coastdown test, yes.
19 Q.  What did you do in regard to that test?
20 A.  I timed how long it took the blade to stop
21     from the release of the trigger.
22 Q.  And that is in your report I believe,
23     correct?
24 A.  I believe it is.

SHEA COURT REPORTING SERVICES
(617) 227-3097

Page 61

```
 1  Q.  How long did it take for the blade to coast
 2      down from the time the trigger was released?
 3  A.  The number in my mind says 12.7 seconds.  I
 4      may or may not have that correct.
 5  Q.  Have you performed any other tests besides
 6      the ladder descending test and the coastdown
 7      time test in connection with your work on
 8      this case?
 9  A.  Yes.
10  Q.  What other tests have you performed?
11  A.  I did take a video of the startup time of
12      the saw, which was inconclusive.  It's on
13      that CD that you noticed that I said that's
14      it probably not worth copying.  It's just
15      two videos of the starting of the saw
16      lasting a couple of seconds each.  And I
17      also manipulated the saw after seeing these
18      videos to see whether I could accidentally
19      or inadvertently trigger the interlock and
20      the trigger.  I could, yes.
21  Q.  Have you now told us about all of the tests
22      that you've done in connection with your
23      work on the Watson case?
24  A.  I also handled the saw quite a bit, but --
```

Page 62

```
 1      starting and stopping it, but I can't recall
 2      any other test that I did specifically.
 3  Q.  Did you cut anything with the exemplar saw
 4      for purposes of this case?
 5  A.  Yes.
 6  Q.  What did you cut?
 7  A.  I just jammed the saw into the wood as --
 8      into a piece of wood as it was coasting to a
 9      stop a few times, just to see what would
10      result, and it wasn't -- it wasn't
11      documented to the extent that I listed what
12      the coast times were, because it was not
13      completely comparable to the accident.  I
14      just wanted to see what the effect of this
15      abrasive blade in a coastdown mode would
16      have had on a piece of wood.
17  Q.  When did you do that test?
18  A.  I did it early on before my report, and I
19      again did it after any report.
20  Q.  Did you keep notes of either of those two
21      tests?
22  A.  No.  It was just visually myself to see
23      whether the saw would stop without cutting
24      away any of the wood, and it did cut the
```

Page 63

```
 1      wood.
 2  Q.  Did you reach any conclusions from those two
 3      tests?
 4  A.  A saw blade is hazardous.
 5  Q.  Is that something you didn't know before you
 6      did the test?
 7  A.  No, I did know that, but I did want to see
 8      what it looked like and felt like.
 9  Q.  Did you learn anything new from doing the
10      test?
11  A.  No.
12  Q.  The startup time test, when did you do that?
13  A.  Within the last two or three weeks, just in
14      preparation for the deposition I was
15      thinking about it.
16  Q.  What did you do when you did the startup
17      time test?
18  A.  I videotaped the starting of the saw and
19      tried to see how long it would take before
20      it came up to speed, but my camera would not
21      -- I could not distinguish after the first
22      tenth or so of a second what speed the saw
23      had reached, and it just indicated to me
24      that the saw came up to speed very quickly
```

Page 64

```
 1      and in all likelihood it reached its final
 2      speed in probably less than three tenths of
 3      a second or something like that.
 4  Q.  Why did you do that test?
 5  A.  Because I anticipated being questioned about
 6      some lurch or jerkiness if a blade brake was
 7      installed on the saw, and I wanted to make
 8      sure that the saw didn't take -- although I
 9      knew it didn't, I just wanted to reassure
10      myself that it didn't take more than two or
11      three seconds to start up and reach full
12      speed.
13  Q.  Did you reach any conclusion about how long
14      it took for the blade to reach full speed?
15  A.  Yes.  Without being sure of it, it seemed to
16      me clearly less than one second.
17  Q.  How does the startup time relate, if it does
18      relate, to the issue of a blade brake?
19  A.  Well, the startup is apparently acceptable
20      in terms of operators being able to handle
21      the saw and not having it lurch
22      uncontrollably when they start, and
23      therefore, if the blade were to be braked in
24      the same or longer time period, then that
```

**Page 69**

1 A. I don't know.
2 Q. And Dewalt I think you point out has a
3    portable circular saw with a blade brake?
4 A. Yes.
5 Q. Do you know whether Dewalt advertises its
6    blade brake as a safety device?
7 A. I have not exhaustively looked into the
8    advertising to see whether or not they
9    advertise it, but it's common in the
10   industry and you can see it in many of the
11   groups on the web, where users will say I
12   will not operate or buy a saw without a
13   blade brake for safety reasons.
14        I will add to that statement that
15   although I don't know about the advertising,
16   I do know that in some of the operator's
17   manuals on these saws it's clearly indicated
18   that if the brake is not functional that the
19   saw should be repaired, because it can be
20   hazardous.
21 Q. Have you ever performed any tests to
22   determine how fast the abrasive blade that
23   was on Mr. Watson's saw would need to be
24   traveling in order to produce the injury

**Page 70**

1    that he sustained?
2 A. I don't know that that could be done,
3    because it would be a function of both how
4    fast it's traveling and how much force it
5    impacts the body with.
6 Q. Is the answer to my question no, that you
7    haven't performed such tests?
8 A. I have not performed those tests, to answer
9    the specific question you asked.
10 Q. Do you know, speaking of force, whether
11   there was any force applied to the saw just
12   before it contacted, just before the blade
13   contacted Mr. Watson's leg?
14 A. Other than inertia loading of the ---
15        MR. TOBIN: Just note my objection.
16   You can answer if you understand the
17   question. Force of blade of the saw.
18 Q. For example -- let me clarify my question --
19   did the saw swing into Mr. Watson's leg?
20   Was the saw with the spinning blade dropped
21   onto his leg, in which case the force I
22   think would be gravity that would be applied
23   to the saw. Did somebody shove the saw into
24   his leg? That's what I mean.

**Page 71**

1    Do you know or do you have an
2    opinion as to whether any force from any
3    source was applied to the saw immediately
4    before it contacted his leg?
5 A. I don't know that.
6 Q. And you certainly don't know the degree of
7    force, if any, that was on the saw when the
8    blade contacted his leg, correct?
9 A. That's correct.
10 Q. You didn't conduct any tests to determine
11   that?
12 A. No.
13 Q. And you didn't do any test to determine how
14   much energy had to be in an abrasive blade
15   at the time of Mr. Watson's injury in order
16   to produce the injury, correct?
17 A. The reason I didn't do those tests -- and I
18   did not do those tests -- is because the
19   variables are too great. Exactly where it
20   struck his leg, exactly what the contraction
21   of his muscles might or might not have been
22   would have affected how deeply the saw could
23   penetrate. I don't know whether it struck
24   some bone in his leg and then veered off or

**Page 72**

1    whether it hit a particularly vulnerable
2    spot behind the knee.
3        And everyone's body is going to be
4    different, and the degree of muscle tension
5    would be different. The angle at which the
6    saw would have hit the body could be
7    different.
8        The variables are just so great
9    that I don't think it would be possible to
10   do that kind of a test, but I was convinced
11   that in the coastdown process this saw, if
12   it impacted his body with any degree of
13   force, could certainly have done the damage
14   it did, and the result is the saw did do the
15   damage.
16 Q. Did you reach an opinion that there was a
17   coastdown time that would be too long to
18   cause his injury? Do you understand my
19   question?
20 A. I do understand your question and -- I think
21   I understand it.
22 Q. Well, I'm going to give you an example. If
23   you say the coast downtime is approximately
24   12 seconds, in other words, the time between

Page 73

```
 1        when you release your finger from the
 2        trigger and when the blade stops completely,
 3        if the blade had been coasting for 11
 4        seconds -- just to choose an example --
 5        before it contacted his leg, would that be
 6        too long a coastdown period to produce the
 7        injury that he had had?  That's the kind of
 8        question that I am asking.
 9   A.   Well, I can only answer that question in
10        terms of probabilities.  The probabilities
11        become less the longer the coastdown time,
12        but given a sufficient impact I would
13        imagine you could get a laceration, even if
14        you had a coastdown time of 11 seconds --
15        I'm sorry, if the actual coastdown time was
16        11 seconds and the unrestrained coastdown
17        would be 12 or 13 seconds.
18             It's a matter of how hard the blade
19        hit the body to determine whether there
20        would or would not have been an injury and
21        to what degree the injury, what extent an
22        injury would have occurred.
23   Q.   You say you imagine that that's the case,
24        but you haven't done any test to confirm
```

Page 74

```
 1        that, have you?
 2   A.   I would change the word imagine to say I'm
 3        quite sure that I could drive that saw into
 4        my leg after an 11-second coastdown and do
 5        some damage to my skin or leg.
 6   Q.   You haven't done any test to confirm what
 7        you have just said?
 8   A.   No, I did not.
 9   Q.   Do you know the rate at which the blade
10        loses energy during the coastdown period?
11   A.   I did see a chart, I believe Dr. Funk put
12        together, but I don't remember any of the
13        details of it, but clearly it loses energy
14        as it slows down.
15   Q.   And do you know whether that rate is an
16        arithmetic rate or geometric rate?
17   A.   It goes as the square of the velocity.
18   Q.   So, if the coastdown time, for example, is
19        12 seconds, it would lose, the blade would
20        lose more than half of its speed at the end
21        of six seconds of coasting?
22   A.   Yes.
23   Q.   Did you do any tests that were designed to
24        determine whether Mr. Watson's injury
```

Page 75

```
 1        occurred while the blade was coasting or
 2        under power?
 3   A.   No.
 4   Q.   I think you told me if this was a coasting
 5        blade that produced his injury you didn't
 6        perform any test to determine the energy
 7        required to produce the injury, correct?
 8   A.   That's correct.
 9   Q.   Now, if the saw instead of, if the blade
10        instead of coasting were under power when he
11        was injured, do you know for what period of
12        time it had been under power?
13   A.   I don't think anybody would know that.
14   Q.   So, if it was under power you can't say for
15        how many seconds it was under power,
16        correct?
17   A.   That's correct.
18   Q.   Now, let's talk about this idea of possible
19        inadvertent activation of the saw that you
20        mentioned in your recent letter.
21             MR. BARRY:  Let's get this marked.
22             (Exhibit No. 4 Letter 3/24/06
23        marked for identification.)
24             (Document handed to witness.)
```

Page 76

```
 1   Q.   Can you identify what we've marked as
 2        Exhibit 4?
 3   A.   Yes.  That's a letter that I submitted to
 4        Mr. Tobin on March 24th.
 5   Q.   Describe the circumstances leading up to
 6        your writing of that letter, if you would.
 7   A.   I was reviewing the file in preparation for
 8        this deposition, and in doing so I reviewed
 9        the videos that were submitted, and in
10        reviewing the videos and considering the
11        length of time, the coasting time versus the
12        injury and seeing that the saw could be
13        inadvertently or could be operated by
14        depressing the interlock button during
15        manipulation of the saw, led me to the
16        conclusion that this was an alternative
17        scenario that I was -- I did not consider
18        strongly enough when I wrote my report.
19   Q.   Was there any conversation that you had with
20        Mr. Tobin within the last week to 10 days in
21        which Mr. Tobin suggested to you that I
22        expected that the opinions that you would
23        testify to at your deposition would be the
24        ones that you disclosed in your September
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

### Page 77

1  report and no others?  Did you have any
2  conversation along those lines?
3  A. He did mention to me that that would have
4  been something that you would have expected,
5  yes.
6  Q. Did he ask you whether you had any other
7  opinions that you might be talking about
8  besides the ones that were in the September
9  2005 report?
10 A. I don't think so, no.  I'm not sure I
11 understand your question.
12 Q. When Mr. Tobin suggested that it was going
13 to be my expectation that you would only
14 talk about and would only have opinions that
15 were disclosed in your September 2005
16 report, how did that prompt you, if it did
17 prompt you, to issue this new letter that
18 we've marked Exhibit 4?
19 A. I think the circumstances were the reverse
20 of what you have just postulated.  I
21 informed Mr. Tobin that I had an additional
22 opinion.
23 Q. I see.  That additional opinion is set forth
24 in Exhibit 4, your letter to Mr. Tobin?

### Page 78

1  A. Yes.
2  Q. Then maybe you can just tell me what that
3  additional opinion is.
4  A. That there is a possibility that the saw was
5  powered after he had started his descent
6  down the ladder, and that it might have been
7  under power shortly before his accident.
8  Q. Now, you say in the fifth paragraph down in
9  your letter -- and you have a copy of it in
10 front of you?
11 A. Yes.
12 Q. The sentence -- it's one sentence -- the
13 sentence begins, "In such an event had there
14 been a blade brake it is more likely than
15 not that his injury would not have occurred
16 or would have been less severe."
17    The event that you're referring to
18 is the inadvertent operation of the saw,
19 correct?
20 A. Yes.
21 Q. And that's described in the prior paragraph?
22 A. Yes, and perhaps it isn't a hundred percent
23 clear.
24 Q. It's not clear.  Maybe you can explain to me

### Page 79

1  how if he inadvertently turned the saw on a
2  blade brake is going to prevent his
3  accident?
4  A. I should have been clearer.  What I meant
5  there is an inadvertent momentary operation
6  of the saw.
7  Q. So, now you're hypothesizing that he
8  inadvertently turned the saw on, but then
9  turned it off?
10 A. Well, not turned it on and off, but
11 accidentally or inadvertently caused it to
12 go on and just as inadvertently or
13 accidentally or that it was just possibly a
14 momentary trigger of the saw, and it
15 wouldn't have maintained power.
16    I don't know what took place.  So,
17 it's possible that the saw was turned on and
18 it remained on until his injury occurred, in
19 which case the second sentence doesn't
20 really make sense.  But what I meant there
21 was if he had triggered it accidentally and
22 the triggering was a momentary trigger, the
23 blade brake would still have had the proper
24 effect of slowing it down.

### Page 80

1  Q. But you have no evidence that he
2  inadvertently turned it on and then just as
3  inadvertently turned it off, do you?
4  A. I'm trying to cover what the possible events
5  were leading up to this accident, and I
6  don't know what precisely happened and I'm
7  trying to cover the alternatives.  This is
8  one alternative.
9  Q. You can't say to a reasonable degree of
10 engineering certainty that Mr. Watson
11 inadvertently activated the saw, can you?
12 A. I can say to a reasonable degree of
13 engineering certainty it's certainly
14 possible that he did so.  Whether he did or
15 not, I don't know.
16 Q. And you can't say to a reasonable degree of
17 engineering certainty whether the blade was
18 coasting or under power at the time of his
19 injury, correct?
20 A. No, I cannot say that.
21 Q. When did you first consider the possibility
22 of whether Mr. Watson inadvertently started
23 the saw?
24 A. After seeing the videos.